Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, MONTANA ENVIRONMENTAL INFORMATION CENTER, FRIENDS OF THE EARTH, and WATERKEEPER ALLIANCE, INC., | Case No. CV-21-47-GF-BMM |
| Plaintiffs, | |
| v. | **Complaint for Declaratory and Injunctive Relief** |
| LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity, and U.S. ARMY CORPS OF ENGINEERS, | |
| Defendants. | |

**INTRODUCTION**

1.      This case involves the U.S. Army Corps of Engineers' 2021 issuance of Nationwide Permit 12 (NWP 12), a general permit issued for oil and gas pipelines projects pursuant to Section 404(e) of the Clean Water Act. The Corps violated the Endangered Species Act, the National Environmental Policy Act, the Clean Water Act, and the Administrative Procedure Act by issuing NWP 12 without adequately assessing its significant direct, indirect, and cumulative environmental effects.

2.      NWP 12 provides a streamlined process to permit oil and gas pipelines to cross rivers, streams, and wetlands. Projects using NWP 12 may proceed without undergoing the comprehensive environmental review ordinarily required by Section 404(a) of the Clean Water Act, and there is no opportunity for public involvement when projects are approved under NWP 12. The Corps estimates that NWP 12 will be used 9,560 times per year (including 8,110 reported uses and 1,450 unreported uses), or an estimated 47,800 times over its expected five-year duration, resulting in direct impacts to over 3,000 acres of U.S. waters.

1

2021 NWP 12 Decision Document at 108.[1] Aside from causing direct, indirect, and cumulative impacts to U.S. waters, NWP 12 activities also cause environmental harm from oil and gas spills and global climate change.

      3.     The 2021 NWP 12 replaces the 2017 iteration of the permit. In previous litigation over the 2017 NWP 12, this Court ruled that the Corps violated the Endangered Species Act (ESA) by failing to undertake programmatic ESA Section 7 consultation with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (together, the "Services") to consider the cumulative adverse environmental effects of discharges on protected species and their critical habitat. *Northern Plains Resource Council et al. v. U.S. Army Corps of Engineers*, No. 4:19-cv-00044 (D. Mont.), appeal pending, No. 20-35412 (9th Cir.). The Court declared the permit unlawful and remanded it to the Corps for compliance with the ESA. The Court declined to rule on claims brought under the National Environmental Policy Act (NEPA) and the Clean Water Act (CWA), stating that the Court "anticipates that the ESA Section 7(a)(2) consultation will inform" the Corps' NEPA and CWA assessments of NWP 12's environmental

---

[1] The Corps' Decision Document for NWP 12 provides the public interest review required by Corps regulations at 33 CFR 320.4(a), as well as the Corps' environmental assessment of NWP 12 pursuant to the National Environmental Policy Act. *See* U.S. Army Corp of Engineers, Decision Document Nationwide Permit 12 (Jan. 4, 2021). Available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/16834

effects. *Northern Plains Resource Council et al. v. U.S. Army Corps of Engineers*, 454 F. Supp. 3d 985, 994-96 (D. Mont. 2020).

4.     Despite this ruling, the Trump administration refused to initiate ESA consultation on the 2017 NWP 12. Instead, it subsequently proceeded to reauthorize several of the Nationwide Permits—including NWP 12—to replace the 2017 permits. On January 13, 2021, just days before President Trump left office and well before the scheduled expiration of the 2017-2022 NWPs, the Corps authorized a new version of NWP 12.[2]

5.     The Corps, flouting this Court's ruling on the 2017 NWP 12, once again determined that the issuance of the 2021 NWP 12 has "no effect" on listed species. In doing so, the Corps reiterated the same erroneous argument previously rejected by this Court, contending that programmatic consultation is not required because all NWP 12 projects that "may affect" listed species are subject to project-specific consultation and therefore the issuance of NWP 12 has "no effect" on listed species.

6.     The Corps' "no effect" determination is inconsistent with applicable regulations, which require consultation at both the programmatic and project-

---

[2] While the 2017 NWP 12 applied to all "utility lines," the 2021 iteration only applies to oil and gas pipelines. Other uses of the 2017 NWP 12 (including water lines, sewer lines, and electronic transmission lines) are now covered by separate NWPs. *See* 86 Fed. Reg. at 2769.

specific stages for NWP 12. *See* 50 C.F.R. § 402.14(c)(4) (project-specific

consultation "does not relieve the Federal agency of the requirements for

considering the effects of the action as a whole"); *see also* 84 Fed. Reg. 44,976,

44,997 (Aug. 27, 2019) (confirming the ESA requires programmatic consultation

even if specific projects developed in the future are subject to site-specific

consultation).

      7.    The Corps' repeated failure to consult with the Services when issuing

NWP 12 is therefore an egregious violation of one of the most vital safeguards of

the ESA. As this Court previously found, the Corps is "well aware" that the

reauthorization of NWP 12 requires such consultation; there is "resounding

evidence" that the reissuance of NWP 12 "may affect" listed species; and

programmatic review "provides the only way to avoid piecemeal destruction of

species and habitat." *Northern Plains*, 454 F. Supp. 3d at 990-94.

      8.    In reissuing NWP 12, the Corps also refused to make any meaningful

changes to its CWA or NEPA analyses, even though this Court anticipated the

Corps would do so on remand.

      9.    NWP 12 continues to violate the CWA. CWA Section 404(e) allows

the Corps to issue nationwide permits only for activities that will have "minimal

adverse environmental effects" and will cause only "minimal cumulative adverse

effect on the environment." 33 U.S.C. § 1344(e)(1). NWP 12, however, authorizes

4

activities that *will* cause more than minimal adverse environmental effects, either individually or cumulatively.

10.    The Corps allows oil and gas pipelines to use NWP 12 repeatedly for each water crossing along a project's length, with no limit to the number of times a pipeline can use NWP 12 or the total number of acres of wetlands that a project can impact. NWP 12 thereby allows the Corps to artificially treat large interstate pipeline projects as hundreds or even thousands of separate "single and complete projects" to avoid the more transparent and thorough individual permit process required by Section 404, which includes public notice and comment and an analysis of the project's overall impacts and alternatives pursuant to NEPA and the CWA. This use of NWP 12 causes more than minimal direct and cumulative adverse environmental effects in violation of CWA Section 404(e).

11.    The Corps' inadequate environmental analysis for NWP 12 also violates NEPA. The Corps does not prepare any project-level NEPA analysis for NWP 12 projects because it purports to have discharged its NEPA obligations upon issuance of an environmental assessment and finding of no significant impact for NWP 12 as a whole (the "NWP 12 EA," which is set forth in the NWP 12 Decision Document). The NWP 12 EA constitutes the Corps' only NEPA analysis for projects permitted by NWP 12.

12.    The Corps' EA violates NEPA by failing to adequately evaluate the environmental impacts of pipeline projects permitted by NWP 12. The EA fails to adequately analyze the direct, indirect, and cumulative impacts associated with approving major oil pipelines under NWP 12, such as the effects of numerous water crossings, impacts from the creation of pipeline rights-of-way (including the removal of high-quality forested wetlands), or the pipelines' contribution to climate change. And the EA does not evaluate the specific risks or impacts of oil spills into waterways from pipelines at all. In fact, the analysis in the NWP 12 EA is the same boilerplate language contained verbatim in the decision documents for each of the other NWPs. The Corps has therefore failed to take the "hard look" at the environmental impacts of NWP 12 activities, as NEPA requires.

13.    To the extent that the Corps limited its analysis of the environmental impacts of NWP 12 by ignoring indirect and/or cumulative impacts—including the cumulative impacts of thousands of NWP 12 activities per year and spills from NWP 12-authorized pipeline projects—in reliance on regulations adopted by the Council on Environmental Quality (CEQ) in July 2020, 85 Fed. Reg. 43304 (July 16, 2020), such reliance on those regulations violates the plain language of NEPA. *See* 42 U.S.C. § 4332(2)(C) (requiring an evaluation of "*any* adverse environmental effects which cannot be avoided should the proposal be

implemented," which must examine "the environmental impact of the proposed action" "*to the fullest extent possible*") (emphasis added).

14.    Plaintiffs therefore seek a declaration that the Corps' issuance of NWP 12 violated the ESA, NEPA, the CWA, and the APA, as well as vacatur of the permit.

