William W. Mercer
Brianne McClafferty
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
Billings, MT  59101
(406) 252-2166
wwmercer@hollandhart.com
bcmcclafferty@hollandhart.com

Deidre G. Duncan (*pro hac vice*)
Karma B. Brown (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 955-1500
dduncan@HuntonAK.com
kbbrown@HuntonAK.com

*Counsel for Defendant-Intervenors American Gas Association, American Petroleum Institute, American Public Gas Association, Association of Oil Pipe Lines, and Interstate Natural Gas Association of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, MONTANA ENVIRONMENTAL INFORMATION CENTER, FRIENDS OF THE EARTH, and WATERKEEPER ALLIANCE, INC., <br><br>               Plaintiffs, <br><br>        v. <br><br>LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity, and U.S. ARMY CORPS OF ENGINEERS, <br><br>          Defendants, <br><br>STATE OF MONTANA, <br>          Defendant-Intervenor, <br><br>       and <br><br>AMERICAN GAS ASSOCIATION, et al., <br>          Defendant-Intervenors. | Case No. CV-21-47-GF-BMM <br><br><br><br><br>**NWP 12 COALITION'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. 44) AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................... iii

I.    INTRODUCTION ..................................................................1

II.   BACKGROUND ....................................................................4

    A.    Congress Amended the CWA in 1977 to Provide the Corps with Authority to Issue Streamlined Permits for Activities with Only Minimal Adverse Environmental Effects. ..........................4

    B.    The Corps' Three-Tiered Review and Approval Process for the NWPs Ensures Any Authorized Activities Meet the Statutory Standard. .................................................6

        1.    Headquarters-level review restricts the activities authorized by NWPs through applicable terms and conditions and PCN requirements. ..............................6

        2.    Corps Division and District Engineers provide second and third levels of review and conditioning for any activities authorized by an NWP..................................7

    C.    As Conditioned, Headquarters' 2021 Reissuance of NWP 12 Is Closely Restricted in Scope to Ensure Compliance with NEPA, the CWA, and the ESA. ..........................................8

III.   STANDARD OF REVIEW ........................................................11

IV.   ARGUMENT......................................................................12

    A.    Plaintiffs Have Not Alleged Facts Sufficient to Establish Standing for Their ESA Claim. ..........................................12

        1.    Plaintiffs do not allege any specific injury to listed species or designated critical habitat resulting from Headquarters' reissuance of NWP 12. ....................13

        2.    Headquarters' reissuance of NWP 12 does not authorize any activities that affect listed species or habitat, and thus Plaintiffs cannot establish injury-in-fact from the challenged action.................................17

B.   The Corps Complied with the ESA When Reissuing NWP
     12 in 2021. .................................................................................. 18

     1.   The Corps satisfied ESA §7 when it determined that
          Headquarters' reissuance of NWP 12 is restricted to
          those activities that have "no effect" on listed species
          or designated critical habitat. ..................................................... 19

     2.   Programmatic consultation is not required for a "no
          effect" action. .............................................................................. 24

     3.   The cases Plaintiffs cite are irrelevant. ..................................... 26

     4.   Cumulative effects are assessed on a project-specific
          basis. ............................................................................................ 34

     5.   GC 18 does not improperly delegate the ESA
          "effects" review to permittees. .................................................... 36

C.   The Corps Complied with NEPA When Reissuing NWP 12. ........... 39

     1.   The Corps' §404 NEPA obligations extend only to
          environmental effects proximately caused by the
          discharge of dredged or fill material into WOTUS. ................. 40

     2.   The Corps was not required to evaluate GHG
          emissions from the potential burning of oil or natural
          gas transported through pipelines. ............................................. 43

D.   NWP 12's Structure and Project-Specific Review Ensure
     Compliance with CWA §404(e). ....................................................... 47

E.   If the Court Finds in Plaintiffs' Favor, Any Remedy Must
     Be Narrowly Tailored. ....................................................................... 50

V.   CONCLUSION ............................................................................................ 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ........................................................................11

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ......................................................50

*Am. Water Works Ass'n v. EPA*,
  40 F.3d 1266 (D.C. Cir. 1994) ......................................................51

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  833 F.3d 1274 (11th Cir. 2016)......................................................40

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012)................................................50, 51

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................14

*Columbia Riverkeeper v. U.S. Army Corp of Eng'rs*,
  No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23,
  2020)..................................................................................................45

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988)................................................26, 28

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015)................................................26, 29

*Crutchfield v. Cty. of Hanover*,
  325 F.3d 211 (4th Cir. 2003)..........................................................5

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020)........................................................46

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008)................................................................44

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
    941 F.3d 1288 (11th Cir. 2019)....................................................41, 46, 47

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ..............................................................22

*Defs. of Wildlife v. Flowers*,
    414 F.3d 1066 (9th Cir. 2005)..........................................................20, 21

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ....................................................................40, 41, 43

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ..............................................................................50

*Friends of the Earth v. Haaland*,
    No. 21-2317 (RC), 2022 WL 254526 (D.D.C. Jan 27, 2022)......................46

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..............................................................................16

*Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*,
    887 F.3d 906 (9th Cir. 2018)..................................................................19

*Indigenous Envtl. Network v. Trump*,
    No. 4:19-cv-00028-BMM, 2022 WL 742469 (D. Mont. Mar.
    11, 2022)..............................................................................................14

*Karuk Tribe of California v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012)................................................................20

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
    746 F.3d 698 (6th Cir. 2014)..................................................................42

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ..........................................................................47

*Lane Cty. Audubon Soc'y v. Jamison,*
    958 F.2d 290 (9th Cir. 1992) ............................................................29, 30, 34

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...........................................................................12, 15, 16

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs,*
    454 F. Supp. 3d 985 (D. Mont. 2020) ........................................................2, 36

*Nat. Res. Def. Council v. U.S. Dep't of the Navy,*
    No. CV-01-07781 CAS (RZX), 2002 WL 32095131 (C.D. Cal.
    Sept. 17, 2002).......................................................................................22, 23, 26

*Nat. Res. Def. Council, Inc. v. Callaway,*
    392 F. Supp. 685 (D.D.C. 1975) .......................................................................5

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
    417 F.3d 1272 (D.C. Cir. 2005).......................................................................25

*Nat'l Wildlife Fed'n v. Brownlee,*
    402 F. Supp. 2d 1 (D.D.C. 2005) .............................................................29, 33

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005) ..........................................................................45

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,*
    556 F.3d 177 (4th Cir. 2009) ..........................................................................42

*Ohio Valley Envtl. Coal. v. Bulen,*
    429 F.3d 493 (4th Cir. 2005)..........................................................6, 40, 48, 49

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,*
    No. 2:12-6689, 2014 WL 4102478 (S.D. W. Va. Aug. 18, 2014)...............47

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries*
    *Serv.,* 482 F. Supp. 2d 1248 (W.D. Wash. 2007).........................................27

*Pub. Emps. for Envtl. Responsibility v. Hopper,*
    827 F.3d 1077 (D.C. Cir. 2016) .....................................................................50

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*,
 898 F.2d 1410 (9th Cir. 1990)...................................................................11

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989) .......................................................................40

*Save the Bay, Inc. v. U.S. Corps of Eng'rs*,
 610 F.2d 322 (5th Cir. 1980).........................................................42

*Sierra Club v. FERC*,
 867 F.3d 1357 (D.C. Cir. 2017)............................................45, 46

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 508 F.3d 1332 (11th Cir. 2007)......................................................49

*Sierra Club, Inc. v. Bostick*,
 No. CIV-12-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30,
 2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015)...................39, 40, 49

*Sierra Club, Inc. v. Bostick*,
 787 F.3d 1043 (10th Cir. 2015).................................40, 47, 48, 49

*Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*,
 683 F.3d 1155 (9th Cir. 2012).........................................................5

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, No.
 3:20-cv-00290-SLG, 2021 WL 3667986 (D. Alaska Aug. 18,
 2021)...........................................................................................46

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016) .......................................................................12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 282 F. Supp. 3d 91 (D.D.C. 2017) .........................................14, 51

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) .............................................................13, 14, 17

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) .................................................................12

*Warth v. Seldin*,
    422 U.S. 490 (1975).....................................................................12

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011)..................................................29, 30

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
    222 F.3d 1105 (9th Cir. 2000), *abrogated on other grounds by
    Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir.
    2011)............................................................................................42

*WildEarth Guardians v. U.S. EPA*,
    759 F.3d 1196 (10th Cir. 2014)..............................................19, 21

*Winnebago Tribe of Neb. v. Ray*,
    621 F.2d 269 (8th Cir. 1980)..................................................41, 42

## FEDERAL STATUTES

5 U.S.C. § 706(2)(A) ..............................................................................11

15 U.S.C. § 717f......................................................................................46

16 U.S.C. § 1536(a)(2).......................................................................18, 19

33 U.S.C. § 1344.......................................................................................5

33 U.S.C. § 1344(e) ..................................................................................5

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-139 (1977), *reprinted in* 4 A Legislative History of
    the Clean Water Act of 1977 (1978) .........................................5