## JURISDICTION AND VENUE

15.    This case arises under the Endangered Species Act, 16 U.S.C. §§ 1531-1544; the Clean Water Act, 33 U.S.C. §§ 1251 et seq., including § 1344(b) (application of Corps guidelines in permit determinations), § 1344(c) (prohibition of discharge of dredged or fill material that will have an unacceptable adverse effect), and § 1344(e) (setting forth circumstances in which the Corps can issue nationwide permits); the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. This court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (review of agency action under the APA); 16 U.S.C. §§ 1540(c), (g) (actions arising under the ESA citizen suit provision); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. §§ 2201-02 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy). The court may grant

7

the relief requested under the ESA, 16 U.S.C. § 1540(g), the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 2201-02 (declaratory and injunctive relief).

16.     By written notice to Defendants dated February 8, 2021, Plaintiffs provided notice of intent to file suit more than sixty days prior to the filing of this complaint, as required by the ESA. 16 U.S.C. § 1540(g). Plaintiffs' notice letter demanded that Defendants initiate and complete programmatic ESA consultation on NWP 12. Defendants failed to respond or remedy the alleged violations, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. § 2201(a).

17.     Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1) because NWP 12 provides CWA section 404 authorization for oil and gas pipelines that will be constructed in this district and because Plaintiff MEIC resides in this district.

## PARTIES

### Plaintiffs

18.     Plaintiff Center for Biological Diversity (the Center) is a national nonprofit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 87,000 members and more than 1.7 million online supporters worldwide. The Center has worked for decades to safeguard water and aquatic

habitats for people, plants, and animals. One of the Center's main goals is to protect the habitats and communities that may be adversely affected by fossil fuel infrastructure projects, such as oil and gas pipelines that utilize NWP 12. The Center's members and staff value and benefit from rare species' continued existence in the wild and are harmed by industrial development and associated trends like global climate change and water degradation that threaten wild species' survival and recovery. The Center has worked for years to protect imperiled species that will be harmed by NWP 12 projects, including migratory birds that rely on waterways—such as the critically endangered whooping crane—and imperiled fish that rely on rivers crossed by NWP 12 projects, including endangered pallid and Atlantic sturgeon.

19.    Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. The Sierra Club has over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in every state. The Sierra Club's concerns encompass the protection of

wildlands, wildlife and habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by NWP 12.

20.    Plaintiff Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, the reduction of greenhouse gas pollution as a means to ameliorate the climate crisis, and the land, air, water, wildlife, and communities impacted by the development of fossil fuels and related infrastructure, including oil and gas pipelines. MEIC members live, work, and recreate in areas, including rivers, streams, and wetlands, that will be adversely

10

impacted by the construction and operation of oil and gas pipelines authorized by
NWP 12.

21.     Plaintiff Friends of the Earth (FoE) is a tax-exempt, 501(c)(3)
organization and a not-for-profit corporation. It has offices in Berkeley, California
and Washington, DC, where it is incorporated. Friends of the Earth is a
membership organization consisting of over 120,000 members across all 50 states.
Additionally, Friends of the Earth has more than 1.5 million activist supporters on
its email list throughout the United States. It is also a member of Friends of the
Earth International, which is a network of grassroots groups in 74 countries
worldwide. Its mission is to protect our natural environment, including air, water,
and land, to achieve a healthier and more just world, using public education,
advocacy, legislative processes, and litigation. Friends of the Earth is concerned
about the adverse environmental and socio-economic impacts that climate change
and fossil fuel development have, including harms to air quality, climate, imperiled
species, the health of local communities, and precious groundwater resources.
Therefore, on behalf of its members and activists, Friends of the Earth's Climate &
Energy Program actively engages in advocacy to curb new oil and gas leases as
well as influence policy and law governing fossil fuel development. Ending
destructive pipeline development is one of FoE's top priorities.

22.     Plaintiff Waterkeeper Alliance, Inc. (Waterkeeper) is a not-for-profit corporation organized under the laws of, and headquartered in, New York. Waterkeeper is a member-supported, international environmental advocacy organization whose mission is to strengthen and grow a global network of grassroots leaders protecting everyone's right to clean water. Composed of approximately 350 member and affiliate organizations around the world, as well as more than 15,000 individual supporting members, Waterkeeper's goal is drinkable, swimmable, and fishable water everywhere. Under its Clean Water Defense campaign, Waterkeeper fights attempts to weaken environmental laws, regulations, and permits, while promoting stronger legal safeguards for the world's water resources on behalf of Waterkeeper's member and affiliate organizations and all of our respective individual members. Waterkeeper holds polluters accountable and advocates for vigilant enforcement of environmental laws.

23.     In bringing this lawsuit, Plaintiffs stand in the shoes of members who live, work, and recreate in places threatened by NWP 12 and who use, study, and cherish the land, water, wildlife, and other resources that will be irrevocably damaged by NWP 12-authorized activities. Plaintiffs have numerous members who live in areas directly affected by NWP 12 activities, and Plaintiffs' members and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by NWP 12-authorized activities.

24.    NWP 12 has been, and will continue to be, used across the country to permit the construction of oil and gas pipelines through rivers, streams, and wetlands, causing construction-related harm through sediment deposition and habitat loss and fragmentation, as well as leaks and spills that devastate waterways that people and wildlife rely on, including members of the Plaintiff organizations.

25.    Plaintiffs have members throughout the country who rely on waterways likely to be crossed by NWP 12 projects for drinking water and/or irrigation. Oil spills from such projects pose significant risks for Plaintiffs' members whose water supplies would be adversely affected by NWP 12 activities.

26.    Plaintiffs also have members whose interests are adversely affected by direct, indirect and cumulative harm from NWP 12-authorized activities to aquatic, riparian, and upland habitat areas that such members use and enjoy, including as habitat for ESA-listed wildlife. For example, oil spills from NWP 12 activities harm listed species that Plaintiffs' members study and enjoy—such as endangered fish and migratory birds—through crude oil ingestion, oiling of plumage, bioaccumulation of contaminants, and oil transfer to eggs and young, which could in turn result in mortality, reduced reproductive success, deformities, and developmental delays.

27.    The past use of NWP 12 for pipeline projects—including major projects such as the proposed Keystone XL pipeline, the Mountain Valley pipeline,

13

the now defunct Atlantic Coast Pipeline, and the Dakota Access pipeline—
demonstrates that this permit will be used thousands of times to construct pipelines
in waterbodies across the country, resulting in harm to rivers, streams, wetlands,
and the wildlife and communities that rely on those waterways, thereby harming
the interests of Plaintiffs' members who live near, study, and/or enjoy areas
affected by NWP 12.

28.     NWP 12 has been used, and is likely to continue to be used, for oil
pipelines intended to move crude from the Bakken Formation in Montana and
North Dakota as well as tar sands oils from Alberta, Canada to refineries and/or
export terminals in the U.S. These projects often must cross hundreds of
waterways, including rivers that provide public water supply and habitat for listed
species. For example, several pipeline projects have been constructed or proposed
from Montana, North Dakota and/or Canada across the Missouri and Platte Rivers
in Montana and Nebraska to reach refineries along the Gulf Coast. These river
systems are home to the endangered pallid sturgeon and are relied upon by
protected migratory birds, including the iconic whooping crane. Construction-
related habitat degradation and oil spills would devastate critically imperiled
species, thereby harming Plaintiffs' members who study them and/or enjoy their
existence in the wild. Likewise, massive gas pipeline projects across the southeast
U.S. that have proposed using NWP 12, such as the Mountain Valley and Atlantic

Coast pipelines, threaten water supplies and listed species and the habitats they rely on, including the endangered Roanoke logperch and candy darter, which are also studied and enjoyed by Plaintiffs' members.

29.    NWP 12 therefore threatens the use, enjoyment, and economic value of property owned by Plaintiffs' members, as well as the waters that members use and enjoy both as a resource and for the habitat they provide for plants and animals. For example, a spill from an NWP 12-approved pipeline on or near a member's land would interfere with use and enjoyment of the area, threaten water supplies, and decrease property values. Similarly, the negative ecological effects of pipeline construction through streams and rivers—such as increased sedimentation, oil spills, and other harm to protected species—would interfere with members' use and enjoyment of those waterways and the wildlife they support.