## FEDERAL REGULATIONS

33 C.F.R. § 320.1(a)(2).............................................................................6

33 C.F.R. § 320.4(a) ..................................................................................47

33 C.F.R. pt. 325 ........................................................................................5

33 C.F.R. pt. 325, App. B ..........................................................................41

33 C.F.R. pt. 325, App. B § 7.b .................................................................43

33 CF.R. § 330.1(c) .....................................................................................7

33 C.F.R. § 330.1(d) .................................................................................7, 8

33 C.F.R. § 330.1(e)(1) ...............................................................................8

33 C.F.R. § 330.1(e)(2) ...............................................................................8

33 C.F.R. § 330.1(e)(3) ...............................................................................8

33 C.F.R. § 330.2(i) ...................................................................................49

33 C.F.R. § 330.5 .........................................................................................6

33 C.F.R. § 330.5(b)(2) ...............................................................................7

33 C.F.R. § 330.5(b)(3) ...............................................................................7

33 C.F.R. § 330.5(c)(1) ...............................................................................7

33 C.F.R. § 330.5(c)(1)(iii) .........................................................................7

33 C.F.R. § 330.6(a) .....................................................................................8

33 C.F.R. § 330.6(a)(3)(i) ............................................................................8

40 C.F.R. § 1508.1(g) ................................................................................41

40 C.F.R. § 1508.1(g)(2) ...........................................................................41

40 C.F.R. § 1508.18 ..................................................................................40

49 C.F.R. pt. 195 ......................................................................................... 39

50 C.F.R. § 402.01(a) ................................................................................. 18

50 C.F.R. § 402.02 ................................................................................. 18, 35

50 C.F.R. § 402.14(a) ................................................................................. 32

50 C.F.R. § 402.14(c) ................................................................................. 19

## FEDERAL REGISTER

53 Fed. Reg. 3120 (Feb. 3, 1988) .............................................................. 41

80 Fed. Reg. 26,832 (May 11, 2015) ................................................... 24, 25

84 Fed. Reg. 44,976 (Aug. 27, 2019) ........................................................ 24

86 Fed. Reg. 2744 (Jan. 13, 2021) .......................... 1, 8, 9, 10, 20, 21, 26, 32, 35, 38

## DOCKETED MATERIAL

Compl. for Declaratory and Injunctive Relief, *Nat'l Wildlife Fed'n v. Brownlee*, No. 1:03CV01392, 2003 WL 23781745 (D.D.C. June 26, 2003) ...................................................................................... 33

Fed. Def.'s Mot. for Voluntary Remand or in the Alternative to Stay, *Nat'l Wildlife Fed'n v. Brownlee*, No. 1:03CV01392, 2005 WL 6173605 (D.D.C. May 13, 2005) ................................................................. 33

## I.    INTRODUCTION

Plaintiffs' latest suit challenges the U.S. Army Corps of Engineers' ("Corps") 2021 promulgation of Nationwide Permit 12 ("NWP 12").  86 Fed. Reg. 2744 (Jan. 13, 2021) [NWP000004-137].[1]  Plaintiffs continue to misconstrue and mischaracterize the action at issue in this case and the Corps' obligations under the relevant statutes, which infects their entire case.

The Court is tasked with reviewing the Corps Headquarters' reissuance of NWP 12, as conditioned; not *future* actions that may trigger further review and conditioning at other levels of the Corps.  The Headquarters' action is limited in key respects that are crucial to understanding the Corps' obligations under the Clean Water Act ("CWA"), National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA"), and how the Corps met those obligations. When properly focused on the *action* actually authorized by Headquarters' reissuance of NWP 12, it is clear that: the Corps fully complied with its statutory obligations; the record supports its conclusions; and its determinations were neither arbitrary nor capricious.

Plaintiffs claim that "[n]othing has changed since this Court's prior analysis" in 2020.  (Doc. 45 at 11).  But that's patently incorrect.  This is a new, distinct rulemaking from the 2017 NWP 12, which was addressed by this Court in

---

[1] Citations are to the administrative record lodged with the Court (Doc. 35).

*Northern Plains Resource Council v. U.S. Army Corps of Engineers*, 454 F. Supp. 3d 985 (D. Mont. 2020) ("*Northern Plains*").  When Corps Headquarters reissued NWP 12 in 2021, it modified the "category of activities" covered by NWP 12, applied new ESA and NEPA regulations, and revised the pre-construction notification ("PCN") provisions, among other things.  What's more, the 2021 NWP 12 is supported by a new administrative record, which reflects the Corps' consideration of the Court's Orders in *Northern Plains*, including development of a biological assessment explaining how the restrictive nature of NWP 12 prohibits any activities that "might affect" listed species or designated critical habitat, absent project-specific review and approval by the District Engineer.  *See* NWP003564-853.

Before moving to the merits of Plaintiffs' claims, however, the Court must satisfy itself that Plaintiffs have standing.  Plaintiffs have not cited a single project relying on the 2021 NWP 12 that harms their purported interests in ESA-listed species or designated critical habitat.  Moreover, because the Headquarters' 2021 reissuance of NWP 12 authorizes only those NWP 12 activities that have "no effect" on listed species, it cannot harm Plaintiffs' alleged ESA interests.  Thus, Plaintiffs cannot demonstrate injury-in-fact to establish standing for their ESA claim, and that claim should be dismissed.

Plaintiffs' merits arguments also fail.  Corps Headquarters fully complied with the ESA, NEPA, and CWA when it reissued NWP 12 in 2021.

As to the ESA, the Corps properly determined that Headquarters' reissuance of NWP 12 is restricted in scope to authorize only those activities that have "no effect" on listed species or designated critical habitat.  The Corps' "no effect" determination is based on the numerous limitations incorporated in NWP 12, including General Condition ("GC") 18, which confine the scope of the *action* authorized by the 2021 reissuance.  Any activity that "might affect" listed species or "is in the vicinity of" designated critical habitat is a separate, new action that is prohibited, *unless and until* it is reviewed (including any necessary consultation procedure) and approved by the District Engineer.  Where an action agency determines that its proposed action has "no effect," as Corps Headquarters did here, its obligations under ESA §7 are complete.

Numerous courts already have reviewed and rejected Plaintiffs' NEPA and CWA claims.  The Corps' review of environmental effects under NEPA extends only to those effects proximately related to discharges into waters of the U.S. ("WOTUS").  The Corps met its NEPA obligation by evaluating the environmental effects of discharges that could be authorized by NWP 12, and properly declined to evaluate effects outside its jurisdiction and control.  And the Corps complied with the CWA, by determining that the circumscribed set of activities authorized by

3

Headquarters' reissuance of NWP 12 meet the "minimal effects" statutory standard.

At base, this is yet another attempt by Plaintiffs to halt certain types of projects they dislike, by distorting what Headquarters' reissuance of NWP 12 actually authorizes and by arguing that the Corps' authority extends well beyond its statutory limits.  But the Corps did its job and fully complied with its statutory obligations.

The Court should grant summary judgment for the Federal Defendants and Defendant-Intervenors.[2]  The NWP 12 Coalition adopts and incorporates by reference the Federal Defendants' motion (Doc. 61) and memorandum of law (Doc. 60), and files this separate motion and supporting memorandum to supplement and expand upon the Federal Defendants' briefing.

## II.    BACKGROUND

### A.    Congress Amended the CWA in 1977 to Provide the Corps with Authority to Issue Streamlined Permits for Activities with Only Minimal Adverse Environmental Effects.

Shortly after the enactment of the CWA in 1972, the Corps and Congress realized the need for a streamlined permit process for activities with only minor environmental effects.  Congress initially authorized the Corps under CWA §404

---

[2] The NWP 12 Coalition is comprised of the American Gas Association, American Petroleum Institute, American Public Gas Association, Association of Oil Pipe Lines, and Interstate Natural Gas Association of America.

to issue only individual permits for discharges of dredged or fill material into WOTUS, 33 U.S.C. §1344, and the Corps took a limited view of the extent to which wetlands and streams fell under CWA jurisdiction.  But in 1975, *Natural Resources Defense Council, Inc. v. Callaway* held that the Corps was required to regulate "navigable waters" under the CWA "to the maximum extent permissible under the Commerce Clause of the Constitution."  392 F. Supp. 685, 686 (D.D.C. 1975).  Fearing that lengthy reviews of relatively minor discharge activities would undermine environmental protection by diverting the Corps from more significant activities, Congress gave the Corps an alternative to the resource-intensive, case-by-case process required for individual §404 permits.  33 C.F.R. pt. 325.

In 1977, Congress enacted §404(e) to authorize the Corps to issue general permits for categories of discharges that (1) "are similar in nature"; (2) "will cause only minimal adverse … effects"; and (3) "will have only minimal cumulative adverse effect[s]".  33 U.S.C. §1344(e).  This "nationwide permit system is designed to streamline the permitting process," *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs,* 683 F.3d 1155, 1164 (9th Cir. 2012) (per curiam), thus allowing the Corps to focus individual permit review on projects with greater anticipated environmental effects.  H.R. Rep. No. 95-139 (1977), *reprinted in* 4 A Legislative History of the Clean Water Act of 1977, at 1217 (1978); *accord Crutchfield v. Cty. of Hanover*, 325 F.3d 211, 215 (4th Cir. 2003).

5

**B.    The Corps' Three-Tiered Review and Approval Process for the NWPs Ensures Any Authorized Activities Meet the Statutory Standard.**

Over the years, based on its technical experience, the Corps has developed and refined NWP 12 to include numerous terms and restrictions, PCN requirements, and GCs, which collectively ensure the statutory minimal effects standard is met.  As the Federal Defendants explain (Doc. 60 at 3), the Corps carefully addresses potential NWP activities at three levels—Headquarters, Division, and District—with each level of review (national, regional, and project-specific, respectively) providing additional analysis and conditioning.  *See* 33 C.F.R. §§320.1(a)(2), 330.5.

**1.    Headquarters-level review restricts the activities authorized by NWPs through applicable terms and conditions and PCN requirements.**

Before issuing the NWPs, Corps Headquarters conducts an environmental analysis at the national level to determine whether the category of activities authorized by the permit result in no more than minimal individual and cumulative adverse environmental effects.  At this level, analysis of potential adverse effects necessarily consists of "reasoned predictions."  *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005) ("*Bulen*").

Headquarters ensures that the activities authorized by the NWP will have no more than minimal impact, in part through imposing stringent terms that must be

met to qualify for use of the NWP and through mandatory GCs, which restrict the activities authorized by an NWP.  33 C.F.R. §330.1(c).  Headquarters publishes a proposed rule, seeks and responds to public comment, *id.* §330.5(b)(2), and memorializes its Section 404(b)(1) Guidelines, NEPA, ESA, and other national-level environmental analyses in a decision document.  *Id.* §330.5(b)(3).  It is the rulemaking action at this level—Headquarters' 2021 reissuance of NWP 12—that is the subject of this challenge.

> ### 2.   Corps Division and District Engineers provide second and third levels of review and conditioning for any activities authorized by an NWP.

Two additional reviews—at the regional and project-specific levels—are provided, but are not at issue here.

At the second level, within each geographically-based Corps Division, the Division Engineer has "discretionary authority to modify, suspend, or revoke NWP authorizations for any specific geographic area, class of activities, or class of waters within his division."  *Id.* §330.5(c)(1).  Division Engineers may "further condition or restrict the applicability of an NWP for cases where they have concerns for the aquatic environment under the Clean Water Act section 404(b)(1) Guidelines or for any factor of the public interest."  *Id.* §§330.1(d), 330.5(c)(1)(iii).