30.    Plaintiffs' members have researched, studied, observed, and sought protection for endangered species that are adversely affected—and whose survival and recovery are threatened—by NWP 12-authorized activities. Plaintiffs' members and staff have visited and observed or sought out threatened and endangered species that are imperiled by NWP 12, and enjoy hiking, fishing, and observing wildlife in wetlands and along rivers and streams that are impacted by NWP 12 activities. Plaintiffs' members intend to continue to visit and observe, or attempt to visit and observe, these species in the near future.

15

31.    Plaintiffs' members derive scientific, recreational, spiritual, and aesthetic benefits from imperiled species' existence in the wild. Their interest in maintaining the species inhabiting rivers, streams, and wetlands that may be affected by NWP 12 activities is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations. Any activities that "may affect" or destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace populations of listed species, interfere with Plaintiffs' members' use and enjoyment of the areas and species.

32.    Plaintiffs' members include scientists who study various threatened and endangered species, and whose interests in studying and enjoying these species and their habitats are entirely dependent on the continued existence of such species. Any action that interferes with and harms these species also harms those members' interests and enjoyment in studying those species. Any loss of individuals or habitat from NWP 12 activities would hamper their ability to undertake such research in the future, thereby harming their academic and aesthetic interests in those species.

33.    The Corps' failure to ensure, through ESA consultation, that the NWP 12 program will not jeopardize protected species directly and irreparably injures Plaintiffs' interests in such species. The Corps' failure to comply with the requirements of the ESA delays, avoids, and undermines protections that are

necessary to secure Plaintiffs' interests in the existence of listed species and their critical habitat.

34.     The Corps' failure to comply with the ESA and its decision to delegate to permit applicants the threshold determination as to whether their use of NWP 12 may even affect a listed species means that Plaintiffs and their members may never even learn about—let alone be in a position to seek to ameliorate—the impacts of NWP 12 projects on listed species and critical habitats of vital interest to Plaintiffs and their members.

35.     The Corps' unlawful issuance of NWP 12 also facilitates (and is designed to facilitate) the construction and use of major oil and gas pipelines that contribute to greenhouse gas emissions that cause catastrophic climate change. This will have a significant cumulative effect on greenhouse gas emissions, which were completely ignored by the Corps when it issued NWP 12. Such emissions seriously harm Plaintiffs' members by exacerbating the climate crisis, which increases the risks of, *inter alia*, habitat and property loss, drought, flooding, disease, and wildfires.

36.     Plaintiffs have also suffered procedural and informational injuries from Defendants' violations. These injuries are connected to Plaintiffs' substantive recreational, scientific, spiritual, and aesthetic interests. Plaintiffs' members and staff rely on Defendants to comply with the requirements of the ESA, NEPA, and

the CWA. Plaintiffs rely on these laws to achieve their organizational purposes,

including monitoring the impacts of agency actions on the environment and listed

species; monitoring legal compliance concerning environmental management;

educating members, directors, staff, and the public concerning species

management and the state of the environment; and advocating for policies that

protect habitats and wildlife.

37.    Plaintiffs are also injured through impairment of their fundamental

missions to protect the environment and imperiled species, and diversion of

resources from other critical tasks that would not have been necessary absent the

Corps' actions. Because many NWP 12-authorized activities  proceed without any

notification to the Corps and even when such notification is provided there is no

public notice or opportunity for public engagement, Defendants' failure to comply

with the ESA, NEPA, and the CWA has caused, and will continue to cause,

Plaintiffs to divert and expend resources and staff—which would have instead been

expended on other organizational conservation priorities—to learn about the

effects of NWP 12 on the environment and listed species, including through having

to repeatedly make Freedom of Information Act requests and review documents

obtained from such requests, monitoring the application of NWP 12 to specific

projects in other ways (such as by contacting individual Corps offices), and

examining NWP 12 projects in an effort to ascertain the effects of NWP 12-

authorized projects on specific waterways, habitats, and species in which Plaintiffs and their members have vital interests.

38.     Plaintiffs are non-profit conservation organizations with limited resources that can be dedicated to their core mission to protect the environment, imperiled species, and the habitats they rely on. Defendants' actions impede Plaintiffs' ability to carry out their fundamental missions, and directly undercuts decades of successful work by Plaintiffs to enforce environmental laws that protect waterways and listed species.

39.     Defendants' actions have also stifled the flow of data on impacts to the environment from pipeline construction that are vital to Plaintiffs' efforts to conserve and protect the environment. The Corps' failure to consult with the Services on NWP 12 and to comply with its NEPA and CWA obligations is therefore harming, and will continue to harm, Plaintiffs by interfering with Plaintiffs' core organizational missions and by requiring them to divert their limited resources and personnel away from other activities in an attempt to fill the gap left by the Corps.

40.     The Corps' unlawful issuance of NWP 12 also seriously impairs the Plaintiff organizations' core conservation missions because it authorizes major pipeline projects that otherwise would be required to apply for individual permits, thereby triggering the Corps' affirmative duty to publicly disclose information

regarding such projects and their adverse impacts. The Corps' violations mean that instead of receiving such information in the ordinary course of individual permit processing and having an opportunity for public comment on individual permit applications, Plaintiffs must instead attempt to learn through other means precisely when and where NWP 12 is being invoked, with no assurance of ever being able to uncover such information in a timely and effective manner. This constitutes a serious organizational and informational injury that flows directly from the Corps' unlawful issuance of a nationwide permit covering major oil and gas pipelines that, under the law and based on the record before the Corps, have more than minimal effects on the environment and thus require individual section 404 permits.

41.    These are actual, concrete injuries to Plaintiffs, caused by the Corps' failure to comply with the ESA, NEPA, the CWA, and implementing regulations. The interests and organizational purposes of Plaintiffs and members are directly and irreparably injured by Defendants' violations of law as described in this Complaint. Unless this Court grants the requested relief, harm to the environment and protected species will continue to accrue, and the aesthetic, recreational, educational, professional, scientific, spiritual, and conservation interests of Plaintiffs and their staff and members will continue to be adversely affected.

42.    The relief Plaintiffs seek in this lawsuit will redress their injuries by requiring the Corps to comply with the ESA, NEPA, and the CWA. This relief will

ensure that the Corps fully evaluates the direct, indirect, and cumulative impacts of oil and gas pipelines before deciding whether that category of activities qualifies for NWP authorization. This relief will also prevent Plaintiffs from being harmed by NWP 12-authorized activities and give Plaintiffs and their members more comprehensive and complete information by relegating major pipelines to the individual permit process and, at the very least, by requiring the Corps to provide Plaintiffs and their members with more information regarding NWP 12's threats to waterways, protected species, and other valued resources. It will allow Plaintiffs, their members and supporters, and others who are concerned about NWP 12 activities, to participate more effectively in individual permit processes and, at the very least, advocate more effectively for changes to mitigate the adverse impacts of NWP 12 (including but not limited to measures designed to protect wetlands and waterways and reduce the impacts of oil spills). The relief sought by Plaintiffs will also help ensure that listed species will not be jeopardized by the NWP 12 program, as the ESA requires.

## **Defendants**

43.    Defendant U.S. Army Corps of Engineers (Corps) is the federal agency charged with administering permits under Section 404 of the CWA for discharge of dredged or fill material into the waters of the United States. The Corps is headquartered in Washington, D.C. and has three regulatory offices in Montana.

44.     Defendant Scott A. Spellmon is Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers headquartered in Washington, D.C., and is designated to act for the Secretary of the Army. Plaintiffs bring this action against Lieutenant General Spellmon in his official capacity only. Lieutenant General Spellmon is the federal officer personally responsible for compliance with any injunction that this Court issues.

## LEGAL BACKGROUND

## The Clean Water Act and NWPs

45.     The CWA was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, Section 404 of the CWA prohibits the discharge of any pollutant, including dredged soil or other fill material, into navigable waters unless authorized by a permit. *Id.* §§ 1311, 1344.

46.     Section 404 of the CWA gives the Corps primary responsibility for permitting construction activities that involve dredge and fill of U.S. waters. *Id.* § 1344(a), (d). The Corps oversees the Section 404 permit process and must comply with guidelines promulgated by the U.S. Environmental Protection Agency (EPA), which are incorporated into the Corps' own regulations. *Id.* § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The objective of these "404(b)(1) guidelines," set forth at 40 C.F.R. Part 230, is to prevent unacceptable adverse

22

impacts to the nation's aquatic ecosystems from the discharge of dredged or fill material. 40 C.F.R. § 230.1(c).