The third level of review occurs when the NWP terms or a general or regional condition require the prospective permittee to submit a PCN seeking

verification that a particular proposed activity complies with the terms and conditions of the NWP. *Id.* §§330.1(e)(1), 330.6(a). In those circumstances, the Corps District Engineer will evaluate the proposed activities "on a case-by-case basis … to ensure that the activity will have only minimal individual and cumulative adverse effects on the environment, and will not be contrary to the public interest," *id.* §330.6(a)(3)(i), and "may add activity-specific conditions," *id.* §330.1(e)(2); 86 Fed. Reg. at 2745 [NWP000005].

If such activity-specific conditions are insufficient to ensure that the activity will have only minimal adverse environmental effects, the District Engineer will not authorize the activity pursuant to the NWP and will instead instruct the prospective permittee that an individual permit is required. *See* 33 C.F.R. §330.1(e)(3). The District Engineer retains discretion to suspend, modify, or revoke any verification. *Id.* §330.1(d). No additional NEPA analysis is required for NWP verifications. *Id.* §330.6(a); 86 Fed. Reg. at 2842 [NWP000102].

### C. As Conditioned, Headquarters' 2021 Reissuance of NWP 12 Is Closely Restricted in Scope to Ensure Compliance with NEPA, the CWA, and the ESA.

Corps Headquarters has refined NWP 12 over the past four decades to include numerous terms and restrictions that tightly circumscribe the scope of activities that may proceed without further review and approval by the District Engineer through a PCN. The 2021 NWP 12 authorizes minor discharges of

dredged or fill material in connection with "[a]ctivities required for the construction, maintenance, repair, and removal of oil and natural gas pipelines," which is defined to include local natural gas distribution utility lines.  86 Fed. Reg. at 2860 [NWP000120].[3]  The streamlined permitting process provided by NWP 12 is important for a variety of projects, including construction and maintenance projects that promote safety, energy resilience and reliability and those that help reduce greenhouse gas ("GHG") emissions.[4]

Multiple terms and thirty-two GCs limit the use of NWP 12—prohibiting activities from proceeding under NWP 12 at all, or requiring a PCN prompting District Engineer-level review.  *See*, *e.g.*, GC 5 (prohibiting activity in areas of concentrated shellfish populations); GC 7 (prohibiting activity in proximity to a public water supply intake); GC 16 (prohibiting activity within a component of the National Wild and Scenic River System); *id.* at 2868 [NWP000128]; *id.* at 2860 [NWP000120] (requiring PCN if the proposed discharge would result in the loss of greater than 1/10-acre of WOTUS).

GC 18, for example, excludes from authorization and requires submission of PCN if any ESA-listed species or designated critical habitat "might be affected" or "is in the vicinity of the activity."  86 Fed. Reg. at 2844 [NWP000104].  Thus,

---

[3] NWP 12 can also authorize, with PCN and verification, crossing of navigable waters under §10 of the Rivers and Harbors Act ("RHA").

[4] *See, e.g.,* Aff. of Pamela Lacey ¶¶21-26 (Doc. 19).

"[t]he only activities that are immediately authorized by NWPs are activities proposed by non-federal entities that do not meet the 'might affect' threshold of general condition 18 and that are not located in designated critical habitat." NWP003596.  By imposing these restrictions, the Corps incentivizes project proponents to design their projects to avoid effects to listed species and critical habitat.  (Doc. 60 at 35).  When GC 18 is triggered, the prospective permittee "cannot begin the activity until receiving written notification from the Corps" that the ESA's requirements have been met and the activity is authorized.  86 Fed. Reg. at 2869, 2873 [NWP000129, NWP000133].[5]  "If the project proponent does not comply with the requirements of NWP general condition 18, or any other NWP general condition, the activity is not authorized by [the] NWP."  NWP0003576. There are no reported instances where effects to listed species of designated critical habitat have occurred as a result of an NWP activity without undergoing the appropriate consultation.  NWP003583; (Doc. 60 at 40).

---

[5] In other circumstances where use of NWP 12 requires PCN (for example because the proposed discharge would result in the loss of greater than 1/10-acre of WOTUS), the prospective permittee shall not begin the activity until either (1) he is notified by the District Engineer in writing that the activity may proceed with any special conditions imposed by the District or Division Engineer; or (2) 45 calendar days have passed from the District Engineer's receipt of a *complete* PCN, and the prospective permittee has *not* received written notice from the District or Division Engineer.  86 Fed. Reg. at 2873 [NWP000133].  In practice, the 45 calendar day period is often much longer because the District Engineer often requests additional information before deeming a PCN to be "complete."  *Id.*

As conditioned, the 2021 NWP 12 reissuance thus closely restricts the scope of authorized activity—i.e., the activity that may proceed without additional Corps review and approval—ensuring Headquarters' reissuance of NWP 12 complies with NEPA, the CWA, and the ESA.

## III.   STANDARD OF REVIEW

The Corps' decision should be upheld under the Administrative Procedure Act unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy,* 898 F.2d 1410, 1414 (9th Cir. 1990).  The arbitrary and capricious standard requires deference to agency factfinding.  *See Abbott Labs. v. Gardner,* 387 U.S. 136 (1967).  A court asks primarily whether the agency "'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'"  *Pyramid Lake Paiute Tribe of Indians,* 898 F.2d at 1414 (internal citation omitted).  The court may not substitute its judgment for that of the agency.  *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971).  So long as the Corps' decision was based on a consideration of relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action.  *See id.*

11

## IV.   ARGUMENT

### A.   Plaintiffs Have Not Alleged Facts Sufficient to Establish Standing for Their ESA Claim.

The Court lacks jurisdiction to hear Plaintiffs' ESA claim.  Setting aside the merits of that claim, Plaintiffs have failed to allege facts showing that they (1) suffered an injury-in-fact, (2) fairly traceable to the Corps' reissuance of NWP 12, and (3) that is likely to be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Injury-in-fact is "'first and foremost.'"  *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016).  Generalized or abstract grievances are insufficient to establish an "injury in fact."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  A plaintiff must show an injury that is "'concrete and particularized'" and "'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339.  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1).  In other words, Plaintiffs must demonstrate "'such a personal stake in the outcome of the controversy as to ... justify [the] exercise of the court's remedial powers on [their] behalf.'"  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (brackets in original, citation omitted).

Plaintiffs fail to meet that standard.  First, Plaintiffs do not point to any specific use of the 2021 NWP 12 that injures their interests in listed species or

12

designated critical habitat.  Second, Headquarters' action is restricted such that it only authorizes activities that have "no effect" on listed species or designated critical habitat.  Thus, Headquarters' reissuance of NWP 12 does not cause any injury to Plaintiffs' purported ESA interests.

> **1.** **Plaintiffs do not allege any specific injury to listed species or designated critical habitat resulting from Headquarters' reissuance of NWP 12.**

Neither Plaintiffs' complaint nor their declarations identify any application of the 2021 NWP 12 that threatens imminent, concrete, and particularized harm to their interests or their members' interests in listed species or designated critical habitat.  The Supreme Court has declined to find standing in such circumstances.

In *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009), the Supreme Court held that challenging a "regulation in the abstract, apart from any concrete application that threatens imminent harm to [the plaintiff's] interests," is insufficient to satisfy the injury requirement for standing.  The Court rejected the respondent's standing affidavit, because "it was not tied to [an] application of the challenged regulations, … does not identify any particular site, and … relates to past injury rather than imminent future injury that is sought to be enjoined."  *Id*. at 495.  Thus, respondents failed to satisfy "Article III's injury-in-fact requirement."  *Id.* at 494.

13

Likewise, Plaintiffs have not identified any specific current application of Headquarters' reissuance of NWP 12 that threatens imminent harm to their stated interests.  A threatened injury "must be *certainly impending* to constitute injury in fact," or there must be a "'substantial risk' that the harm will occur."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) (emphasis in original).  "'[A]llegations of *possible* future injury' are not sufficient."  *Id*. at 409 (emphasis in original).  The only projects cited in Plaintiffs' complaint and declarations "relate[] to past injury rather than imminent future injury."  *Summers*, 555 U.S. at 495.  Plaintiffs point to projects that have been terminated (Keystone XL),[6] cancelled (Atlantic Coast),[7] no longer plan to rely on an NWP (Mountain Valley), or are constructed (Dakota Access).[8]  *See, e.g.,* Decl. of Brett Hartl ¶¶ 11-12, 26 (Doc. 45-4) (asserting harms from past projects and plans "to return to … areas where NWP 12 projects have historically been constructed"); Decl. of Martin Hamel ¶¶ 11 (Doc. 45-3) ("Hamel Decl.") (referencing Dakota Access and

---

[6] *Indigenous Envtl. Network v. Trump*, No. 4:19-cv-00028-BMM, 2022 WL 742469 (D. Mont. Mar. 11, 2022) (determining that challenge to Keystone XL project was moot because project has been cancelled).

[7] *See* Pls. Compl. ¶ 27 (Doc. 1) (admitting Atlantic Coast is "defunct").

[8] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 96, 107 (D.D.C. 2017) (noting that Dakota Access became fully operational around June 1, 2017).  Eight of the remaining projects cited in Plaintiffs' declarations are complete (TransCanada Gulf Coast, Enbridge Flanagan South, Atlantic Bridge, Bayou Bridge, Millennium, Permian Highway, Bridger, and the Haines oil pipeline); two were withdrawn (Byhalia, Jordan Cove/Pacific Connector); and two were cancelled (Constitution, PennEast).

Keystone XL); Pls.' Compl. ¶¶ 26-28 (referencing general "harm from NWP 12-authorized activities," and citing "past use of NWP 12 for pipeline projects").  Mr. Hamel, for example, expresses an interest in sturgeon, but concedes he does not know "precisely where NWP 12 projects will take place over the next few years" and makes no claim that he has visited or has any firm plans to visit sturgeon in proximity to any current or imminent NWP 12 projects.[9]  Hamel Decl. ¶¶ 11, 14.