47.     CWA Section 404(e) allows the Corps to, "after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). NWPs can last up to five years, at which point they must be reissued or left to expire. *Id.* § 1344(e)(2); 33 C.F.R. §§ 330.5, 330.6(b). NWPs are "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." *Id.* § 330.1(b).

48.     The Corps must evaluate the cumulative effects of the activities proposed to be covered by a NWP before it is issued. *See, e.g.*, 33 U.S.C. § 1344(e)(1); 33 C.F.R. § 323.2(h); 33 C.F.R. § 320.4; 40 C.F.R. § 230.7(b).

49.     Once an NWP is issued, specific projects that meet the terms and conditions of that NWP may proceed without obtaining an individual Section 404 permit. Projects permitted via an NWP are not subject to public participation, and do not go through the more comprehensive, site-specific environmental- and

23

public-interest review individual Section 404 permits require. *See* 33 C.F.R. § 323.3(a).

50.     In most cases, permittees may proceed with activities authorized by NWPs without notifying the Corps at all. *Id.* § 330.1(e)(1). However, in some cases permittees must notify Corps district engineers of their projects through submission of a preconstruction notification (PCN) and await verification before the project may proceed under the NWP. *Id.* §§ 330.1(e)(1), 330.6(a).

51.     If, upon receiving a PCN, the district engineer decides that an activity does not comply with the terms or conditions of an NWP, the district engineer must deny verification and require an individual Section 404 permit. *Id.* § 330.6(a)(2).

52.     If the district engineer determines that an activity does comply with the terms and conditions of an NWP, the district engineer will notify the applicant that the project is verified under the NWP. *Id.* § 330.6(a)(3). The district engineer may add conditions on a case-by-case basis to ensure the activity will have only minimal individual and cumulative adverse effects on the environment and will not be contrary to the public interest. *Id.* § 330.6(a)(3)(i).

53.     Ordinarily, once a permittee has submitted a PCN for a project under an NWP, it may presume that the project qualifies for the NWP unless otherwise notified by the district engineer within a 45-day period. *Id.* § 330.1(e)(1).

54.     The Corps does not issue any public notice or allow any opportunity
for public involvement when a PCN is submitted or when a project is verified
under an NWP. *See id*. § 330.1(e).

55.     Corps regulations provide that two or more different NWPs can be
combined to authorize a project, but that "the same NWP cannot be used more than
once for a single and complete project." *Id*. § 330.6(c).

56.     Corps division engineers may prepare supplemental documentation
for NWPs, make modifications, and add regional conditions. *Id*. § 330.5(c).

### The Endangered Species Act

57.     With the ESA, Congress intended endangered species to be afforded
the highest of priorities. The ESA's purpose is "to provide a means whereby the
ecosystems upon which endangered species and threatened species depend may be
conserved, [and] to provide a program for the conservation of such endangered
species and threatened species." 16 U.S.C. § 1531(b).

58.     The ESA assigns responsibility to implement the statute to the
Secretaries of Commerce and Interior, which in turn have delegated responsibility
to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service,
respectively. 50 C.F.R. § 402.01.

59.     To fulfill the substantive purposes of the ESA, federal agencies are
required to engage in Section 7 consultation with the Services to "insure that any

action authorized, funded, or carried out by such agency . . . is not likely to

jeopardize the continued existence of any endangered species or threatened species

or result in the destruction or adverse modification of habitat of such species which

is determined . . . to be critical." 16 U.S.C. § 1536(a)(2). To "jeopardize" means

"to engage in an action that reasonably would be expected, directly or indirectly, to

reduce appreciably the likelihood of . . . the survival [or] recovery of a listed

species in the wild by reducing the reproduction, numbers, or distribution of that

species." 50 C.F.R. § 402.02.

60.    The ESA's regulatory definition of "action" is broad and includes "all

activities or programs of any kind authorized, funded, or carried out, in whole or in

part, by Federal agencies in the United States or upon the high seas," such as the

promulgation of regulations, the granting of permits, or actions directly or

indirectly causing modifications to the land, water, or air. *Id*.

61.    Section 7(a)(2) and its implementing regulations set forth a detailed

process that must be followed before agencies take or approve actions that may

affect threatened or endangered species or critical habitat. In fulfilling the

requirements of Section 7(a)(2) and the procedural requirements set forth in 50

C.F.R. Part 402, agencies must "use the best scientific and commercial data

available." 16 U.S.C. § 1536(a)(2).

62.    Each federal agency must "review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat" in the action area. 50 C.F.R. § 402.14(a). The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered. 51 Fed. Reg. 19,926, 19,949 (June 3, 1986). The "action area" includes all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

63.    The Corps has a duty to determine whether any actions it authorizes require consultation. *See* 50 C.F.R. § 402.14(a). If the action is "likely to adversely affect" listed species or critical habitat, the agency must engage in "formal consultation" with the Services to meet the ESA's substantive "no jeopardy" mandate. *Id.* § 402.14; *see* 16 U.S.C. § 1536(a)(2). The threshold for triggering this formal consultation requirement is very low. *See* 51 Fed. Reg. at 19,949-50.

64.    Formal ESA consultation commences with the action agency's written request for consultation and concludes with the Services' issuance of a "biological opinion." 50 C.F.R. § 402.02; *see id.* § 402.14(c), (g)(4). During formal consultation, the Services and the action agency must evaluate the "[e]ffects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing

27

environmental conditions—that is, the "environmental baseline." *Id.* §§ 402.02, 402.14(g)(3). "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area . . . ." *Id.* § 402.02. The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

65.   The biological opinion is the heart of the formal consultation process and states the Services' opinion as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4), (h)(3); *see* 16 U.S.C. § 1536(a)(2), (b)(3)(A).

66.   If the Services determine that the action is likely to jeopardize a species, the biological opinion must outline "reasonable and prudent alternatives" to the action, if any exist, that will avoid jeopardy and "which [the agency] believes would not violate [Section 7(a)(2)]." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). The Services may also "suggest modifications" to the action during the course of consultation "to avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13(b).

67.    For Federal programs that may affect listed species, agencies must also engage with the Services in "programmatic consultation" to guide the implementation of such programs by establishing standards, guidelines, or governing criteria to avoid, minimize, or offset the effects of the program on listed species and critical habitat, and to establish protocols to track and respond to the collective impacts of actions taken pursuant to the program. *See* 50 C.F.R. § 402.02.

68.    Pursuant to the Services' revised regulations defining "framework programmatic action," programmatic consultations require that any incidental take be subsequently authorized under a project-specific Section 7 consultation. *See* 80 Fed. Reg. 26,832, 26,832, 26,837 (May 11, 2015) (adding definition of "framework programmatic action" to 50 C.F.R. § 402.02 and adding 50 C.F.R. § 402.14(i)(6) to clarify that incidental take statements generally will not be issued at the programmatic level). Such project-specific consultation, however, "does not relieve the Federal agency of the requirements for considering the effects of the action as a whole." *Id.* § 402.14(c)(4).

69.    The Services' regulations provide that for programmatic actions, such as the Corps' issuance of NWP 12, programmatic consultations and project-specific consultations work in tandem, with each playing a vital role in protecting imperiled species. *See* 84 Fed. Reg. 44,976, 44,997 (Aug. 27, 2019) (preamble to

29

Services' 2019 ESA regulations reiterating that, "[a]s explained in the 2015"

regulations, the ESA "still requires a programmatic consultation to meet the

requirements of section 7(a)(2)[,]" even if "specific projects . . . developed in the

future . . . are subject to site-specific stepped-down, or tiered consultations where

incidental take is addressed").

## The National Environmental Policy Act

70.     NEPA is "our basic national charter for protection of the

environment." 40 C.F.R. § 1500.1(a). NEPA's goals are to (1) "prevent or

eliminate damage to the environment and biosphere," (2) "stimulate the health and

welfare" of all people, and (3) "encourage productive and enjoyable harmony

between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

71.     In creating NEPA, Congress recognized that "each person should

enjoy a healthful environment" and the statute therefore requires that the federal

government use all practicable means to "assure for all Americans safe, healthful,

productive, and esthetically and culturally pleasing surroundings," and to "attain

the widest range of beneficial uses of the environment without degradation, risk to

health or safety, or other undesirable and unintended consequences." *Id.* §

4331(b)–(c).