In fact, the only current project referenced by Plaintiffs is a 2021 NWP 12 verification for the NorthWestern Energy Byron pipeline.  Decl. of Steve Krum ¶ 5 (Doc. 45-6) ("Krum Decl."); Decl. of Anne Hedges ¶ 19 (Doc. 45-5) ("Hedges Decl.").  But, as Plaintiffs concede, the Bryon pipeline would be constructed under the Yellowstone River pursuant to §10 of the RHA, and Plaintiffs' Declarants do not identify any listed species or designated critical habitat that might be harmed by this activity, because there are none.[10]  Decl. of Sage Joyce ¶ 13 (Doc. 60-1).

---

[9] "Such 'some day' intentions—without any description of concrete plans … do not support a finding of the 'actual or imminent' injury that our cases require.'" *Lujan*, 504 U.S. at 564.  *See also* Decl. of Kenneth Midkiff ¶ 13 (Doc. 45-7) (expressing general intent to return to the Missouri River, but failing to tie those plans to any injury resulting from a 2021 NWP 12 project).

[10] Mr. Krum asserts generalized statements of harm from felling of cottonwood trees "important for … bird and animal habitat," which would "eliminate wildlife habitat," and impair "sightings" of "deer, bear, moose, bald eagles, and even mountain lions."  Krum Decl. ¶¶ 7-8.  These are not species protected under the ESA, and, in any event, it is unclear how an underground pipeline would impair Mr. Krum's wildlife sightings.

Plaintiffs fall back on generalized assertions of harm to "species" and "habitat," not tethered to any particular application of the 2021 NWP 12, which is plainly insufficient to show "imminent injury." *Lujan*, 504 U.S. at 564; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (harm must be "likely, as opposed to merely speculative"). *See e.g.* Decl. of Hallie Templeton ¶¶ 10-11 (Doc. 45-8) ("Templeton Decl.") (expressing concern about "harm to species" and "[a]ctivities that harm native species"); Midkiff Decl. ¶¶ 6-8, 13 (expressing "concern[] about endangered species found in the Missouri River," claiming to regularly visit these areas, and asserting that any species decline would deprive him of benefits he enjoys "from the existence of these rare animals"). Similarly, assertions of harm to Mr. Hamel's scientific and academic interests in the pallid sturgeon are neither concrete nor particularized for standing purposes. *See* Hamel Decl. ¶¶ 11-15; *Lujan*, 504 U.S. at 566 (rejecting "'animal nexus' approach, whereby anyone has an interest in studying or seeing the endangered animals anywhere on the globe has standing; and the 'vocational nexus' approach, under which anyone with a professional interest in such animals can sue").[11]

---

[11] None of the remaining declarants allege injury to any listed species or critical habitat. *See* Decl. of Daniel Estrin ¶ 11 (Doc. 45-2); Templeton Decl. ¶ 10; Hedges Decl. ¶ 11.

In sum, Plaintiffs fail to connect their asserted ESA injuries to any current project relying on Headquarters' 2021 reissuance of NWP 12.[12]  As such, Plaintiffs fail to establish standing for their ESA claim.

> **2.      Headquarters' reissuance of NWP 12 does not authorize any activities that affect listed species or habitat, and thus Plaintiffs cannot establish injury-in-fact from the challenged action.**

As discussed *infra* at IV.B., Headquarters' reissuance of NWP 12 is restricted to authorize only those activities that have "no effect" on listed species or designated critical habitat.  Any use of NWP 12 that even *might affect* listed species or designated critical habitat, is prohibited absent submission of PCN, further review, and consultation, if required, and written authorization by the District Engineer.  Thus, *no activities* are authorized through Headquarters' reissuance of NWP 12 that could affect ESA-listed species or habitat and harm Plaintiffs' purported interests in these protected species or habitat.

* * *

---

[12] Plaintiffs may contend they have suffered a procedural injury from the Corps' alleged failure to conduct §7 consultation.  But assertions of procedural harm without any tie to an affected concrete interest do not establish injury-in-fact. *Summers*, 555 U.S. at 496 ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*— is insufficient to create Article III standing").  Plaintiffs have failed to identify any harm or injury to their interests in ESA-listed species or designated critical habitat resulting from Headquarters' reissuance of NWP 12.  Accordingly, any assertion of a procedural injury would fail.

That is not to say that Plaintiffs may never have standing to assert an ESA claim. But any project-specific use of NWP 12 that could potentially provide standing for such a claim is a new action that would be subject to PCN and District Engineer-level review and verification. If Plaintiffs encounter a future activity-specific use of NWP 12 that harms their interests in a concrete manner, they can file suit challenging that as-applied use of NWP 12.

Plaintiffs' ESA claim should be dismissed for lack of standing.

## B.     The Corps Complied with the ESA When Reissuing NWP 12 in 2021.

If the Court proceeds to the merits of Plaintiffs' ESA claim, summary judgment should be granted in favor of the Federal Defendants and Defendant-Intervenors.

The ESA charges the *action agency* (not the Services, nor the Court) with the exclusive responsibility to define the scope of the action it authorizes and to assess whether that authorized action has "effects" on listed species or designated critical habitat. 16 U.S.C. §1536(a)(2).[13] Here, that means the Corps must assess whether its action—Headquarters-level reissuance of NWP 12—is likely to jeopardize the continued existence of listed species or adversely modify designated critical habitat. *Id.* Based on the action agency's review of its authorized action, it

---

[13] The §7 regulations promulgated by the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (together, "the Services") reiterate this command. 50 C.F.R. §§402.01(a), 402.02.

*may* be required to consult.  But where the action agency determines that the

proposed authorization has "no effect" on listed species or designated critical

habitat—as the Corps did here—its obligations under ESA §7 are complete.

"[C]onsultation requirements are not triggered."  *See Friends of the Santa Clara*

*River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 913 (9th Cir. 2018) (internal

quotation marks and citation omitted).

> 1.   **The Corps satisfied ESA §7 when it determined that Headquarters' reissuance of NWP 12 is restricted to those activities that have "no effect" on listed species or designated critical habitat.**

An action agency's obligations under the ESA turn on the scope of action

actually authorized by the agency.  16 U.S.C. §1536(a)(2).  In determining whether

consultation is required, an agency focuses on the *action* it has chosen to approve

and assesses the effects of that action only:  "When an agency action has clearly

defined boundaries, we must respect those boundaries…."  *WildEarth Guardians v.*

*U.S. EPA*, 759 F.3d 1196, 1209 (10th Cir. 2014).  *See also* 50 C.F.R. §402.14(c)

(looking to action agency's "description of the proposed action" to be considered).

The *action* at issue here—Headquarters' 2021 reissuance of NWP 12—is

highly conditioned and restricted in scope, due to the numerous Headquarters-level

limitations incorporated in the NWPs.  Primary among these terms and conditions

restricting the action is GC 18, which makes clear that no activity is authorized

under any NWP that "might affect" listed species or critical habitat, unless PCN is

submitted and further authorization obtained.[14]  86 Fed. Reg. at 2846

[NWP000106].  Submission of a PCN is a *new proposed action*, which might be

authorized after further agency review, but "*[n]o activity is authorized* under any

NWP which 'may affect' a listed species or critical habitat" *until §7 "consultation*

*... has been completed*."  *Id.* at 2869 [NWP000129] (emphases added).  GC 18,

thus, *prohibits* work unless and until the applicant is "notified by the district

engineer that the requirements of the ESA have been satisfied and that the activity

is authorized."  *Id.*  Any *future-yet-to-be-authorized* use of NWP 12 that would

trigger PCN is outside the scope of Headquarters' reissuance of NWP 12.

     For purposes of ESA §7, the Corps properly limited its effects assessment to

this tightly circumscribed set of activities authorized by Headquarters' 2021

reissuance of NWP 12 and determined this authorized action would have "no

effect" on listed species or designated critical habitat.  86 Fed. Reg. at 2848

[NWP000108]; NWP003610.  The Corps' ESA §7 obligations were complete once

it reached that "no effect" determination.  Nothing more was or is required from

the Services under these circumstances.  *Karuk Tribe of California v. U.S. Forest*

*Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc); *Defs. of Wildlife v. Flowers*,

---

[14] The "might affect" and "in the vicinity of" standards are much broader
and more conservative than the "may affect" standard under the Services' ESA
regulations.  They are thus protectively designed to ensure that any proposed action
even possibly triggering consultation requires, before authorization, review and
verification by the District Engineer.

414 F.3d 1066, 1069 (9th Cir. 2005) ("'[T]he 'no effect' determination was a decision for the Corps to make, not the USFWS.'").

Plaintiffs contend the Corps improperly narrowed the "action" it authorized by relying on District Engineer project-specific review pursuant to GC 18 to reach a "no effect" determination and should have instead evaluated all NWP 12 activities that could be authorized at some point in the future as part of its "action." (Doc. 45 at 18-19). But this position disregards the action agency's role in determining the authorized action and the boundaries of that action. The Tenth Circuit has explained that "the duty to consult is bounded by the agency action," and "we must respect [the] boundaries [of that agency action] and not describe inaction outside those boundaries as merely a component of the agency action." *WildEarth Guardians*, 759 F.3d at 1208-09. ESA consultation "cannot be invoked by trying to piggyback nonaction on an agency action by claiming that the nonaction is really part of some broader action." *Id.* at 1209. Indeed, were that allowed, "[t]he agency would have to set forth everything it might do." *Id.*

As explained above, Headquarters' reissuance of NWP 12 is cabined by GC 18, which *prohibits* any activities that "might affect" listed species or habitat, absent further appropriate review. 86 Fed. Reg. at 2846 [NWP000106]. Future uses of NWP 12 that come within GC 18 are new proposed actions that require

submission of PCN for their own ESA "effects" determination, and are not authorized until consultation, if required, is complete.

The Corps' approach for the NWPs is consistent with ESA analyses upheld by other courts.  In *Center for Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466 (D.C. Cir. 2009), for example, the plaintiffs challenged the Department of the Interior's decision to expand leasing on the Outer Continental Shelf for off-shore oil-and-gas development, arguing that the agency had failed to consult.  *Id.* at 482.  The D.C. Circuit dismissed plaintiffs' ESA challenge due to the "multi-stage nature of [the] leasing programs," explaining that "the first stage of a leasing program does not cause any harm to anything because it does not require any action or infringe on the welfare of animals," which "is, by design, only implicated at later stages of the program, each of which requires ESA consultation."  *Id.* at 483.