72.     To fulfill these purposes, NEPA requires that: (1) agencies take a

"hard look" at the environmental impacts of their actions before the actions occur,

thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

73.     NEPA seeks to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside until the government complies with NEPA.

74.     The purpose of the NEPA process is to inform federal agency decision-makers and the public of the "reasonable alternatives" that would "avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1. This analysis of alternatives is the "heart" of NEPA. The agency

should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id.* § 1502.14.

75.     To accomplish this, NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—the environmental impact statement (EIS)—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1.

76.     To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency may first prepare an environmental assessment (EA). *Id*. §§ 1501.5.

77.     The lead agency must take a hard look at the relevant environmental concerns and alternatives to the proposed action, and must consider short and long-term effects, both beneficial and adverse effects, effects on public health and safety, and effects that would violate Federal, State, Tribal, or local law protecting the environment. 40 C.F.R. § 1501.3.

78.     If the agency determines, after preparing the EA, that the proposed action does not require preparation of an EIS, it must then prepare a finding of no

significant impact (FONSI) detailing why the action "will not have a significant effect on the human environment." 40 C.F.R. § 1501.6; *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (describing procedure). If the EA indicates that the federal action "may" significantly affect the quality of the human environment, the agency must prepare an EIS. *See, e.g.*, *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

79.     In making the determination of whether to prepare an EIS, the agency must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). "A determination that significant effects on the human environment will in fact occur is not essential. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (internal citation omitted).

80.     The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA. 40 C.F.R. §§ 1500-1508.

81.     Last year, CEQ amended its 1978 regulations implementing NEPA, effective September 14, 2020. *See* Update to the Regulations Implementing the

Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,304 (July 16, 2020). There are already four lawsuits challenging the new regulations.[3]

82.     While the 2020 CEQ regulations remove the requirement to consider indirect and cumulative impacts in an EA or EIS, the Corps' reliance on these regulations to avoid consideration of important environmental impacts of NWP 12 violates NEPA. *See* 42 U.S.C. § 4332(2)(C) (requiring an evaluation of "*any* adverse environmental effects which cannot be avoided should the proposal be implemented," which must examine "the environmental impact of the proposed action" "*to the fullest extent possible*") (emphasis added); 42 U.S.C. § 4332(2)(F) (requiring agencies to consider the "worldwide and long-range character of environmental problems"); *Kleppe v. Sierra Club*, 427 U.S. 390, 409-10 (1976) (noting that Congress's mandate that agencies use "all practicable means" to "assure consideration of the environmental impact of their actions in decisionmaking," requires consideration of cumulative effects) (citations omitted); *City of Davis v. Coleman,* 521 F.2d 661, 676–77 (9th Cir. 1975) (outlining the statutory obligation to consider the indirect effects of agency actions).

---

[3] *See California v. Council on Env't Quality*, No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020); *Env't Just. Health All. v. Council on Env't Quality*, No 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); *Wild Va. v. Council on Env't Quality*, No. 3:20-cv-00045-NKM (W.D. Va. July 29, 2020); *Alaska Cmty. Action on Toxics v. Council on Env't Quality*, No. 3:20-cv-05199 (N.D. Cal. July 29, 2020).

83.    Indirect and cumulative effects are critical components of environmental impacts and in many cases, they are the most important issues of concern to the public and other stakeholders.

84.    "A meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

85.    Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects but have no quantified assessment of their combined impacts. *Bark v. United States Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020).

86.    Allowing the Corps to forgo consideration of cumulative and indirect effects will have profound adverse effects on the environment, particularly on the global climate, which is a prime example of indirect effects aggregated into cumulative effects. "The impact of greenhouse gas emissions on climate change is

precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. NHTSA*, 508 F.3d 508, 550 (9th Cir. 2007).

87.    NEPA requires a quantification of the incremental impacts that the proposed project's emissions will have on climate change or on the environment more generally in light of other past, present, and reasonably foreseeable actions. *See Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1216 (9th Cir. 2008). NEPA requires analysis of the "*actual* environmental effects resulting from those emissions." *Id.*

88.    NEPA also requires consideration of separate components of a single project in a single NEPA review. 40 C.F.R. § 1501.9(e). NEPA regulations state that connected actions should be considered in a single EIS, defining them as action that "cannot or will not proceed unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification." *Id.*

89.    NEPA requires federal agencies to analyze both the probability of a given harm occurring and the consequences of that harm if it does occur. *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012). Agencies cannot avoid their responsibility to consider future effects by claiming they are

uncertain, because NEPA requires some element of predictive behavior. *N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1078-79 (9th Cir. 2011).

90.     For fossil fuel pipeline projects, federal courts have found that NEPA requires analysis of the risk that an oil spill will occur and an assessment of the potential impacts of a spill on particular resources and into Corps jurisdictional waterways. *See, e.g., Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021) (EA inadequate because it did not adequately assess the risks and potential impacts of a pipeline oil spill; *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-68 (9th Cir. 2005) (Corps was required to analyze effects of increased tanker traffic, and attendant risks of oil spills, before issuing Section 404 permit for dock extension).

91.     The Corps' regulations explain that the scope of a NEPA analysis includes the impacts of the specific activity requiring a Corps permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review. 33 C.F.R. § Pt. 325, App. B(7)(b)(1). The Corps' regulations provide that the NEPA analysis should include direct, indirect, and cumulative impacts. *Id.* App. B(7)(b)(3).

92.     NEPA requires agencies to take a hard look at the effects of agency action on the "human environment," which is broadly defined to mean "comprehensively the natural and physical environment and the relationship of

present and future generations of Americans with that environment." 40 C.F.R. §

1508.1(m) (2020). This encompasses environmental justice concerns. *See*

*generally Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1368

(D.C. Cir. 2017) ("As always with NEPA, an agency is not required to select the

course of action that best serves environmental justice, only to take a 'hard look' at

environmental justice issues.").

93.     The CEQ regulations require federal agencies to provide an

opportunity for public participation. *See* 40 C.F.R. § 1506.6 (the agency must

"[m]ake diligent efforts to involve the public" in preparing environmental

documents, give "public notice of . . . the availability of environmental documents

so as to inform those persons . . . who may be interested or affected," and "[s]olicit

appropriate information from the public").

## The Administrative Procedure Act

94.     The APA provides for judicial review of agency actions such as those

at issue here and provides the standard of review for ESA citizen suit claims. A

reviewing court shall "hold unlawful and set aside" any Corps actions found to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

## The Corps' Reissuance of NWP 12

95.    This Court previously held that the Corps violated the ESA by failing to programmatically consult with the Services on the issuance of the 2017 iteration of NWP 12, declared the permit unlawful and remanded it to the Corps for compliance with the ESA. *Northern Plains Resource Council et al. v. U.S. Army Corps of Engineers*, No. 4:19-cv-00044 (D. Mont.), appeal pending, No. 20-35412 (9th Cir.). The Court declined to rule on Plaintiffs' NEPA and CWA claims; however, it intimated that the Corps should reevaluate its compliance with these statutes, stating that the Court "anticipates that the ESA Section 7(a)(2) consultation will inform" the Corps' NEPA and CWA assessments of NWP 12's environmental effects. *Northern Plains Resource Council et al. v. U.S. Army Corps of Engineers*, 454 F. Supp. 3d 985, 994-6 (D. Mont., Apr. 15, 2020).

96.    Following that decision, the Corps did not undertake any ESA consultation with the Services on the 2017 NWP 12. It also did not address its compliance with NEPA or the CWA, as the Court indicated was necessary.

97.    On September 15, 2020, the Corps published a proposal to reauthorize the Nationwide Permit program, well before the 2017 iteration of the NWPs was set to expire in March of 2022. 85 Fed. Reg. 57,298. The Corps also proposed to reissue the general conditions and definitions for all NWPs, with some modifications. *Id*.

98.     On November 16, 2020, Plaintiffs in this matter, among many others, submitted comments to the Corps regarding the proposed NWPs. Plaintiffs' comments outlined violations of the ESA, NEPA, and the CWA regarding the NWPs, including NWP 12. These violations are substantially the same as the legal violations at issue in the litigation over the 2017 NWP 12, since the Corps did not take any action to remedy those claims for the new permit.