Similarly, in *Natural Resources Defense Council v. U.S. Dep't of the Navy*, No. CV-01-07781 CAS (RZX), 2002 WL 32095131, at *24 (C.D. Cal. Sept. 17, 2002) ("*NRDC*"), the Central District of California confirmed that the Navy did not improperly divide its "action" to avoid consultation.  At issue was the Navy's Littoral Warfare Advanced Development Program ("LWAD"), which serves as a framework to oversee and coordinate future actions.  Those future actions (sea tests) would be subject to appropriate ESA analysis on a "sea-test-by-sea-test"

basis.  Plaintiffs, however, argued that the LWAD and the future sea tests constituted a single program with a cumulative adverse effect on marine species, and thus that the Navy was required to consult on the LWAD program as a whole, rather than on the individual sea tests.  *Id.* at *2.  Distinguishing *Conner, Pacific Rivers,* and *Lane County* (cited by Plaintiffs here)*,* the court held that "an agency has substantial discretion to determine whether a 'program' … or its component elements are the more appropriate object of ESA consultation." *Id.* at *24.  The record did not suggest that the Navy decided to consult with NMFS on a sea-test-by-sea-test basis to avoid environmental review.  Rather, the Navy purposefully structured its program (like the Corps has done with the NWPs) to provide for consultation with NMFS on the future individual sea tests when there would be concrete information about the locations of the sea tests and the technologies to be tested.  *Id.*  The court held that this approach was proper, and the Navy did not inappropriately segment its ESA analysis to avoid consultation.  *Id.*

The same is true here.  The Corps' determination that Headquarters' reissuance of NWP 12 has "no effect" was not an attempt to evade consultation.  Rather, through GC 18, the Corps has ensured that consultation will occur at the appropriate juncture—when project-level activity is proposed for review and authorization by the District Engineer.

## 2.   Programmatic consultation is not required for a "no effect" action.

The mere existence of programmatic consultation does not supersede the action agency's threshold effects assessment.  As the Services noted in their most recent consultation regulations, §7 provides "significant flexibility" for federal agency compliance with the ESA, and "many types of programmatic consultation would be considered an *optional* form of section 7 compliance."  84 Fed. Reg. 44,976, 44,996 (Aug. 27, 2019) (emphasis added).  There is no requirement in the statute, the Services' regulations, or case law that requires an action agency to undertake programmatic consultation where it has determined its action has "no effect."  Indeed, consultation, whether programmatic or otherwise, need only occur *if* the action agency finds its action "may affect" species or habitat.  Here, the Corps properly determined that Headquarters' reissuance of NWP 12 has "no effect" on species or habitat, and nothing further is required.

The Services' regulations confirm that consultation is *not* required for programmatic action that has "no effect" on listed species or designated critical habitat.  80 Fed. Reg. 26,832 (May 11, 2015).  The 2015 regulations define a framework programmatic action as "a collection of activities of a similar nature, … or an action adopting a framework for the development of future actions."  *Id.* at 26,835.  While the Services' 2015 rule (which is not binding on the Corps) cites the NWPs as an example of a federal program that provides a framework

24

programmatic action, the preamble is explicit as to what that means:  "this [rule] does not imply that section 7 consultation is required for a framework programmatic action that has *no effect* on listed species or critical habitat."  *Id.* (emphasis added).[15]

The preamble further explains that framework programmatic actions can include activities *immediately authorized without further agency approval*, but also could contemplate *future actions that might be later authorized*.  *Id.*  And those future actions are "subject to section 7 consultation requirements at a later time as appropriate."  *Id.*  Thus, the regulations contemplate an action that is immediately authorized (e.g., Headquarters' reissuance of NWP 12), and later actions that are subject to future consultations (e.g., any proposed use of NWP 12 that triggers PCN).  Those are separate actions.

This tracks precisely with what the Corps did here.  In determining whether to consult, the Corps assessed the carefully confined scope of activities authorized

---

[15] NWP 12 is not a "program":  NWPs are "rules."  *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("Each NWP easily fits within the APA's definition of "rule."  This is so because each NWP, which authorizes a permittee to discharge dredged and fill material …, is a legal prescription of general and prospective applicability which the Corps has issued to implement the permitting authority the Congress entrusted to it in section 404 of the CWA."); *see also* Doc. 60 at 43 n.15 ("The Corps' issuance of multiple general permits is more akin to rulemaking than a "program," as that term is construed under the ESA. … The Corps agrees that NWP 12 is an agency action within the meaning of the ESA, but it is inaccurate to label this specific general permit as a 'program.'").

by Headquarters' reissuance of NWP 12.  It did not consider future activities, which, if later proposed, would require submission of PCN pursuant to GC 18 and be subject to agency review and consultation, as appropriate, before authorization. The Services' regulations thus are consistent with and support the Corps' conclusion that "an ESA section 7(a)(2) consultation with the FWS and NMFS is not required on a national, programmatic level for the issuance or reissuance of the NWPs." 86 Fed. Reg. at 2848 [NWP000108].  The case law, too, confirms this approach.  *Accord NRDC*, 2002 WL 32095131, at *24 (confirming that "programmatic consultation was not necessary or worthwhile in light of the Navy's pursuit of consultations in connection with individual sea tests" and "that determination was not arbitrary and capricious").

### 3. The cases Plaintiffs cite are irrelevant.

None of the cases cited by Plaintiffs are analogous.  The cited cases do not involve situations, like here, where the action agency purposefully restricted its action to authorize *only* those activities that *do not effect* listed species or habitat. Rather, the cases involve a determination by the action agency that its action *"may affect"* listed species or habitat, and the cases go on to address specific legal issues associated with the consultation undertaken for those "may affect" determinations. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ("*Cottonwood*"); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) ("*Conner*");

26

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 482 F.

Supp. 2d 1248 (W.D. Wash. 2007) ("*Pacific Coast*").  Moreover, Plaintiffs do not

cite a single case in which programmatic consultation was required for a "no

effect" determination.  These cases have no bearing, therefore, on whether the

Corps correctly reached its "no effect" determination, or whether programmatic

consultation is required for this type of action.

For starters, the issue in *Pacific Coast* was with the biological opinion issued

during the consultation process following the action agencies' "may affect"

determination.  The Forest Service ("FS") and Bureau of Land Management

("BLM") determined that amendments to a habitat conservation strategy within a

specific geographic range "may affect" listed species and initiated §7 consultation

with the Services.  482 F. Supp. 2d. at 1257-58.  The consultation resulted in a no-

jeopardy biological opinion, which relied on compliance with a "discretionary"

analytical process for future site-specific consultations.  *Id.* at 1258.  The biological

opinion, however, failed to address what would happen if projects proceeded

without applying the discretionary process.  *Id.* at 1270.

This is not the issue here.  Unlike *Pacific Coast*, where the agencies

determined their action "may affect" listed species or habitat, Headquarters'

reissuance of NWP 12 is restricted to the circumscribed set of NWP 12 activities

that have "no effect" on protected species or habitat.  The Corps analyzed the

scope of its authorized action, and properly reached a "no effect" determination, which did not require consultation or a biological opinion.

*Conner* also involved a "may affect" determination. In *Conner,* the FS determined that issuance of federal oil and gas leases, which granted exclusive rights to undertake oil and gas investigation, exploration, development, production, and abandonment activities on 1,350,000 acres of forest land, "might affect" listed species or critical habitat and initiated §7 consultation. 848 F.2d at 1444 n.5, 1452. FWS limited its consultation to *the leasing stage*, however, and did not address potential impacts from *post-leasing* oil and gas activities, such as development, production, and abandonment, which were inevitable because there were no restrictions on the later post-leasing activities that would have prohibited those activities from going forward without any necessary consultation. *Id.* at 1456 n.37. Because the *entire authorized* agency action that "might affect" listed species or habitat necessarily included those later post-leasing activities, the Ninth Circuit deemed the FWS's limitation of the consultation to the leasing stage to be inadequate and a violation of the ESA.

*Conner* was thus focused on whether the Services properly fulfilled their role in the consultation process after the action agency reached a "may affect" determination. That is inapposite from the situation here where the Corps made a threshold "no effect" determination based on the restrictions in Headquarters'

reissuance of NWP 12 which *do not authorize any activities* that even "might affect" listed species or habitat, and thus consultation was not required.

*Cottonwood*, too, is distinct as it addressed the triggers for reinitiation of consultation. There was no dispute in *Cottonwood* that the underlying agency action—a land management document, known as the Lynx Amendments—required consultation because it "may affect" lynx. 789 F.3d at 1085. The issue was simply whether and under what circumstances the FS retained responsibility to reinitiate consultation when the underlying action was complete. *Id.* Again, this is not the issue before the Court, because the Corps properly examined the effects of Headquarters' reissuance of NWP 12 and determined there would be "no effect" from authorized activities on listed species or habitat.

In sum, each of these cases involved a "may affect" determination by the action agency and addressed specific issues regarding the ensuing consultation. But that is not the issue here, where the Corps reached a threshold determination of "no effect."

The remaining three cases cited by Plaintiffs—*Western Watersheds Project v. Kraayenbrink,* 632 F.3d 472 (9th Cir. 2011), *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005) ("*Brownlee*"), and *Lane County*

*Audubon Society v. Jamison*, 958 F.2d 290 (9th Cir. 1992) ("*Lane County*")—are irrelevant for other reasons.

*Western Watersheds,* on which Plaintiffs rely to argue that the Corps' "no effect" determination was in error, is readily distinguishable.  (Doc. 45 at 15). There*,* the Ninth Circuit held that that the action agency, BLM, erred in its initial determination that the action—amendments to grazing regulations—had "no effect" on listed species or critical habitat due to "resounding evidence from agency experts," BLM scientists and FWS, that the amendments "'may affect' listed species and their habitat."[16]  632 F.3d at 498.  Unlike *Western Watersheds,* the administrative record for the 2021 NWP reissuance supports the Corps' "no effect" determination, and the Services expressed *no concern* with that determination, nor did they request consultation.