99.     On January 13, 2021—just days before President Trump left office— the Corps published a final decision ("Final Decision") reissuing 12 of the existing NWPs and issuing four new NWPs. 86 Fed. Reg. 2,744.

100.   The Final Decision included the reissuance of NWP 12, which authorizes discharges of dredged or fill material into waters of the United States associated with the construction, maintenance, or repair of oil and gas pipelines, provided the activity does not result in the loss of greater than ½-acre of waters of the United States.

101.   The 2021 NWP 12 is substantially the same as the previous version of the permit, with very few changes. Perhaps the most notable change is that NWP 12 is now limited to oil and gas pipelines, while previous versions authorized a much broader category of linear utility projects.

102.   Although the use of NWP 12 is limited to oil and gas pipelines with up to a half-acre of loss of U.S. waters for each "single and complete project," the

Corps defines that term as "that portion of the total linear project . . . that includes *all crossings of a single water of the United States (i.e., a single waterbody) at a specific location*." *Id.* at 2877 (emphasis added). In other words, NWP 12 allows pipeline projects to use NWP 12 separately at each location where the project crosses a river, stream, or wetland. By contrast, non-linear projects can invoke NWP 12 only once for the overall project, unless the separate components of the project would have "independent utility" (i.e., if the components could function as stand-alone projects). *Id.* at 2876.

103.   NWP 12 thus allows the Corps to treat numerous water crossings along a proposed pipeline project—which often number in the hundreds or thousands—as "single and complete projects" that each qualify separately under NWP 12. There is no limit to the number of times that a single pipeline project can use NWP 12, nor is there a maximum number of acres of water that a pipeline project can impact while still being authorized under NWP 12. Because the Corps treats each crossing separately, it does not use the total amount of loss attributable to a project to determine whether the half-acre threshold has been met.

104.   The Corps rationalizes this practice by claiming that water crossings on a linear pipeline are usually at "separate and distant" locations and/or separate watersheds along a pipeline route such that cumulative effects are dissipated.  *See id.* at 2777.

105.   However, NWP 12 does not actually require that multiple crossings along a linear project be "separate and distant" or in separate watersheds: it does not define the phrase "separate and distant" or impose any spacing requirements, and it does not require district engineers to make a "separate and distant" finding. In fact, projects permitted by NWP 12 often have ten or more water crossings per mile and dozens of water crossings on the same waterbody and/or watershed.

106.   The Corps further claims that district engineers, upon receipt of a PCN for an NWP 12 project, will conduct a project-level review to ensure that all water crossings "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," as required by 33 U.S.C. § 1344(e)(1). *Id.* at 2745; *see also id.* at 2762 ("If, for a particular PCN, the district engineer determines that the individual and cumulative adverse environmental effects would be more than minimal, he or she will exercise discretionary authority and require an individual permit.").

107.   However, NWP 12 requires a permittee to submit a PCN *only if* the proposed project meets certain criteria. *See, e.g.*, *id.* at 2860-1, 2868-9. If none of these criteria is met, a project proponent may commence with the activity under NWP 12 without notifying the Corps or the public at all.

108.   In fact, many project applicants proceed under NWP 12 without ever submitting a PCN or notifying the Corps, and thus the Corps district engineers lack the opportunity to evaluate the environmental effects of those projects at all.

## The Corps' Failure to Comply with the ESA

109.   Pipelines constructed in U.S. waters pursuant to NWP 12 "may affect," and are "likely to adversely affect," species listed under the ESA and/or destroy or adversely modify designated critical habitat, including through construction-related habitat loss and degradation as well as leaks and spills of oil into Corps' jurisdictional waterways, with disastrous impacts on aquatic resources.

110.   In its Decision Document for NWP 12, the Corps acknowledged the potential for harm to the environment and species that rely on areas affected by NWP 12-authorized activities, including from inadvertent returns of drilling fluids; fragmentation of terrestrial and aquatic ecosystems; leaks and spills of petroleum products; conversion of wetlands resulting in loss of wetland functions as well as permanent loss of wetland habitat and alteration of natural drainage patterns; and adverse effects on water quality from increases in sediments and pollutants in the water that impair the quality of fish and wildlife habitat by modifying or eliminating areas used for nesting, foraging, resting, and reproduction.

111.   Pipeline construction and operation can also cause (and has caused) immediate and irreparable impacts to ecosystem functions of streams and adjacent

wetlands through several means, including by: spreading invasive species; damaging soils; degrading water quality and harming fish; causing cumulative impacts to bank stability and floodplain vegetation leading to erosion, sedimentation, release of toxic substances, and reduced biodiversity and productivity; converting forested wetlands to scrub wetlands; and causing cumulative adverse impacts from forest fragmentation, habitat loss, erosion, and sedimentation, and soil nutrient loss. These impacts adversely affect hundreds of listed species that rely on rivers, streams, and wetland habitats and other aquatic resources across the country.

112.   The Corps did not undertake any ESA Section 7 consultation with the Services regarding its reissuance of NWP 12 in 2021 to determine whether the NWP 12 program may jeopardize listed species or adversely modify critical habitat. Instead, the Corps concluded that programmatic consultation is not required because all NWP 12 projects that "may affect" listed species are subject to project-specific consultation pursuant to NWP General Condition 18, and therefore the Corps' issuance of NWP 12 has "no effect" on listed species. 86 Fed. Reg. at 2844-9, 2869.

113.   However, this is inconsistent with the Services' regulations, which require programmatic consultation even when project-specific review will subsequently occur. *See* 84 Fed. Reg. at 44,997 (noting the ESA still requires a

programmatic consultation even if specific projects developed in the future are subject to site-specific consultations).

114.   The project-specific consultations triggered by NWP General Condition 18 cannot ensure that the NWP 12 program as a whole—including the collective impacts of thousands of activities permitted under NWP 12—will not result in jeopardy to listed species or adverse modification of critical habitat. Programmatic consultation is necessary to allow the Services to analyze the aggregate impacts of multiple projects under the NWP 12 program and to ensure that appropriate program-wide criteria and safeguards are in place for tracking, avoiding, minimizing, and mitigating such impacts.

115.   The Services specifically stated that the NWP program required programmatic review when they issued the 2015 regulations defining framework programmatic consultations. *See* 80 Fed. Reg. at 26,835 ("Examples of Federal programs that provide such a framework include . . . the U.S. Army Corps of Engineers' Nationwide Permit Program.").

116.   The Corps relies on permittees to submit PCNs pursuant to NWP General Condition 18 when the permittees themselves acknowledge that their activities "might" affect listed species. *See* NWP 12 Decision Document at 16. This delegates the initial effects determination to the permittee. The PCN requirement set forth in General Condition 18 cannot ensure that the Corps will

engage in project-specific Section 7 consultation for all projects utilizing NWP 12

that may affect listed species because there is no guarantee that a project applicant

will submit a PCN for every water crossing that "might" affect a listed species.

## The Corps' Failure to Comply with NEPA

117.    The Corps' reissuance of NWP 12 is a major federal action that

requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C). The Corps issued an

EA and FONSI for its reissuance of NWP 12 dated January 4, 2021 (the NWP 12

Decision Document).

118.    The NWP 12 EA is the Corps' only NEPA document for an estimated

9,560 uses of NWP 12 per year nationwide. The Corps will not prepare any further

NEPA analysis for individual projects that are permitted, verified, or authorized by

NWP 12. *See, e.g.*, 86 Fed. Reg. at 2778 ("Corps Headquarters fulfills the

requirements of NEPA when it finalizes the environmental assessment in its

national decision document for the issuance or reissuance of an NWP. An NWP

verification issued by a district engineer does not require separate NEPA

documentation."). In fact, for oil pipelines there is no guarantee that any other

federal agency will conduct any project-level NEPA review because there is no

federal statute governing oil pipeline permitting.

119.    The NWP 12 EA is narrowly limited to discussing the impacts of

discharges of fill material into waterways. It does not discuss the full range of

46

direct, indirect, and cumulative impacts associated with oil pipelines or other utility projects permitted by NWP 12.