*First,* there is *nothing* in the record to suggest that the activities actually authorized by Headquarters' reissuance of NWP 12 may affect species or habitat. The Corps thoroughly analyzed effects of NWP 12 in its decision document.  And as the Federal Defendants explain, mindful of the Court's Orders in *Northern*

---

[16] According to the court, BLM failed to consider its own identification of hundreds of species present on the affected lands, statements from FWS that the regulations "*would* affect status species and their habitat," and conclusions from BLM scientists advising that §7 consultation was necessary.  *Western Watersheds*, 632 F.3d at 497-98.  Notwithstanding this record, BLM maintained that the regulatory changes were "purely administrative" and would not affect species or habitat.  *Id.* at 498.  But that is not the case here where the action does not authorize any activities that even "might affect" listed species or habitat.

*Plains*, the Corps developed a voluntary biological assessment and examined whether the NWPs, with their specific and binding restrictions, would affect listed species or habitat.  (Doc. 60 at 39-41, 43-44).  Based on the analyses in the decision document and biological assessment, the Corps concluded that Headquarters' reissuance of NWP 12 would have no effect on listed species or critical habitat.

Plaintiffs point to various statements from the Corps' public interest, NEPA, and 404(b)(1) Guidelines analyses for the 2021 NWP 12 regarding effects to the environment or aquatic resources, and conflate these effects with effects on listed species and habitat.  (Doc. 45 at 15-16 (citing NWP001034 ("General environmental concerns" public interest factor); NWP001022 (NEPA "impacts on aquatic environment" review); NWP001035-36 ("Wetlands" public interest factor); NWP001040 ("Water quality" public interest review factor); NWP001037 ("Fish and wildlife values" public interest review factor); NWP001062 ("Other wildlife" 404(b)(1) factor))).  But they are not the same.  None of these record statements discuss GC 18 or effects on ESA-listed species or designated critical habitat. General statements about impacts to aquatic resources, the environment, and wildlife in the context of the Corps' analysis have no bearing and provide no evidence to suggest that reissuance of NWP 12 "may affect" listed species or

habitat.[17]  The Corps' review was robust and uniformly supports its "no effect" determination.

*Second*, unlike *Western Watersheds*, the record reflects that, though not required, the Corps coordinated with the Services on the Headquarters' reissuance of the NWPs, and neither Service requested consultation for the 2021 NWPs nor provided any disagreement with the Corps' biological assessment and "no effect" determination.  *See* 50 C.F.R. §402.14(a); NWP000605; NWP010830. [18]

Accordingly, none of the circumstances or record evidence that allow a court to second-guess an agency's "no effect" finding are present here, as they were in *Western Watersheds*.

---

[17] The FWS "comment letter" cited by Plaintiffs (Doc. 45 at 17 (citing NWP 009598-9605)), is not as they say.  It is a letter from a FWS field office identifying regional programmatic consultations that have occurred between that FWS field office and the Corps' Wilmington District, which led to standard local operating procedures for certain species, e.g., the Northern Long Eared Bat, in that region. NWP009604.  The adoption of local procedures and conditions to further protect species at a regional level is consistent with the Corps' overall NWP approach. Moreover, as the Federal Defendants explain, "[t]he position of a field … office does not represent the considered views of an entire agency."  (Doc. 60 at 45 n.16).

[18] Plaintiffs point to statements from prior *voluntary* consultations and documents from earlier NWP reissuances for long-since expired permits that have no bearing on the Headquarters' 2021 NWP reissuance.  (Doc. 45 at 17).  As the Corps explained, "the national programmatic consultations conducted in the past for the NWP program were voluntary consultations," 86 Fed. Reg. at 2846-47 [NWP000106], and the Corps has consistently maintained that consultation is not required.

The challenge brought in *Brownlee*—the only case cited by Plaintiffs that involved a challenge to NWPs—was also very different.  *Brownlee* did not concern Headquarters' reissuance of NWP 12.  Rather, *Brownlee* focused narrowly on the Corps' Jacksonville District's ESA compliance on the 2002 version of four NWPs, including the 2002 NWP 12, and whether sufficient consultation occurred with respect to regional conditions adopted and incorporated into the challenged NWPs for their use in Florida with respect to the Florida panther.  402 F. Supp. 2d at 11. The *Brownlee* Plaintiffs did not seek to enjoin the NWPs nationwide or require programmatic consultation; they sought only to require the Corps to consult with FWS regarding impacts of the four NWPs on the Florida panther.  *See* Compl. ¶¶ 23-27, 48, and Prayer for Relief, *Nat'l Wildlife Fed'n v. Brownlee*, No. 1:03CV01392, 2003 WL 23781745 (D.D.C. June 26, 2003).  The court held that sufficient consultation on the regional conditions had not occurred, and to remedy that issue, ordered the Corps to obtain FWS's sign-off on the regional panther conditions.  *Brownlee*, 402 F. Supp. 2d at 11.  On remand, the Jacksonville District (not Corps Headquarters) consulted with FWS solely on the regional panther conditions for use of the four challenged NWPs in Florida.  *See* Fed. Def.'s Mot. for Voluntary Remand or in the Alternative to Stay ¶¶ 4-6, *Nat'l Wildlife Fed'n v. Brownlee*, No. 1:03CV01392, 2005 WL 6173605 (D.D.C. May 13, 2005).  That is a completely distinct issue occurring at a different level in the Corps' review and

conditioning of the NWPs from the action here, which involves Headquarters-level reissuance of the 2021 NWP 12.[19]

Finally, *Lane County* is even farther afield, as the action agency there failed to make an effects assessment at all.  That matter involved the "Jamison Strategy," a BLM land and timber harvest management document that established specific criteria for timber sales in Washington, Oregon, and California, with a focus on approximately 1,149,954 acres of old growth forest suitable for spotted owl habitat in western Oregon.  958 F.2d at 291.  *Lane County* is inapposite because BLM contended that the Jamison Strategy was not an "'action'" requiring an effects assessment, but rather "a voluntarily created 'policy statement.'"  *Id.* at 293.  There is no dispute here that the Corps was required to make an effects assessment, and it did so.

### 4.    Cumulative effects are assessed on a project-specific basis.

Plaintiffs contend that project-level review cannot address "aggregate impacts" or "ensure an analysis of the cumulative impacts of projects within the same geographic vicinity," and thus programmatic consultation is necessary.  (Doc. 45 at 20-21).  The Services' regulations prescribe how cumulative effects are to be defined and considered for ESA §7 consultations with federal agencies, when those

---

[19] To whatever extent this out-of-Circuit district court decision might be read more broadly by the Court as suggesting that programmatic consultation is required for the NWPs, the case is not persuasive and should not be followed.

federal agencies determine their proposed actions *may affect* listed species or designed critical habitat and *initiate* consultation.  50 C.F.R. §402.02; 86 Fed. Reg. at 2848 [NWP000108].  Cumulative effects are defined as "those effects of future State or private activities, *not involving Federal activities,* that are reasonably certain to occur *within the action area of the Federal action subject to consultation*.  50 C.F.R. §402.02 (emphases added).  The Headquarters' reissuance of NWP 12 is restricted to those activities that have "no effect," and thus there can be no cumulative effects from that action.  As the Federal Defendants explain, "[z]ero plus zero is still zero."  (Doc. 60 at 48-49).

Future NWP 12 activities that "might affect" listed species or habitat will be reviewed through their own consultation.  50 C.F.R. §402.02.  Consistent with the Services' regulations and its ESA obligations, when a particular activity-specific use of NWP 12 triggers consultation, the consultation will take into account the relevant cumulative effects *within the action area*.  That is the way the cumulative effects analysis works: it specifically excludes future *Federal activities*, recognizing that such actions will be analyzed in a future consultation.  It would be contrary to the Services' regulations to attempt to account for cumulative effects from future Federal actions now, as Plaintiffs suggest, because those effects are by definition excluded and studied later at the appropriate time.  *Id.*

This is the same process that would be followed in the absence of NWP 12 entirely.  If a permittee, instead, applies to the Corps for an individual CWA permit (a future Federal action), the same activity-specific analysis, including relevant cumulative effects, would occur as part of the consultation for that permit.  There would be no additional "programmatic" consultation.

At base, Plaintiffs seek to add another layer of consultation, so that there would be a consultation procedure at the national, regional, and project-specific levels.  But this approach would ensnarl the NWP program in the very same administrative and procedural red tape Congress sought to avoid by adopting the NWP program, without improving the project-specific review provided by existing conditions and procedures, which have functioned well for decades.

### 5.   GC 18 does not improperly delegate the ESA "effects" review to permittees.

Plaintiffs' final argument is that GC 18 improperly delegates the ESA "effects" review to potential permittees.  (Doc. 45 at 22-23).  The Court has appropriately acknowledged that it must "presume[] that the Corps, the Services, and permittees will comply with all applicable statutes and regulations."  *Northern Plains*, 454 F. Supp. 3d at 993.  Nonetheless, in *Northern Plains,* the Court reasoned that GC 18 "fails to ensure that the Corps fulfills *its* obligations under ESA Section 7(a)(2) because it delegates the Corps' initial effect determination" to the applicant.  *Id*.

36

Respectfully, this position conflates after-the-fact compliance with a permitting regime with the scope of authorized activity under that regime.  In all permitting regimes, it is incumbent on the prospective permittee to make an initial determination whether it meets the required conditions or exceptions (or even intends to comply with those conditions or exceptions).  That question of compliance does not change the scope of activities that the permitting agency has authorized, or will authorize, to occur.  And it is only the authorized activities that must be assessed under ESA §7.

For example, subject to certain very limited exceptions, an individual cannot drive a motor vehicle without a license.  But it is incumbent on each individual to know as much and to apply for a license when the time comes.  Whether an individual complies with the requirement to obtain a license does not change the scope of activity the government has chosen to authorize.  Nor is it relevant that the government places that initial burden of compliance on private citizens.  But there are not many individuals who ignore this requirement and drive without licenses, and there are specific penalties in place should that occur.

Here, GC 18 and other limitations restrict the scope of activities authorized to proceed without future approval, and thus the scope of activities that must be assessed for purposes of §7.  Headquarters' reissuance of NWP 12 does not authorize any activity that "might affect" species or habitat.  Any such activity that

37

triggers GC 18 is prohibited, unless and until the applicant submits a PCN and the District Engineer notifies the applicant that the ESA's requirements are met.