120.   For example, the NWP 12 EA does not evaluate the risks or impacts of pipeline leaks and spills into waterways, nor does it discuss the various types of gas and oil transported by pipelines permitted by NWP 12 or their respective characteristics, impacts, or spill response requirements. Instead, the Corps' NWP 12 EA simply states:

> The Corps does not have the authority to take actions to prevent or control potential leaks or spills that may occur during the construction or operation of oil or natural gas pipelines. Since the Corps does not regulate the release of oil, natural gas, or products derived from oil or natural gas, it is not required to perform a detailed analysis of the effects of those possible future leaks or spills because those leaks or spills are not an effect of the Corps' proposed action.

NWP 12 Decision Document at 8.

121.   The NWP 12 EA acknowledges that oil and gas pipeline crossings constructed with "horizontal directional drilling" (or HDD) technology presents a risk of "frac-outs," or "inadvertent returns of drilling fluids to waters of the United States," which occur when pressurized fluids and drilling lubricants escape the active drilling bore, migrate up through the soils or bedrock, and are released to the surface at or near the construction site or in the waterbody. However, the NWP 12 EA fails to evaluate those risks or impacts, instead simply concluding: "The Corps does not have jurisdiction over inadvertent returns, leaks, or spills that may occur

during horizontal directional drilling to install or replace oil or natural gas pipelines." NWP 12 Decision Document at 12.

122.   The NWP 12 EA also fails to evaluate the climate change impacts associated with NWP 12, including the potential for increased greenhouse gas emissions caused by pipeline construction and/or the lifecycle emissions associated with the gas and oil transported by NWP 12 projects. Instead, the NWP 12 EA states:

> The Corps does not have the authority to regulate the operation of any oil or natural gas pipeline, or the emissions that result from combustion of oil or natural gas, or from the industrial processes that derive other products from oil or natural gas. Therefore, under the current NEPA regulations, the Corps is not required to evaluate those upstream and downstream impacts, including potential impacts on the planet's climate.

*Id.* at 9-10. *See also id.* at 91 ("The Corps does not have the authority to control the burning of fossil fuels or the adverse environmental effects that are caused by burning those fossil fuels to produce energy.").

123.   The NWP 12 EA also does not evaluate the impacts associated with the permanent conversion of forested wetlands to lesser quality wetlands associated with pipeline rights of way. However, the EA does acknowledge that forested wetland will be permanently converted. *See, e.g.*, NWP 12 Decision Document at 92 ("The construction of oil or natural gas pipeline rights-of-way through forested wetlands may result in the conversion of forested wetlands to

scrub-shrub or emergent wetlands. Those conversions may be permanent to maintain the oil or natural gas pipeline in good, operational order. The conversion of wetlands to other types of wetlands may result in the loss of certain wetland functions, or the reduction in the level of wetland functions being performed by the converted wetland.").

124.   The NWP 12 EA purports to contain a cumulative effects analysis, but that analysis includes only a summary of historic and current causes of wetlands depletion in the United States; discusses U.S. waters and species or habitat loss generally; and estimates the total acreage and condition of wetlands in the United States. The NWP 12 EA does not discuss any cumulative impacts specifically associated with the construction, maintenance, operation, or repair of oil or gas pipelines; the cumulative effects associated with the creation and permanent maintenance of pipeline rights-of-way such as forest fragmentation, habitat loss, erosion and sedimentation, soil nutrient loss, aesthetic impairment, etc.; or the cumulative effects from using NWP 12 hundreds or even thousands of times, often in close proximity, to approve massive pipeline projects. In fact, the cumulative effects analysis in the NWP 12 EA is the same boilerplate language contained verbatim in the decision documents for each of the other NWPs.

125.   The NWP 12 EA fails to evaluate the environmental justice implications of Nationwide Permit 12 activities. Instead, the Corps summarily

concludes that the NWPs as a whole "are not expected to have any discriminatory effect or disproportionate negative impact on any community or group, and therefore are not expected to cause any disproportionately high and adverse impacts to minority or low-income communities." 86 Fed. Reg. 2744, 2859 (January 13, 2021).

126.   Rather than evaluate the full host of direct, indirect, and cumulative impacts associated with pipelines and other activities permitted by NWP 12, the NWP 12 EA appears to defer much of its analysis to the project level. For example, the EA states:

> During their reviews of PCNs, district engineers document their conclusions as to whether the proposed activity will result in no more than minimal adverse environmental effects, or whether it is necessary to exercise discretionary authority and require an individual permit for the proposed activity. This documentation includes the district engineer's consideration of cumulative effects.

NWP 12 Decision Document at 17. However, the Corps division or district engineer performs no further NEPA analysis when projects proceed under NWP 12, even upon issuance of verifications for specific projects.

127.   The Corps asserts that its limited analysis of the environmental impacts of the NWPs in the Decision Documents is consistent with the 2020 CEQ regulations which "altered how cumulative effects are considered under NEPA." 86 Fed. Reg. 2842.

50

128.   However, the Corps' reliance on the 2020 CEQ NEPA regulations to
ignore specific impacts of NWP 12 violates NEPA.[4] NEPA specifically requires an
evaluation of "*any* adverse environment effects which cannot be avoided should
the proposal be implemented," 42 U.S.C. § 4332(2)(C) (emphasis added), which
cannot be accomplished if the agency ignores the cumulative effects of its actions,
particularly in the context of a nationwide permit that will be used thousands of
times each year for major oil and gas pipeline projects across the country.

129.   Furthermore, NEPA requires the Corps to evaluate the cumulative
effects of NWP 12 activities where, as here, a cumulative effects determination is
an essential precondition to the Corps' issuance of a NWP pursuant to the CWA.
*See, e.g.*, 33 U.S.C. § 1344(e)(1); 33 C.F.R. § 323.2(h); 33 C.F.R. § 320.4; 40
C.F.R. § 230.7(b).

## FIRST CLAIM FOR RELIEF

### The Corps' reissuance of NWP 12 violated the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and applicable regulations

130.   Plaintiffs reallege, as if fully set forth herein, each and every
allegation contained in the preceding paragraphs.

---

[4] As set forth above, the 2020 CEQ regulations are subject to several challenges
and could soon be vacated by a court or rescinded by the Biden administration.

131.   The Corps has a duty pursuant to ESA Section 7(a)(2) to ensure that its actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat. 16 U.S.C. § 1536(a)(2).

132.   NWP 12 allows activities that result in direct harm to listed species from habitat loss and fragmentation, sedimentation and contamination of waters relied on by listed species, as well as indirect impacts associated with oil spills and climate change.

133.   The Corps' reissuance of NWP 12 was therefore an agency action that "may affect" listed species, and the Corps was required to undertake programmatic ESA Section 7 consultation to ensure that activities authorized and undertaken pursuant to the NWP 12 program will not jeopardize the continued existence of listed species or result in adverse modification of designated critical habitat. *Id*.

134.   The ESA requires that the Corps consider the collective, national-scale programmatic impacts of NWP 12 on listed species. Programmatic consultation is necessary to analyze the additive effects of NWP 12-authorized activities on listed species, in order to avoid piecemeal destruction of habitat that may jeopardize species in violation of ESA Section 7. In fact, when the Services issued the 2015 regulations defining framework programmatic consultations, they

used the Corps' NWP program as a specific example of a federal program where programmatic consultation would be required. 80 Fed. Reg. at 26,835.

135.   Programmatic consultation on NWP 12 is necessary to afford the Services the opportunity to identify where NWP 12 may be problematic for listed species or critical habitat, and to provide reasonable and prudent measures to minimize take, such as measures to ensure that the Corps gathers and analyzes sufficient data to prevent jeopardy to listed species, and to ensure that incidental take does not occur at unsustainable levels.

136.   The Corps' reliance on future project-specific consultations to support its "no effect" determination for NWP 12 is inconsistent with the applicable regulations, which require programmatic review of NWP 12 as well as project-specific consultations. *See* 50 C.F.R. § 402.14(c) (project-specific consultation "does not relieve the Federal agency of the requirements for considering the effects of the action as a whole"); 84 Fed. Reg. 44,976, 44,997 (Aug. 27, 2019) (the ESA "still requires a programmatic consultation to meet the requirements of section 7(a)(2)[,]" even if "specific projects . . . developed in the future . . . are subject to site-specific stepped-down, or tiered consultations where incidental take is addressed").