A project proponent theoretically might flout GC 18 and move forward with a project in violation of that condition, but it would do so at its own peril.  Indeed, compliance is a serious and important concern, and there are numerous mechanisms in place to ensure it.  *See, e.g.,* 86 Fed. Reg. at 2846 [NWP000106] (discussing "take" prohibition, enforcement actions and penalties under the CWA and ESA for violations of GC 18 or if an unauthorized activity takes place).  In addition, the ESA includes a citizen suit provision.

It is no surprise that Plaintiffs cannot point to a single example where the appropriate consultation has not occurred.  (Doc. 60 at 42).  Indeed, this is consistent with the Corps' experience: "The Corps is not aware of any incidences where effects to listed species or designated critical habitat may have occurred as a result of an NWP activity without the district engineer initiating … consultation or determining that the NWP activity was covered by a regional programmatic … consultation."  NWP003583; NWP003610.

That the burden of compliance is on the potential permittee does not mean the Corps has "delegated" any of its responsibilities.  It has exercised its responsibilities under the ESA to determine the scope of the authorized action and assessed the effect of that action on listed species and habitat.

## C.      The Corps Complied with NEPA When Reissuing NWP 12.

Before reissuing NWP 12, the Corps fully analyzed relevant environmental effects *proximately caused* by the minor discharges of dredged or fill material into WOTUS authorized by NWP 12.  Plaintiffs, however, contend that the Corps was obligated to consider broader operational impacts—such as oil and gas spills,[20] "frac-outs," and GHG emissions—from pipelines that might rely on NWP 12 for construction of a small portion of the overall project.[21]  (Doc. 45 at 27).  These arguments are based on an incorrect assumption about the Corps' authority and a misunderstanding of the law.

Plaintiffs also contend that the Corps' cumulative effects analysis was lacking.  (Doc. 45 at 39-46).  But the Corps' cumulative effects approach and analysis for NWP 12 has been upheld by many courts.  *See, e.g., Sierra Club, Inc. v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685, at *9 (W.D. Okla. Dec. 30,

---

[20] Oil spills, to the extent they occur, are operational impacts caused by a failure of an oil pipeline.  The Corps does not have jurisdiction over pipeline operation and spills, or leaks of substances from pipelines.  Rather, these operational impacts are addressed by other regulatory agencies, including the U.S. Environmental Protection Agency and the Coast Guard through the Oil Pollution Act, the Department of Transportation, and the Pipeline and Hazardous Materials Safety Administration pursuant to its comprehensive regulations implementing the Pipeline Safety Act.  49 C.F.R. pt. 195.

[21] The NWP 12 Coalition joins and incorporates by reference the Federal Defendants' response to Plaintiffs' NEPA arguments regarding the Corps' consideration of oil and gas spills, inadvertent returns of drilling fluid, forested wetlands, and cumulative effects. (Doc. 60 at 19-31).

2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015) ("*Bostick*") ("[T]he Corps' cumulative impacts analysis with regard to the reissuance of NWP 12 was not arbitrary and capricious."); *Bostick,* 787 F.3d at 1047.  *See also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1286-89 (11th Cir. 2016) (upholding the Corps' approach for analyzing cumulative effects in connection with other NWPs); *Bulen*, 429 F.3d at 499.

The Corps' NEPA analysis was appropriate and is entitled to deference.

**1.  The Corps' §404 NEPA obligations extend only to environmental effects proximately caused by the discharge of dredged or fill material into WOTUS.**

NEPA requires federal agencies to take a "'hard look'" at the environmental consequences of proposed federal actions before taking them.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).  The scope of an agency's analysis under NEPA is determined by the precise nature of the federal action, which in turn depends on the activities subject to the agency's control and responsibility.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767-68 (2004); *see also* 40 C.F.R. §1508.18 (defining "major federal action" to include "actions with effects that may be major and which are potentially *subject to Federal control and responsibility*") (emphasis added).

A mere "but for" causal relationship between an agency action and an effect is not a sufficient basis to attribute that effect to the agency action for purposes of

NEPA.  40 C.F.R. §1508.1(g)(2); *see also Pub. Citizen,* 541 U.S. at 767.  Instead,

there must be a "reasonably close causal relationship" between the environmental

effect and the proposed action, 40 C.F.R. §1508.1(g), analogous to the concept of

proximate cause in the tort context.  *Pub. Citizen*, 541 U.S. at 767; *see also*

*Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 272-73 (8th Cir. 1980) (a "but for"

causal relationship in which an effect would not occur without the activity is not a

sufficient basis to attribute an effect to the agency's action under NEPA).  In other

words, an "agency need not consider" effects that it "has no ability to prevent,"

*Pub. Citizen*, 541 U.S. at 770, such as those that "are remote in time,

geographically remote, or the product of a lengthy causal chain," 40 C.F.R.

§1508.1(g)(2).

The Corps' substantive authority is limited to the discharge of dredged or fill

material into WOTUS.  *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,

941 F.3d 1288, 1296 (11th Cir. 2019) ("*CBD v. Corps*").  The Corps' NEPA

regulations confirm that "the *activity* the Corps studies in its NEPA document is

the discharge of dredge or fill material" for which federal authorization is sought.

33 C.F.R. pt. 325, App. B; 53 Fed. Reg. 3120, 3121 (Feb. 3, 1988) (emphasis

added).  Accordingly, the Corps' NEPA obligation is limited to environmental

effects proximately caused by discharges of dredged or fill material authorized by

the Corps permit, and it is those environmental effects the Corps studies in its

NEPA documents, including the environmental assessment ("EA") for NWP 12. *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706 (6th Cir. 2014).

The Corps' review does not extend to any larger activity outside the Corps' jurisdiction.  *See, e.g., Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009) ("[T]he fact that the Corps' §404 permit is central to the … valley-filling process [as part of a coal mine] does not itself give the Corps 'control and responsibility' over the entire fill"); *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116-17 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (Corps' NEPA review of CWA permit need not include effects of larger project); *Winnebago Tribe*, 621 F.2d at 272-73 (Corps' NEPA review for transmission line river crossing limited to those parts of the power line that affected navigable waters, not entire transmission line); *Save the Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322, 327 (5th Cir. 1980) (NEPA review of Corps permit authorizing construction of facility wastewater pipeline not required to consider overall impacts of facility).

The scope of the Corps' jurisdiction and control is critical to a proper understanding of the effects it must analyze for purposes of complying with NEPA.

The Corps' EA properly evaluated the potential impacts from reissuance of NWP 12.

> **2.** **The Corps was not required to evaluate GHG emissions from the potential burning of oil or natural gas transported through pipelines.**

Plaintiffs argue that the Corps failed to evaluate the "reasonably foreseeable effects of greenhouse gas emissions caused by NWP 12 activities." (Doc. 45 at 46-49). That argument is fundamentally flawed. A NEPA analysis must focus on effects that are proximately related to the agency action, not possible effects of an agency action that are beyond the agency's decision-making authority. *See Pub. Citizen*, 541 U.S. at 767-73.

The Corps does not authorize or control pipelines, nor does it have authority to regulate GHG emissions. The Corps' authority is limited to the minor discharges of dredged or fill material into WOTUS for the category of activities, authorized by NWP 12. *See* 33 C.F.R. pt. 325, App. B §7.b. No statute authorizes the Corps to regulate air emissions from oil refineries or natural gas power plants, merely because that oil or gas was transported through a pipeline, portions of which required a Corps permit to construct. Because the Corps "does not have the authority to control the burning of fossil fuels or the adverse environmental effects that are caused by burning those fossil fuels to produce energy," NWP001035, the Corps reasonably concluded it "is not required to evaluate those … downstream

impacts, including potential impacts on the planet's climate."  NWP000953-54.
The Corps' lack of regulatory jurisdiction over the activities producing those
effects puts them beyond the ambit of the Corps' NEPA review.

*Center for Biological Diversity v. National Highway Traffic Safety
Administration*, 538 F.3d 1172 (9th Cir. 2008), cited by Plaintiffs (Doc. 45 at 46),
confirms the requirement for a close, causal relationship between the action and
possible effects of that action, for such effects to be evaluated in the agency's
NEPA analysis.  There, the National Highway Traffic Safety Administration
("NHTSA") issued a rule setting corporate average fuel economy standards for
SUVs, minivans, and pickup trucks.  The court agreed with Petitioners that "[b]y
allowing particular fuel economy levels, which NHTSA argues translate directly
into particular tailpipe emissions, NHTSA's regulations are the *proximate cause* of
those emissions."  538 F.3d at 1216-17 (internal quotation marks omitted)
(emphasis added).  Here, however, any GHG emissions from the potential burning
of oil or natural gas transported through pipelines, segments of which may have
been constructed pursuant to an NWP 12 authorization, are outside the Corps'
jurisdiction and control and far too remote to be proximately caused by any
discharges authorized by the reissuance of NWP 12.

　　　　Several of the cases cited by Plaintiffs are plainly distinguishable because
they involve challenges to individual §404 permits for specific projects, as opposed

to NWPs.  With an individual permit, the Corps' role may be more significant; there might be a "reasonably close causal relationship" between the §404 individual permit and the operation or other activity that could lead to the impact in question.  For example, *Columbia Riverkeeper v. U.S. Army Corp of Eng'rs*, No. 19-6071 RJB, 2020 WL 6874871, at *4 (W.D. Wash. Nov. 23, 2020), cited by Plaintiffs (Doc. 45 at 48), involved an individual §404 permit necessary for construction of a *methane export terminal*, consisting of a dock, berth, methanol pipelines, inert gas lines, vapor return lines, support structures, loading equipment, utilities, and stormwater system.  Due to the direct link between the individual permit for construction of the facility and the GHG emissions that might result from shipping methanol and producing olefins in Asia, the court found that the Corps must take a hard look at potential GHG emissions from the facility.  *See also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 855, 867-68 (9th Cir. 2005) (cited by Plaintiffs, Doc. 45 at 49) (involving an individual §404 permit required to construct a dock that would increase tanker traffic).  But that is not the case here.