137.   The Corps has not even ensured that project-specific consultation will occur for every NWP 12-authorized project that "may affect" listed species. The

Corps relies on project proponents to submit a PCN where listed species "might be" affected so that the Corps can determine whether project-specific consultation is necessary. However, this impermissibly turns the initial effect determination over to non-federal applicants, whereas ESA Section 7(a)(2) requires federal agencies to make that determination. *See* 50 C.F.R. § 402.14(a). The Corps' reliance on permittees means that if those parties fail to notify the Corps for any reason, the agency will have no awareness that impacts to listed species were possible and thus no basis for consulting, in violation of the ESA.

138.   Regardless, the project-specific consultations contemplated by NWP General Condition 18 cannot satisfy the Corps' ESA Section 7 duty to consult on NWP as a whole. Project-specific consultations cannot ensure that the aggregate impacts from the program will not jeopardize listed species or adversely modify critical habitat, and the Corps' NWP 12 scheme for ESA compliance therefore improperly curtails consultation on the NWP's full effects, in violation of the ESA. 50 C.F.R. § 402.14(c)(4) & (g)(3), (4).

139.   The Corps' failure to undertake and complete programmatic ESA Section 7 consultation with the Services on the issuance of NWP 12 constitutes a failure to ensure, as mandated by the ESA, that the NWP 12 program is not likely to jeopardize the existence of listed species or result in destruction or adverse modification of critical habitat, in violation of Section 7 of the ESA, 16 U.S.C.

§ 1536, and the ESA's implementing regulations. Such action is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

140.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

141.   The Corps' reissuance of NWP 12 was a major federal action that requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C).

142.   The Corps issued an EA/FONSI for its reissuance of NWP 12, which constitutes the Corps' only NEPA document for an estimated 9,560 activities per year using NWP 12. The Corps will not prepare any further NEPA analysis for individual projects that are permitted or authorized by NWP 12.

143.   The Corps' EA violated NEPA by failing to take the requisite hard look at the significant environmental effects of reissuing NWP 12 (i.e., the impacts of projects permitted or authorized by NWP 12). *See, e.g.*, 40 C.F.R. §§ 1502.1, 1502.16(a), (b), 1501.9(e). Among other things, the NWP 12 EA failed to adequately analyze:

a.     The risks and impacts of gas leaks and crude oil spills from pipelines approved by NWP 12, including but not limited to spills into Corps jurisdictional waterways and an examination of the various types of crude oil products transported by NWP 12 projects and their respective properties, characteristics, environmental impacts, or spill response requirements;

b.     The environmental impacts associated with the construction and maintenance of pipeline rights of way, both within and outside of Corps jurisdictional waterways, including but not limited to the permanent conversion of forested wetlands to lower quality wetlands, forest fragmentation, habitat loss, erosion and sedimentation, soil nutrient loss, and aesthetic impairment;

c.     The risks and environmental impacts associated with frac-outs, or inadvertent returns, leaks, or spills of drilling fluids during installation of oil and gas pipelines using horizontal directional drilling;

d.     The climate change impacts of NWP 12, including but not limited to the potential for increased lifecycle greenhouse gas emissions resulting from oil and gas pipelines approved by NWP 12;

e.     The cumulative impacts of NWP 12, including the effects of multiple uses of NWP 12 for the same pipeline within particular watersheds,

regions, or other sensitive areas; and the impacts of other past, future, and reasonably foreseeable projects; and

      f.    The environmental justice impacts of NWP 12.

144.   The Corps' reliance on the changes made to the CEQ NEPA regulations in 2020 to avoid an analysis of the full range of impacts of NWP 12—including the indirect and cumulative impacts described above—violates NEPA. Absent an analysis of *all* the environmental impacts of NWP 12—including indirect and cumulative impacts discussed herein—the Corps did not, and could not, take the "hard look" at NWP 12 "to the fullest extent possible," as NEPA requires. *See* 42 U.S.C. § 4332(2)(C). Therefore, the Corps' failure to include an analysis of those impacts is arbitrary and capricious.

145.   Furthermore, the Corps' FONSI for NWP 12 was itself arbitrary and capricious, since the agency failed to make a convincing case that the impacts of issuing NWP 12 are not significant. The environmental impacts associated with the Corps' reissuance of NWP 12 are "significant," 40 C.F.R. § 1501.3(b), and thus by preparing an EA/FONSI rather than an EIS for its NWP 12 reissuance, the Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

146.   For the reasons set forth above, the Corps' reissuance of NWP 12 violated NEPA. It was arbitrary and capricious, an abuse of discretion, or

otherwise not in accordance with law, and contrary to the APA. *See* 5 U.S.C. §

706(2)(A).

## THIRD CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the Clean Water Act, 33 U.S.C.
§ 1344(e), applicable regulations, and the Administrative Procedure Act,
5 U.S.C. §§ 701-706**

147.   Plaintiffs reallege, as if fully set forth herein, each and every

allegation contained in the preceding paragraphs.

148.   Section 404(e) of the CWA allows the Corps to issue NWPs only for

categories of projects that the agency determines "are similar in nature, will cause

only minimal adverse environmental effects when performed separately, and will

have only minimal cumulative adverse effect on the environment." 33 U.S.C.

§ 1344(e)(1).

149.   NWP 12 permits or authorizes the construction and operation of

pipelines and associated facilities that do not result in the loss of greater than a

half-acre of waters of the United States "for each single and complete project." 86

Fed. Reg. at 2860. However, the Corps defines "single and complete linear

project" as "that portion of the total linear project . . . that includes all crossings of

a single water of the United States *(i.e., a single waterbody) at a specific location*."

*Id*. at 2877 (emphasis added). The effect of this definition is to artificially treat

each water crossing along a proposed pipeline project, which often number in the

hundreds or thousands, as a "single and complete project" that qualifies separately under NWP 12.

150.   There is no limit to the number of times that a single pipeline project can use NWP 12, nor is there a total maximum number of acres of waters of the United States that a pipeline project can impact while still being authorized under NWP 12.

151.   NWP 12 relies on the discretion of division and district engineers to ensure, on a project-by-project basis, that the activities will have no more than minimal effects. However, this project-level review by Corps district or division engineers fails to ensure projects permitted by NWP 12 will have only minimal adverse environmental effects because for many projects that proceed under NWP 12, an applicant is not required to submit a PCN or notify the Corps at all, and thus the Corps does not have an opportunity to evaluate the adverse environmental effects of those projects.

152.   For those projects where a PCN is required, project-level review by Corps district or division engineers still fails to ensure that the multiple water crossings for projects permitted by NWP 12 will have only minimal adverse environmental effects, either individually or cumulatively, because the Corps never considers the cumulative effects of multiple water crossings for pipeline projects.

153.   In short, NWP 12 permits pipeline projects to use the NWP numerous times along a pipeline or utility route—even if there are high concentrations of water crossings in specific areas—with no mechanism to ensure impacts would be minimal. Thus, the Corps failed to ensure that projects authorized by NWP 12 "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment" as required by 33 U.S.C. § 1344(e)(1) and Corps regulations. *See, e.g.,* 33 C.F.R. § 320.4; 40 C.F.R. § 230.7.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)   Declare the Corps' issuance of NWP 12 in violation of the Endangered Species Act, the National Environmental Policy Act, the Clean Water Act, the Administrative Procedure Act, and applicable regulations;

b)   Remand NWP 12 to the Corps for compliance with the National Environmental Policy Act, the Clean Water Act, and the Endangered Species Act;

c)   Vacate NWP 12, in whole or in part, and/or set a date certain for completion of the ESA Section 7 consultation and NEPA review processes;

d)   Award Plaintiffs their costs, expenses, and attorneys' fees under applicable law; and

e)    Provide for such other relief as the Court deems just and appropriate.


Dated: May 3, 2021                 Respectfully submitted,


/s/ Timothy M. Bechtold
Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

/s/ Jared Margolis
Jared Margolis
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
(802) 310-4054
jmargolis@biologicaldiversity.org

/s/ Eric Glitzenstein
Eric Glitzenstein
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org
*Attorneys for Center for Biological
Diversity, Friends of the Earth, and
Waterkeeper*

/s/ Doug Hayes
Doug Hayes
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301

(303) 449-5595
doug.hayes@sierraclub.org
*Attorney for Sierra Club and Montana*
*Environmental Information Center*