Plaintiffs' remaining cases are distinguishable because the agency's authority in those cases was broader under the relevant statute than the Corps' limited authority under the CWA.  For example, Plaintiffs rely on *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) ("*Sabal Trail*") (Doc. 45 at 48-49), which

reviewed the Federal Energy Regulatory Commission's ("FERC") NEPA analysis for a proposed interstate natural gas pipeline. *See* 867 F.3d at 1373. Unlike the Corps' limited statutory authority under §404 of the CWA, which narrowly focuses on impacts from the discharge of dredged and fill material (the scope of its jurisdiction and control), FERC considers a broader array of factors when it reviews an application to construct and place into service an interstate natural gas pipeline under §7 of the Natural Gas Act ("NGA"). 15 U.S.C. §717f. The *Sabal Trail* majority held that the NGA permits FERC to deny a certificate application based on the volume of reasonably foreseeable downstream GHG emissions, and so FERC must consider those emissions as part of its NEPA analysis. *See* 867 F.3d at 1374-75.[22]

*Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020), *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, No. 3:20-cv-00290-SLG, 2021 WL 3667986 (D. Alaska Aug. 18, 2021), and *Friends of the Earth v. Haaland*, No. 21-2317 (RC), 2022 WL 254526 (D.D.C. Jan. 27, 2022), cited by Plaintiffs (Doc. 45 at 47), are similar. The federal defendants in these cases (BLM and the Bureau of Ocean Energy Management ("BOEM")) had significantly more jurisdiction and control under the relevant statutes over the

---

[22] The NWP 12 Coalition does not concede that *Sabal Trail* was properly decided. *CBD v. Corps*, 941 F.3d at 1300 (concluding that "the legal analysis in *Sabal Trail* is questionable at best").

projects at issue, and the related oil production was, therefore, a direct consequence of the proposed actions for purposes of the agencies' NEPA analysis.

The CWA does not provide the Corps with authority to address issues like potential climate change impacts, or operational impacts from projects that could make use of NWP 12. The Corps' NEPA analysis for NWP 12 properly focused on those effects that are proximately caused by the discharge activity authorized by NWP 12. At a minimum, the Corps has applied "a reasonable interpretation of its own regulations and its own substantive expertise," *CBD v. Corps*, 941 F.3d at 1300, in deciding that GHG emissions are not proximately related to the reissuance of NWP 12, and that reasonable decision is entitled to deference. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-18 (2019).[23]

### D.   NWP 12's Structure and Project-Specific Review Ensure Compliance with CWA §404(e).

Substantively, Plaintiffs' CWA claims are indistinguishable from the claims rejected by multiple federal courts of appeals, which have upheld the structure and substance of various NWPs, including NWP 12. *See, e.g., Bostick*, 787 F.3d 1043.

---

[23] Plaintiffs contend that the Corps should have evaluated GHG emissions as part of its CWA public interest review. (Doc. 45 at 49) (citing 33 C.F.R. §320.4(a)). This argument again misses the mark by claiming that the Corps must consider effects outside its jurisdictional authority. "[T]he scope of the public interest review may not exceed the scope of the Corps' authority under the CWA— it is restricted to the 'filling' of jurisdictional waters." *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, No. 2:12–6689, 2014 WL 4102478, at *21 (S.D. W. Va. Aug. 18, 2014). The Corps' public interest review appropriately considered the relevant factors. *See, e.g.,* NWP001035.

Plaintiffs argue that the Corps' use of activity-specific review by District Engineers fails to ensure that NWP 12 will only have minimal effects.  (Doc. 45 at 51-52).  But this claim was wholly rejected by the Tenth Circuit in *Bostick*, which held that the Corps' reissuance of NWP 12 complied with §404(e)'s minimal effects standard: "The environmental groups have not shown that [NWP 12] authorizes linear projects with more-than-minimal impacts, and the Corps has permissibly interpreted the statute to allow partial deferral of its minimal-impacts analysis." *Bostick*, 787 F.3d at 1055.

Multiple other courts of appeals have approved of the Corps' interpretation of §404(e) to allow project-specific review.  (Doc. 60 at 11-12).  Rejecting the argument that §404(e) requires the Corps to guarantee the absence of more than minimal impacts when it issues an NWP, *Bulen*, 429 F.3d at 500, held that "neither that section nor any other provision of the CWA specifies how the Corps must make the minimal-impact determinations, the degree of certainty that must undergird them, or the extent to which the Corps may rely on post-issuance procedures in making them."  Thus, "given the inevitable *ex ante* uncertainty the Corps confronts when issuing [an NWP], its reliance on post-issuance procedures is a reasonable, if not the only possible, way for it to cement its determination that

48

the projects it has authorized will have only minimal environmental impacts." *Id.*

at 501; *accord Bostick*, 787 F.3d at 1060-61.[24]

Plaintiffs also argue, as they did in *Bostick*, that allowing NWP 12 to be used

for "separate and distant" crossings does not comply with §404(e).  (Doc. 45 at 51-

55).  As the Federal Defendants explain (Doc. 60 at 15), since 1988, the Corps has

"calculate[d] the ½-acre threshold 'separately for each separate and distant

crossing.'"  *Bostick*, 787 F.3d at 1056; *see also* 33 C.F.R. §330.2(i).  In *Bostick*, the

district court upheld the "single and complete linear project" definition, 2013 WL

6858685 at *19-20, and the Tenth Circuit likewise found that "[t]he Corps' use of

the 'separate and distant' test was not arbitrary or capricious."  *Bostick*, 787 F.3d at

1056.  The Corps did not act arbitrarily or capriciously here by relying on its long-

standing "separate and distant" definition, codified in Corps regulations, and

upheld by the Tenth Circuit in *Bostick*, when reissuing NWP 12.

Plaintiffs offer no persuasive reason for this Court to depart from the well-

trod path.  The Corps' minimal effects determination complies with §404(e).

---

[24] The Eleventh Circuit reached the same conclusion in reviewing a general permit authorizing certain limited fills for suburban development.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 508 F.3d 1332 (11th Cir. 2007) (per curiam).  Relying on *Bulen*, the Eleventh Circuit upheld the district court's determination that §404(e) allows the Corps to comply with the minimal effects standard, based, in part, on project-specific review.  *Id.* at 1335-37.

E.    **If the Court Finds in Plaintiffs' Favor, Any Remedy Must Be Narrowly Tailored.**

The Court should grant the NWP 12 Coalition's and Federal Defendants' motions for summary judgment. If the Court finds in Plaintiffs' favor on any counts, however, it should provide an opportunity for further briefing on an appropriate remedy consistent with its determinations.

As the Federal Defendants explain (Doc. 60 at 53), to the extent the Court reaches remedy, vacatur is not warranted or appropriate. The general course of action when an agency action is found unlawful is remand to the agency. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). The circumstances here would warrant remand *without* vacatur: "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences....'" *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

As to the second factor of the *Allied-Signal* test, the Ninth Circuit employs a flexible approach that considers all types of disruptions, including "'the social and economic costs of delay.'" *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016). In *California Communities Against Toxics*, 688 F.3d at 993–94, for example, the Ninth Circuit declined to vacate because stopping "a billion-dollar venture employing 350 workers" would be "economically

disastrous." *Id.* at 994 ("if saving a snail warrants judicial restraint, *see Idaho Farm Bureau*, 58 F.3d at 1405-06, so does saving the power supply."); *see also Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 104 (citing *Cal. Cmtys. Against Toxics* for the proposition that courts "have repeatedly considered the economic implications of vacatur); *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1273 (D.C. Cir. 1994) (declining to vacate rule in part because "vacatur would be unnecessarily disruptive to the [affected] industries").

The consequences of any vacatur of NWP 12 would be extremely disruptive to the Corps, NWP 12 Coalition and its members, and the public at large. *See* Decl. of Jennifer Moyer ¶¶ 7-15 (Doc. 60-2).  Coalition members rely on NWP 12 for a wide range of authorized oil and natural gas activities that have minimal environmental effects, but are essential to the reliable, safe, and affordable delivery of energy to U.S. consumers, including rural customers, schools, hospitals, and businesses.  These activities include maintenance, repair, and construction projects across the country.  The delay and expense that would result from any unavailability of NWP 12 would harm not only the Coalition's members, but the public at large and our nation's economy, energy security, and energy diversity.

Moreover, Plaintiffs have not established standing to support vacatur of NWP 12 at all, let alone on a nationwide basis.  (Doc. 60 at 54-55); *supra* at IV.A. To avoid an overbroad remedy, the NWP 12 Coalition respectfully requests the

Court provide an opportunity for briefing in response to any issues it might identify that warrant further review by the Corps before entering a remedy in this case.

## V.      CONCLUSION

For the foregoing reasons, this Court should grant the Federal Defendants' and NWP 12 Coalition's Cross-Motions for Summary Judgment and deny the Plaintiffs' Motion for Summary Judgment.

Date:  April 1, 2022                    Respectfully submitted,


                                        /s/ Karma B. Brown
                                        Deidre G. Duncan, *pro hac vice*
                                        Karma B. Brown, *pro hac vice*
                                        HUNTON ANDREWS KURTH LLP
                                        2200 Pennsylvania Avenue, NW
                                        Washington, DC  20037
                                        (202) 955-1500
                                        dduncan@HuntonAK.com
                                        kbbrown@HuntonAK.com

                                        /s/ Brianne C. McClafferty
                                        William W. Mercer
                                        Brianne McClafferty
                                        HOLLAND & HART LLP
                                        401 North 31st Street, Suite 1500
                                        Billings, MT  59101
                                        (406) 252-2166
                                        wwmercer@hollandhart.com
                                        bcmcclafferty@hollandhart.com

                                        *Counsel for Defendant-Intervenors*
                                        *American Gas Association, American*
                                        *Petroleum Institute, American Public*
                                        *Gas Association, Association of Oil Pipe*
                                        *Lines, and Interstate Natural Gas*
                                        *Association of America*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 44) and in Support of Cross-Motion for Summary Judgment of American Gas Association, American Petroleum Institute, American Public Gas Association, Association of Oil Pipe Lines, and Interstate Natural Gas Association of America complies with the requirements of Local Rule 7.1(d)(2) and contains 12,297 words, excluding the parts exempted by Local Rule 7.1(d)(2)(E), according to the word count calculated by Microsoft Word for Microsoft 365.

/s/ Karma B. Brown

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2022, I filed the above Memorandum in

Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 44) and in Support

of Cross-Motion for Summary Judgment with the Court's electronic case

management system, which caused notice to be sent to all parties.


/s/ Karma B. Brown_____