TODD KIM
ASSISTANT ATTORNEY GENERAL

BENJAMIN J. GRILLOT
COBY HOWELL
KRISTOFOR R. SWANSON
Environment & Natural Resources Division
U.S. Department of Justice

[contact information in signature block]
*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY, et al.,** | |
| Plaintiffs, | |
| v. | |
| **LT. GEN SCOTT A. SPELLMON, et al.,** | Case No. 4:21-cv-00047-BMM |
| Federal Defendants, | **Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment** |
| and | |
| **AMERICAN GAS ASSOCIATION, et al.,** | |
| Defendant-Intervenors, | |
| and | |
| **STATE OF MONTANA,** | |
| Defendant-Intervenor. | |

TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................1

I.   NWP 12 Complies with CWA Section 404(e) by Ensuring Activities Will Cause Only Minimal Environmental Effects ...................................................1

    A. The Corps' Longstanding Approach to Crossings of Separate Waterways and Multiple Crossings of a Single Waterway is Reasonable...................................................................................................2

    B. NWP 12's Post-Issuance Review of Project-Specific Impacts is Reasonable...................................................................................................5

II.   The Corps Complied with NEPA .....................................................................6

    A. The Corps Reasonably Scoped its Review of Potential Effects ...........7

    B. The Corps Properly Considered Effects from HDD and to Forested Wetlands..................................................................................................11

    C. The Corps Properly Assessed Cumulative Effects .............................13

III.   The Corps Complied with the ESA .................................................................15

    A. Plaintiffs Lack Standing for Their ESA Claims..................................15

       1. Plaintiffs Fail to Demonstrate Individual Standing .................16

       2. For Similar Reasons Venue is Improper in the District of Montana for Plaintiffs' ESA Claims.........................................21

       3. Plaintiffs Fail to Demonstrate Organizational Standing..........23

    B. Even if the Court Reaches the Merits of the ESA Claims, Summary Judgment Should be Granted in Favor of the Corps...........................25

       1. The Corps' No Effect Determination is Entitled to Deference 25

IV.   Vacatur Would Need to be Limited to the Project From Which Plaintiffs Have Shown a Concrete Harm .......................................................................32

CONCLUSION ..................................................................................................34

# TABLE OF AUTHORITIES

*350 Montana v. Haaland*,
   29 F.4th 1158 (9th Cir. 2022) ................................................................9

*Am. Diabetes Ass'n v. U.S. Dep't of Army*,
   938 F.3d 1147 (9th Cir. 2019) .............................................................24

*Cal. Pub. Utils. Comm'n v. FERC*,
   29 F.4th 454 (9th Cir. 2022) ...............................................................26

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
   575 F.3d 999 (9th Cir. 2009) ...............................................................18

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)...................................................................... 16, 18

*Coal. to Protect Puget Sound v. U.S. Army Corps of Eng'rs*,
   417 F. Supp. 3d 1354 (W.D. Wash. 2019)...........................................15

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ...............................................................24

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) .............................................................29

*Cooling Water Intake Structure Coal. v. U.S. EPA*,
   905 F.3d 49 (2d Cir. 2018)...................................................................29

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) .............................................................29

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
   941 F.3d 1288 (11th Cir. 2019) .............................................................9

*Decker Coal Co. v. Commonwealth Edison Co.*,
   805 F.2d 834 (9th Cir. 1986) ...............................................................23

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004)...............................................................................7

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012) ...............................................................24

*Fed. Power Comm'n v. Fla. Power & Light Co.*,
    404 U.S. 453 (1972)................................................................................1

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
    887 F.3d 906 (9th Cir. 2018) ...............................................................26

*Garland v. Ming Dai*,
    141 S. Ct. 1669 (2021) ..........................................................................12

*Greater Yellowstone Coal. v. Flowers*,
    359 F.3d 1257 (10th Cir. 2004) .............................................................4

*Immigrant Assistance Project of the L.A. Cnty. Fed'n of Labor v. INS*,
    306 F.3d 842 (9th Cir. 2002) ...............................................................23

*Indep. Towers of Wash. v. Washington*,
    350 F.3d 925 (9th Cir. 2003) ...............................................................15

*Inst. of Certified Practitioners, Inc. v. Bentsen*,
    874 F. Supp. 1370 (N.D. Ga. 1994)......................................................23

*Kelly v. Echols*,
    2005 WL 2105309 (E.D. Cal. Aug. 30, 2005).....................................21

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
    746 F.3d 698 (6th Cir. 2014) .................................................................9

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)............................................................................2

*Lane Cnty. Audubon Soc'y v. Jamison*,
    958 F.2d 290 (9th Cir. 1992) ...............................................................29

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...............................................................................20

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ...................................................................................19

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) .......................................................................... 25, 31

*Nat'l Family Farm Coal. v. EPA*,
    966 F.3d 893 (9th Cir. 2020) ............................... 17, 18, 19, 25, 26, 30

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    2013 WL 1294647 (D. Or. Mar. 27, 2013) .........................................28

*Ohio Valley Env't Coal. v. Bulen*,
    429 F.3d 493 (4th Cir. 2005) ...............................................................13

*Plains Res. Council v. U.S. Army Corps of Eng'rs*,
    460 F. Supp. 3d 1030 (D. Mont. 2020) ...............................................34

*Reuben H. Donnelly Corp. v. Fed. Trade Comm'n*,
    580 F.2d 264 (7th Cir. 1978) ...............................................................22

*Sawtooth Mountain Ranch LLC v. United States*,
    2022 WL 562612 (D. Idaho Feb. 24, 2022) .......................................26

*Selkirk Conservation All. v. Fosgren*,
    336 F.3d 944 (9th Cir. 2003) ...............................................................10

*Sierra Club v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015) .............................................. 1, 3, 4, 6

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) .........................................................8, 9

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.D.C. 2015) ....................................................................2

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) .............................................................24

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  205 F. Supp. 3d 4 (D.D.C. 2016) ............................................................5

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................. 16, 18

*U.S. Army Corps of Eng'rs v. N. Plains Res. Council*,
  141 S. Ct. 190 (2020) ......................................................................34

*W. Org. of Res. Councils v. Bernhardt*,
  412 F. Supp. 3d 1227 (D. Mont. 2019) ................................................15

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ...........................................................29

*W. Watersheds Project v. Matejko*,
  468 F.3d 1099 (9th Cir. 2006) .........................................................29

*Warth v. Seldin*,
  422 U.S. 490 (1975) .......................................................................23

*White Tanks Concerned Citizens, Inc. v. Strock*,
  563 F.3d 1033 (9th Cir. 2009) ..................................................... 10, 11

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) .........................................................19

*Zamani v. Carnes*,
  491 F.3d 990 (9th Cir. 2007) ..........................................................19

## STATUTES

15 U.S.C. § 717f(c)(1)(A) ........................................................................9

16 U.S.C. § 1532(5)(A) ..........................................................................32

28 U.S.C. § 1391(e) ......................................................................... 22, 23

33 U.S.C. § 403 ....................................................................................12

33 U.S.C. § 1344(e)(1) ................................................................14

33 U.S.C. § 1362(7) ....................................................................32

## CODE OF FEDERAL REGULATIONS

33 C.F.R. § 322.3 .......................................................................12

33 C.F.R. § 323.1 .......................................................................10

33 C.F.R. pt. 325 ........................................................................10

33 C.F.R. pt. 330 ........................................................................10

33 C.F.R. § 330.1(a) ...................................................................10

33 C.F.R. § 330.1(d) .....................................................................2

33 C.F.R. § 330.1(e)(2) ........................................................ 2, 4, 27

33 C.F.R. § 330.2(i) ......................................................................3

33 C.F.R. § 330.4(f) ............................................................... 17, 27

33 C.F.R. § 330.6(a)(2), (d) ..........................................................4

40 C.F.R. § 1501.5(c) .................................................................13

40 C.F.R. § 1501.9(a) ...................................................................9

40 C.F.R. § 1508.1(g) (2020) ........................................................7

50 C.F.R. § 402.12 .....................................................................18

50 C.F.R. § 402.14(a) .................................................................31

50 C.F.R. § 402.14(g)(2) .............................................................30

**FEDERAL REGISTERS**

56 Fed. Reg. 59110 (Nov. 22, 1991)............................................................2

86 Fed. Reg. 2744 (Jan. 13, 2021) .............................................. 3, 5, 6, 13

87 Fed. Reg. 23453 (Apr. 20, 2022) ........................................................7

**OTHER**

15 Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice
   & Procedure p. 3808 (2d ed. 1987)...................................................21

**INTRODUCTION**

Summary judgment should be granted in favor of Federal Defendants.  The

U.S. Army Corps of Engineers complied with the Clean Water Act, National

Environmental Policy Act, and Endangered Species Act in issuing Nationwide

Permit 12 (and Plaintiffs lack standing to bring their Endangered Species Act

claim).  Even if summary judgment in favor of Plaintiffs were appropriate,

Plaintiffs would not be entitled to the broad-reaching remedy they seek.

**ARGUMENT**

## I.   NWP 12 Complies with CWA Section 404(e) by Ensuring Activities Will Cause Only Minimal Environmental Effects

To succeed on their challenge to NWP 12, Plaintiffs must demonstrate that

the Corps' determination that NWP 12-permitted activities would have only

"minimal adverse environmental effects" under Section 404(e) lacks a "substantial

basis in fact." *Sierra Club v. Bostick*, 787 F.3d 1043, 1055 (10th Cir. 2015)

(internal quotation marks and citation omitted).[1]  Plaintiffs fail to meet that heavy

burden.  Summary judgment should be granted in favor of the Federal Defendants

on the CWA claim.

---

[1] Contrary to Plaintiffs' assertion, this is the proper standard for evaluating decisions based on an agency's technical expertise and experience within its area of competence.  *See, e.g.*, *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 463 (1972).

As a threshold matter, Plaintiffs wrongly claim that NWP 12 "authorizes" oil and gas pipelines with "no limits" on length, number of water crossings, or amount of forested wetlands that are cleared.  Pls.' Resp. 50.  This assertion ignores NWP 12's limitations on use, including the district engineer's role in verifying that an activity (1) complies with the Permit's terms and conditions; (2) will cause no more than minimal adverse effects; and (3) is not contrary to the public interest. *Sierra Club v. U.S. Army Corps,* 803 F.3d 31, 39 (D.D.C. 2015); 33 C.F.R. § 330.1(d), (e)(2).  As discussed below, NWP 12 complies with Section 404(e).

## A.   The Corps' Longstanding Approach to Crossings of Separate Waterways and Multiple Crossings of a Single Waterway is Reasonable.

For more than over thirty years, when determining if impacts are "minimal" under Section 404(e), the Corps has treated each crossing of a single waterbody or different waterbodies by a linear project (like a pipeline) as a "single and complete" project if the crossings are at "separate and distant" locations.  *See* Regulatory Guidance Letter 88-06 at 2, 3 (June 27, 1988); 56 Fed. Reg. 59110, 59113 (Nov. 22, 1991).   Congress did not directly speak to this precise issue, and the Corps' longstanding interpretation of what impacts for linear projects are "minimal" is reasonable and deserves deference, particularly as it involves the Corps' technical expertise.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417-18 (2019);

*Bostick*, 787 F.3d at 1055.  Plaintiffs' attempts to attack the Corps' approach fall flat.

First, contrary to Plaintiff's assertion (Pls.' Resp. 51, 54), there is no "assumption" that water crossings will be "separate and distant."  *See* 33 C.F.R. § 330.2(i).  Instead, when an applicant submits a PCN, a district engineer verifies that the proposed activities crossing a single waterbody several times are, indeed, sufficiently separate and distant to ensure that there will be no more than minimal adverse environmental effects.  86 Fed. Reg. 2744, 2778 (Jan. 13, 2021).  When doing so, the engineer takes into account "differences in the distribution of waters and wetlands in the landscape, local hydrologic conditions, [and] local geologic conditions."  *Id.*  This location-specific consideration is reasonable and necessary to account for this country's significant variety of landscapes and environmental conditions.

Second, Plaintiffs argue that the Corps fails to provide any examples of a "separate and distant" determination made by a district engineer when authorizing projects under NWP 12.  However, each verification by a district engineer intrinsically includes a determination that the proposed crossings are sufficiently separate and distant.  If they were not, and the applicant declined to modify the project so that all water crossings requiring authorization are separate and distant,

3

the district engineer would require the applicant to obtain an individual permit.  33 C.F.R. §§ 330.1(e)(2); 330.6(a)(2),(d).

Plaintiffs claim to have provided "numerous examples of clustered crossings" and argue that the number of proximate crossings alone shows that NWP 12 fails to comply with the CWA.  Pls.' Resp. 52.  They identify only two such examples involving the Keystone and Gulf Coast pipelines.  Notably, the Keystone PCNs were withdrawn before the Corps completed its verifications.  Further, the Gulf Coast pipeline crossings were challenged *and upheld* in the Tenth Circuit.  *Bostick*, 787 F.3d at 1056 ("Corps' use of  the 'separate and distant' test was not arbitrary or capricious"), *citing Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269-73 (10th Cir. 2004).[2]

That aside, Plaintiffs have challenged only NWP 12, not individual Permit verifications.  If Plaintiffs believe that specific PCN verifications involving multiple crossings of a single waterbody authorize an activity with more than minimal effects, Plaintiffs may challenge those verifications.  They did not do so here.

---

[2] Plaintiffs attempt to distinguish *Bostick* claiming it was a challenge to "an earlier version of NWP 12."  Pls.' Resp. 64.  However, as discussed above, the Corps' interpretation of "separate and distant"—upheld in *Bostick*—has been in place since 1991.

Accordingly, the Corps' longstanding, location-specific, approach to evaluating linear projects that cross a waterbody multiple times or different waterbodies is reasonable and should be upheld.

### B.   NWP 12's Post-Issuance Review of Project-Specific Impacts is Reasonable

Plaintiffs do not dispute that post-issuance procedures, like those employed in NWP 12, can satisfy Section 404(e)'s requirements.  Pls.' Resp. at 57.  Instead, they focus on allegedly lacking project-level review for activities that do not require a PCN.[3]  *Id.*  However, Plaintiffs' "vague assertions" that non-PCN activities might have more than minimal effects are not sufficient to meet Plaintiffs' burden here.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 30 (D.D.C. 2016) (Tribe's failure to identify specific unreasonable non-PCN activities does not satisfy its burden).  If Plaintiffs have evidence that specific non-PCN activities have more than minimal effects, they may bring a citizen suit or challenge to NWP 12 basing their standing on a specific

---

[3] The Corps estimated that approximately 1,450 activities per year will not require a PCN.  NWP0001052.  Plaintiffs construe "activity" to mean distinct water "crossings."  This is incorrect.  The Corps uses "activity" to mean just that—an activity (i.e., a single and complete project) that would require Corps authorization but could make use of NWP 12.  For example, a "crossing" (using Plaintiffs' construction) may involve multiple activities (such as clearing, placement of timber matting, and fill for placement of the pipeline).  Further, many activities result only in temporary impacts, which NWP 12 requires be returned to pre-construction elevations.  86 Fed. Reg. 2860.

project that does not require a PCN.  They have failed to do so, and NWP 12's carefully tiered approach to reviewing project impacts should be upheld.

Plaintiffs again ignore NWP 12's requirements for submitting a PCN— including instances where a new pipeline is longer than 250 miles, when a discharge will result in a loss greater than 1/10[th] of an acre of jurisdictional waters, or when any listed species or designated critical habitat might be affected.  86 Fed. Reg. 2860.  Further, when a PCN is submitted, the applicant must also provide information on all NWP 12-authorized activities associated with the project (including those that would not require a PCN on their own).  *Id.* 2873.  The district engineer then reviews this information to ensure the activities will not result in more than minimal individual and cumulative impacts under Section 404(e).  Accordingly, this tiered review process—where the Corps makes "reasoned predictions" at permit issuance and then requires subsequent activity-specific review—ensures that NWP 12 will only have minimal effects under Section 404(e).  *Bostick*, 787 F.3d at 1056-60.

## II.    The Corps Complied with NEPA

Summary judgment should be granted in favor of Federal Defendants on the NEPA claim.

6

## A.   The Corps Reasonably Scoped its Review of Potential Effects

Our opening brief explained that the Corps acted reasonably in concluding it did not need to analyze oil spill and climate change impacts.  Fed. Defs.' Resp. 18–26.  "[W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions," the agency may reasonably exclude that effect from its NEPA analysis.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004); 40 C.F.R. § 1508.1(g) (2020) (defining "effects").[4]  NWP 12 does not authorize, approve, or regulate oil and gas pipelines.  Thus, it was not arbitrary for the Corps to conclude that oil spill and climate change impacts are too attenuated from the authority the Corps is exercising.

Plaintiffs' response largely repeats the arguments made in their opening brief, attempting to attribute all impacts associated with oil and gas pipeline operations to the Corps' limited Section 404(e) authority.  We make three points in reply.

First, Plaintiffs continue to ignore the nature of the Corps' action.  Plaintiffs note that "if the Corps declines to issue NWP 12 . . . those pipelines cannot be installed in U.S. waters and their environmental impacts would not occur . . . ."

---

[4] The Council on Environmental Quality's recent amendment to NEPA regulations' definition of "effects" goes into effect on May 20, 2022.  87 Fed. Reg. 23453, 23469–70 (Apr. 20, 2022).  As the amendment post-dates the Corps' decision here, we continue to cite the immediately prior definition.

Pls.' Resp. 41.  But this is only half right.  It is true that, absent NWP 12 or an individual permit, the projects could not fill jurisdictional waters during construction.  And that certainly means the *impacts associated with that fill* would not occur.  Hence, the Corps analyzed impacts associated with the fill.  It is not necessarily correct, however, to say that *all* the pipeline's environmental impacts—particularly oil spills and impacts from downstream combustion—would not occur absent NWP 12.  A Section 404 authorization is not needed to construct or operate an oil or gas pipeline.  It is only needed to fill jurisdictional waters as part of construction.  If, during construction, the pipeline avoids filling jurisdictional waters, there is no need for a Section 404 permit.  But the pipeline's operational effects would remain.

Plaintiffs renew their analogy to *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017).  Pls.' Resp. 42.  But they have no response to our point that the cases the D.C. Circuit distinguished in that opinion—and that found the agency did *not* have to analyze operational effects—provide the better analogy to the Corps' authority here.  *See* Fed. Defs.' Mem. 21–22.

Plaintiffs also posit that *Sierra Club v. FERC* is applicable because, just as there, the Corps' decision-making procedures require it to consider environmental effects.  *See* Pls.' Resp. 42; *see id.* at 45.  But Plaintiffs provide no support for their conclusion that Section 404(e) authorizes the Corps to deny a permit based upon

8

effects that have only an attenuated link to the fill or other activities the Corps

would be authorizing.  Indeed, even in the context of individual permits, courts

have held the opposite.  *See, e.g., Ctr. for Biological Diversity v. U.S. Army Corps

of Eng'rs*, 941 F.3d 1288, 1297–1301 (11th Cir. 2019); *Kentuckians for the

Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706–08 (6th Cir.

2014).

In any event, the issue in *Sierra Club v. FERC* was *which* operational

impacts FERC needed to consider, not *if* the agency needed to consider operational

effects.  *See* 867 F.3d at 1373–74.  There was no dispute that FERC was authorized

to prevent the pipeline from being constructed or operating.  *See id.* at 1363–64

(citing 15 U.S.C. § 717f(c)(1)(A)).  The Corps holds no similar authority here.

Plaintiffs' new citation (Resp. 47) to *350 Montana v. Haaland*, 29 F.4th 1158 (9th

Cir. 2022), again only illustrates the Corps' point.  The case involved an agency

approval to expand a coal mine.  *See id.* at 1163.

Second, Plaintiffs are incorrect that the issue here is not one of NEPA

scoping.  Pls.' Resp. 43–44.  Despite Plaintiffs' assertion, NEPA scoping addresses

more than just "geographic and temporal boundaries."  Pls.' Resp. 43.  NEPA

regulations state: "Agencies shall use an early and open process to determine the

scope of *issues for analysis* . . . ."  40 C.F.R. § 1501.9(a) (emphasis added).

Plaintiffs do not dispute that the scope of a NEPA analysis "should be entrusted to

9

the expertise of the deciding agency." *Selkirk Conservation All. v. Fosgren*, 336 F.3d 944, 962 (9th Cir. 2003).

Plaintiffs again incorrectly assert (Resp. 43) that the Corps' NEPA regulations in 33 C.F.R. part 325, appendix B apply to general permits like NWP 12. Corps' regulations make clear that Part 325 applies to the Corps' review of individual permits. 33 C.F.R. § 323.1 (identifying applicable regulations, including part 325, for "*applications* for [Department of the Army] permits to authorize the discharge of dredged or fill material into waters of the United States" (emphasis added)). The Corps' issuance of general permits like NWP 12 is governed by 33 C.F.R. part 330, which does not similarly incorporate part 325. *See* 33 C.F.R. § 330.1(a).

<u>Third</u>, Plaintiffs misunderstand NEPA in asserting that the scope of the Corps' impacts analysis must be the same regardless of the permit being issued. *See* Pls.' Resp. 45. As the Ninth Circuit has explained in the context of Corps individual permits, "[t]he scope of the environmental review under NEPA . . . [is] dictated by the environmental effects triggered by" the agency action in question. *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1039 (9th Cir. 2009). With respect to effects that a given permit could trigger, "[t]he number of factual scenarios possible are infinite." *Id.* at 1040. Indeed, in the context of Corps individual permits associated with construction of multi-use developments,

the Ninth Circuit has reached different conclusions on the scope of effects the

Corps must analyze under NEPA depending on the permit's role in the overall

development. *See id.* Thus, there is nothing unreasonable in the Corps' conclusion

that, given the attenuated link between wetland fill and pipeline operations, the

Corps did not need to analyze operational effects when deciding whether to reissue

NWP 12.

**B.** **The Corps Properly Considered Effects from HDD and to Forested Wetlands**

The Corps' assessment of potential effects from hydraulic directional

drilling (HDD) and to forested wetlands also complied with NEPA.

As explained in our opening brief, NWP 12's authorization of Section 404

fill activities does not result in the potential for inadvertent drilling fluid returns

during HDD. Fed. Defs.' Mem. 26–27. HDD is used to *avoid* jurisdictional

waters, obviating the need for a Section 404 authorization. In response, Plaintiffs

argue that the explanation is a post-hoc rationalization and seek to fault us for

focusing only on NWP 12's Section 404 authorization (and not that under Section

10 of the Rivers and Harbors Act). Pls.' Resp. 32–34. Neither point has merit.

First, the explanation in our opening brief was not a post hoc rationalization.

We cited to the EA at NWP000956. Fed. Defs.' Mem. 27. There, the EA states:

"The Corps does not have jurisdiction over inadvertent returns . . . that might occur

during horizontal directional drilling [to] install[] or replac[e] oil or natural gas

11

pipelines." NWP000956.  The Corps does not have that jurisdiction because it is not authorizing the activity for purposes of Section 404 and because the inadvertent returns themselves are not regulated activities under Section 404.  The intent in the Corps' statement is made clear by the comment to which the Corps was responding.  That comment had "stated that the Corps has not sufficiently evaluated the risk, impacts, and mitigation measures associated with inadvertent returns." NWP000956.  In any event, agency explanations must be upheld if the agency's reasoning can be reasonably discerned.  *See Garland v. Ming Dai*, 141 S. Ct. 1669, 1680 (2021).[5]

Second, our opening brief focused on Section 404(e) because Plaintiffs' briefing focuses on the Corps' authority under Section 404, not Section 10.  It is true that NWP 12 (assuming its conditions are met) also authorizes crossing navigable waters under Section 10.[6]  The Permit requires a PCN prior to Section

---

[5] Plaintiffs focus on the Corps' statement that the inadvertent returns themselves are not considered discharges of dredge or fill material that would implicate Section 404.  While the statement is true, that is a separate issue than whether NWP 12 authorizes HDD such that the effects of that activity would need to be considered under NEPA.  The EA documents the Corps' reasonable consideration of NWP 12's potential effects.  NWP001019–28, 1033–42.

[6] Absent a Corps authorization, Section 10 prohibits, among other things "any obstruction . . . to the navigable capacity of any waters of the United States . . . ." 33 U.S.C. § 403.  Corps regulations consider structures or work under a navigable water to impact navigable capacity and therefore require a Section 10 permit.  33 C.F.R. § 322.3.

10 authorization.  86 Fed. Reg. 2860.  The EA also discloses that "where [HDD] is used to install or replace a portion of the pipeline, there is a possibility of inadvertent returns of drilling fluid that could adversely affect wetlands, streams, or other aquatic resources."  NWP001033.  And the EA considers NWP 12's reasonably foreseeable effects on, among other things, wetlands (NWP001036) and water quality (NWP001040).

With respect to forested wetlands, our opening brief explained that the Corps recognized the issue, assessed the potential effects, and ultimately concluded that the converted wetlands (though not forested) would still perform valuable wetland functions.  Fed. Defs.' Mem. 28–30.  Plaintiffs' retort just repeats their assertion that the Corps' analysis should have been more detailed.  Pls.' Resp. 36.  But Plaintiffs do not dispute that EAs are intended to "briefly" analyze potential impacts.  40 C.F.R. § 1501.5(c).  Nor do Plaintiffs dispute that, given the nature of a nationwide permit, the effects analysis is necessarily (and appropriately) general. Fed. Defs.' Mem. 29 (citing *Ohio Valley Env't Coal. v. Bulen*, 429 F.3d 493, 501). The EA's assessment of potential effects from HDD and to forested wetlands complied with NEPA.

## C.    The Corps Properly Assessed Cumulative Effects

Our opening brief explained the Corps' assessment of cumulative impacts. Fed. Defs.' Mem. 30–31.  Plaintiffs make three points in reply, erring in each.

13

First, Plaintiffs posit that the Corps' cumulative impacts analysis could not be adequate because the different nationwide permits authorize different things. Pls.' Resp. at 38.  This is simply wrong, and continues to ignore the Corps' authority.  Each nationwide permit authorizes the *same* thing—limited discharge of dredge or fill material into jurisdictional waters (and, for some, authorization under Section 10).  Plaintiffs are again attempting to attribute to the Corps the subsequent effects of the private activities that make use of NWP 12 during pipeline construction.  As explained above, that legal assumption is incorrect when used in the all-encompassing manner that Plaintiffs use it here.  *See supra* at 7–11.  When the Corps' authority is viewed properly, the Corps acted reasonably in focusing its cumulative effects assessment primarily (though not exclusively) on impacts to jurisdictional waters.

Second, Plaintiffs assert that the EA conceded that the Permit "may have more than minimal cumulative effects."  Pls.' Resp. 38.  But, even if true, Plaintiffs are attempting to impose a CWA requirement into NEPA.  *See* 33 U.S.C. § 1344(e)(1) (authorizing general permits for activities that "will have only minimal cumulative adverse effect on the environment").  The NEPA question here is whether the Corps has adequately assessed cumulative impacts, regardless of whether they are described as minimal or something else.  As explained above and in our opening brief, the answer is yes.  To the extent Plaintiffs are challenging

14

the Corps' conclusion under NEPA that the Permit would not result in significant cumulative impacts, Plaintiffs have waived that argument.  The fact that Plaintiffs pled a challenge to the finding of no significant impact is of no matter, as they did not pursue the argument in either of their briefs.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e will not consider any claims that were not actually argued in appellant's opening brief."); *W. Org. of Res. Councils v. Bernhardt*, 412 F. Supp. 3d 1227, 1240 n.4 (D. Mont. 2019).

Third, Plaintiffs err in their attempted analogy to the Western District of Washington's opinion in *Coalition to Protect Puget Sound v. U.S. Army Corps of Engineers*, 417 F. Supp. 3d 1354, 1366 (W.D. Wash. 2019).  The portions of the opinion to which Plaintiffs cite are discussing CWA requirements.  *See id.* at 1365–66.  And, while the court noted NEPA at the end of the section in question, it did not provide any NEPA analysis.  *See id.* at 1366.  Further, the court's concern was based on the permitted activities' regionalized focus there, a concern that would not translate to NWP 12.  *See id.*  The Corps complied with NEPA.

## III.   The Corps Complied with the ESA.

### A.   Plaintiffs Lack Standing for Their ESA Claims.

Federal Defendants contested standing for Plaintiffs' ESA claims because they identified only one active project relying on NWP 12: the Byron Pipeline in Laurel, Montana.  The problem was that there are no ESA listed species or critical

habitat in the Byron Pipeline project area.  Joyce Decl. ¶ 13.  In response, Plaintiffs

do not dispute the lack of ESA-listed species or critical habitat in the project area,

and now concede that they are not relying on the Declaration of Mr. Krum, a

member of the Montana Environmental Information Center ("MEIC"), to establish

standing for their ESA claims.  Pls.' Resp. 3 n.1.  Instead, Plaintiffs argue that they

have established standing for their ESA claims because they assert a procedural

injury and attempt to shore up their evidentiary showing by submitting new

declarations on reply.  Neither tactic works.

### 1.      Plaintiffs Fail to Demonstrate Individual Standing.

Plaintiffs fail to address the now seminal case on procedural standing:

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009).  Even in the context of

procedural challenges, where the standards for redressability are relaxed, the

Supreme Court made clear that there must be a specific agency action resulting in

injury-in-fact.  *Id.* at 497.  Relying on statistical probability that a litigant will

"stumble" across some unidentified agency action is not enough.  *Id.* at 496, 497

(rejecting injury-in-fact based on "a statistical probability that some of those

members are threatened with concrete injury").  And the threatened injury "must

be *certainly impending*," or there must be a "'substantial risk' that the harm will

occur."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013).

To be sure, Plaintiffs' declarations identify the Byron Pipeline, admittedly a

concrete NWP 12 application.  But the Byron Pipeline does not implicate any ESA-related interests.  Joyce Decl. ¶ 13.  Injury-in-fact with respect to Plaintiffs' ESA interests does not exist and, indeed, cannot exist because General Condition 18 prohibits the use of NWP for any activity that is likely to directly or indirectly jeopardize ESA-listed species or adversely modify designated critical habitat for such species.

Plaintiffs' reliance on *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020), illustrates the point.  In that case, plaintiffs submitted declarations that detailed imminent agency action that had a "geographic nexus" between the individual and the "location suffering" the harm.  *Id.* at 909.  Here, there is no such showing.  Instead, there is only a hypothesis that NWP 12 will somehow, somewhere, someday harm some listed species and thereby affect Plaintiffs' interests.  But that hypothesis flies in the face of the Permit's binding condition that any proposed activity intending to rely on NWP 12 cannot have *any effect* on listed species or critical habitat without first notifying the Corps of the proposed project. 33 C.F.R. § 330.4(f).  That is far different than the circumstances in *National Family*, where EPA knew that "protected species and critical habitats would be *exposed* to potentially harmful chemicals."  966 F.3d at 924 (EPA's "preliminary risk assessments—which relied on conservative assumptions—found a chance that Enlist Duo 'may affect' hundreds of protected species.").  Factually,

this stands in marked contrast to the Corps' finding that it is "not aware of any incidences where effects to listed species or designated critical habitat may have occurred as a result of an NWP activity . . . ."  NWP003583.[7]

Here, there also is a legal disconnect—an express condition in NWP 12—that prohibits any authorized ESA injury-in-fact.  This moves this case well beyond *National Family* and *Summers*.  There is no risk, much less a substantial risk, of an ESA injury, precisely because of NWP 12's conditions.  *Clapper,* 568 U.S. at 414 n.5; NWP00003576.  No amount of investigation, or FOIA requests, will produce an example of authorized injury-in-fact to listed species because, under the terms for the permit, there cannot be one.  That is why Plaintiffs' showing will never rise above the *Summers* hard floor.[8]

---

[7] In *National Family* there were indicia, some of which were from EPA itself, that the contested agency action would be applied in a geographical location that was reasonably close to a plaintiff, thereby presenting a substantial risk of injury-in-fact.  For example, the pesticides could be applied to milkweed, which could have had an effect on monarch butterflies, which created a risk of harm to plaintiffs' interests in the butterfly.  *Nat'l Family*, 966 F.3d at 906 ("evidence that destruction of milkweed on target fields would harm the monarch butterfly population.").  Here, we do not have that possibility, or that showing.

[8] There is also no procedural violation here.  The Corps prepared a biological assessment in accordance with 50 C.F.R. § 402.12.  And it made a no effect determination consistent with the ESA's procedures.  *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1019 (9th Cir. 2009).  This stands in contrast to *National Family*, where EPA did not compile a biological assessment, but rather primarily "relied on an updated ecological risk assessment . . . ."  966 F.3d at 906.  True, Plaintiffs are unsatisfied with the merits of the Corps' no effect determination and believe the finding is arbitrary and capricious, but that does not

Plaintiffs' attempts to shore up their previously filed standing declarations fare no better. <u>First</u>, these declarations are not properly before the Court. It is improper for a moving party to introduce new facts or legal arguments in the reply brief different than those presented in the moving papers. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894-95 (1990); *see also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). The Court should strike these untimely declarations.

<u>Second</u>, the newly offered declarations rely on supposed harm that post-dates the complaint. Standing, however, is examined at the commencement of litigation. *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000). The complaint was filed on May 3, 2021. ECF 1. Mr. Hartl's second declaration addresses a Corps verification issued in August 2021. 2d Hartl Decl. ¶ 4. Similarly, Mr. Hamel states that "[s]ince my First Declaration was filed in this matter, I have become aware of a pipeline project that has applied to the Corps to use NWP 12 . . . ." 2nd Hamel Decl. ¶ 3. Plaintiffs cannot rely on purported injuries that did not exist at the time the complaint was filed. *White,* 227 F.3d at 1243.[9] But even if they

---

mean the correct *procedures* were neglected. The Corps followed ESA procedure—it made a determination that there is "no effect." That is why, as the Ninth Circuit recognized, the merits of the Corps' no effect determination is analyzed under the APA, not the ESA. *Nat'l Family*, 966 F.3d at 923.

[9] Plaintiffs' reliance on the Byron Pipeline suffers from this same timing problem. Joyce Decl. ¶ 12. But it is of no matter given that the use of NWP 12 for that Pipeline does implicate any ESA interests.

could, these belated attempts still fail.  Neither declarant states any intention of

visiting Kentucky or South Carolina where the projects are located.  2d Hartl Decl.

¶ 4; 2d Hamel Decl. ¶ 4.  Indeed, Mr. Hartl, who resides in Arizona, makes clear

that he has no intention of visiting the project.  2d Hartl Decl. ¶ 9.  These are not

even "some-day" intentions.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

     <u>Third</u>, even if the Court considers the belated declarations, they only

demonstrate how NWP 12, standing alone, cannot cause an ESA injury-in-fact.

For example, Mr. Hartl references the Corps' verification for the Bullitt Pipeline in

South Carolina.  2d Hartl Decl. ¶ 4.  That NWP 12 verification has been

suspended.  Decl. of Eric Reusch ¶ 29.  But even if the verification were reinstated,

the proposed activities triggered General Condition 18 and thus, the entity

submitted a PCN and is required to await notification from the district engineer

that the ESA requirements are satisfied, among other conditions.  *Id.* ¶ 10.  The

Corps also initiated consultation with the U.S. Fish and Wildlife Service (FWS),

which culminated in a Biological Opinion, among other ESA findings, for the

affected, listed species.  *Id.* ¶¶ 15-25.  Mr. Hartl's example demonstrates that there

cannot be an ESA injury-in-fact from NWP 12 because General Condition 18

worked exactly as anticipated.

     Mr. Hamel is similar.  He references activities associated with the Pamplico

Pipeline in South Carolina.  2d Hamel Decl. ¶ 4.  But he also acknowledges that

Dominion Energy does not intend to proceed with proposed activities without notifying the Corps. *Id.* ¶ 4. Mr. Hamel also notes that the proposed pipeline will cross *tributaries* to the Great Pee Dee River, and that there is designated critical habitat on that river, but he never actually states that any dredge and fill activities will occur in critical habitat. *Id*. ¶¶ 5-6. In any event, the Corps is in the process of complying with the ESA for this proposal. Decl. of Travis G. Hughes ¶ 13-20. Here again, NWP 12's conditions prevent direct fill or discharges that impact designated critical habitat.

### 2.     For Similar Reasons Venue is Improper in the District of Montana for Plaintiffs' ESA Claims.

As explained above, Plaintiffs do not identify any other active project relying on NWP 12 in the District of Montana and have effectively conceded that MEIC—the only entity for which Plaintiffs have shown an injury-based membership link to Montana—lacks standing for its ESA claims. Pls.' Resp. 3 n.1. Because MEIC lacks standing, and there are no other identified projects involving ESA-listed species or critical habitat in this District, venue is improper in the District of Montana for Plaintiffs' ESA claims.

It is well established that "in a case in which multiple claims are joined, the venue must be proper for each claim." 15 Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice & Procedure p. 3808 (2d ed. 1987); *Kelly v. Echols*, 2005 WL 2105309, *11 (E.D. Cal. Aug. 30, 2005). For claims against

21

the United States or its officers or agencies, venue is proper in any judicial district in which "(A) a defendant in the action resides[10], (B) a substantial part of the events or omissions giving rise to the claim occurred . . . , or (C) the plaintiff resides if no real property is involved in the action."  28 U.S.C. § 1391(e).

Plaintiffs allege that venue is proper in this District "because NWP 12 provides CWA section 404 authorization for oil and gas pipelines that will be constructed in this district and because Plaintiff MEIC resides in this district." Compl. ¶¶ 17, 28.  However, Plaintiffs' declarations identify only one project relying upon NWP 12 in this District (the Byron Pipeline).  Krum Decl. ¶¶ 2-3; Hedges Decl. ¶ 19.  Plaintiffs do not identify any other active or imminent uses of NWP 12 in this District.  *See* Coal. Brief 14–15 (explaining how Keystone XL and every other identified project is either completed, terminated, or no longer relies on NWP 12).

Moreover, MEIC relies on only two members, Mr. Krum and Ms. Hedges, to establish standing for its organization, both of which rely on the Byron Pipeline. Krum Decl. ¶¶ 2-3; Hedges Decl. ¶ 19.  Because MEIC relies on only the Bryon Pipeline for its alleged injury, and it is undisputed that there are no listed species or critical habitat in that project area, MEIC lacks standing to bring the ESA claims in

---

[10] Plaintiffs do not allege Federal Defendants reside in the District of Montana, nor could they.  *Reuben H. Donnelly Corp. v. Fed. Trade Comm'n*, 580 F.2d 264, 267 (7th Cir. 1978).

this case.  Fed. Defs.' Mem. 32–33.

When venue is based a plaintiff's residence, that plaintiff must have standing to bring the claims asserted.  *Immigrant Assistance Project of the L.A. Cnty Fed'n of Labor v. INS*, 306 F.3d 842, 867 n.20 (9th Cir. 2002).  Plaintiffs cannot manufacture venue in this District by adding a plaintiff who lacks standing for the ESA claims.  *See Inst. of Certified Practitioners, Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994).  Similarly, the Bryon Pipeline cannot be used to establish venue for the ESA claims because the project does not implicate ESA listed species or critical habitat and therefore a "substantial part of the events . . . *giving rise to the claim*" cannot be established.  28 U.S.C. § 1391(e) (emphasis added).  There is no nexus among Plaintiffs, the ESA, and this District.  *Decker Coal Co. v. Commonwealth Edison Co*., 805 F.2d 834, 842 (9th Cir. 1986) (finding a "close nexus to the underlying events" persuasive).

Even if Plaintiffs' new declarations had shown injury-in-fact for the ESA claims, the District of Montana would not be the correct venue in which to litigate those claims.

### 3.  Plaintiffs Fail to Demonstrate Organizational Standing.

An organization may "seek judicial relief from injury to itself," *Warth v. Seldin*, 422 U.S. 490, 511 (1975), but only where the organization itself satisfies "the requirement for individual standing: a demonstration of concrete and

particularized injury." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004).  Plaintiffs' alternative argument fails for the same reasons their attempt at establishing individual standing fails.  NWP 12, standing alone, cannot injure the organizations' ESA interests.

Nor are the declarations sufficient to establish organizational standing. Plaintiffs rely almost entirely on the First Hartl Declaration.  Pls.' Resp. 9–11; Hartl Decl. ¶¶ 10, 14, 16.  Besides the lack of ESA injury-in-fact, this showing is plainly insufficient.  An organizational harm relates to "the organization's ability to function as an organization," which can occur through government actions or policies that affect the organization's ability to secure funds, obtain members, or perform its core functions.  *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring). An organization that is "merely going about its business as usual" does not establish a cognizable organizational harm.  *Am. Diabetes Ass'n v. U.S. Dep't of Army*, 938 F.3d 1147, 1155 (9th Cir. 2019).  Mr. Hartl does not articulate anything more than the Center for Biological Diversity going about its customary business, *i.e.*, contesting agency actions with which it disagrees.

Indeed, NWP 12 does not ask anything of these organizations, let alone *force* them to divert resources from core organizational functions.  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th

24

Cir. 2011) (en banc).  Dissatisfaction with an agency decision does not force the diversion of resources, much less impede core organizational functions.

Finally, it is patently incorrect that Section 7(a)(2) is an informational statute and therefore the Center is harmed by the lack of information that would otherwise be provided through a programmatic consultation.  Pls.' Resp. 10.  As the Supreme Court reiterated, "[n]othing in section 7 authorizes or requires the Service to provide for public involvement . . . ."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007).

**B.  Even if the Court Reaches the Merits of the ESA Claims, Summary Judgment Should be Granted in Favor of the Corps.**

Plaintiffs do not truly wrestle with the import of the Ninth Circuit's recent decision in *National Family*.  Nor do they address the Corps' factual findings in the NWP 12 biological assessment.  NWP003564–853.  Legal and factual circumstances have changed since the Court issued its opinion in *Northern Plains* and these changes warrant a different outcome.

**1.  The Corps' No Effect Determination is Entitled to Deference.**

Plaintiffs do not dispute that the Corps' no effect determination rests on "specific and binding plans" and that implementation of NWP 12's conditions are "reasonably certain to occur."  *Nat'l Family*, 966 F.3d at 923.  Nor could they. General Condition 18, among others, expressly prohibits any effect to listed

species and critical habitat.  NWP00104.  And in circumstances such as these, the

Ninth Circuit has held that agencies fulfill their ESA obligations with a reasonable

no effect determination.  *Nat'l Family*, 966 F.3d at 923.  The Corps' no effect

determination warrants deference.[11]

Instead of providing an example of how NWP 12 "may affect" listed

species, Plaintiffs mischaracterize the Corps' compliance with Section 7(a)(2).

Pls.' Resp. 13, 38.  The Corps is not relying on subsequent ESA consultations to

comply with Section 7(a)(2) for the act of reissuing NWP 12.  Rather, the Corps

complied with Section 7(a)(2) by compiling a biological assessment in accordance

with the consultation regulations, which evaluated the effects of reissuing NWP 12,

and reached its own independent conclusion that reissuance would have "no effect"

on listed species and critical habitat.  NWP003610.

Plaintiffs either confuse or conflate two distinct CWA agency actions when

---

[11] Plaintiffs argue that the Corps is not entitled to deference because it lacks expertise in evaluating NWP 12's effects, and attempt to distinguish *Nat'l Family,* 966 F.3d at 923; *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 915, 925–26 (9th Cir. 2018); *Sawtooth Mountain Ranch LLC v. United States,* 2022 WL 562612 (D. Idaho Feb. 24, 2022), on that basis.  Pls.' Resp. 24–25.  This argument fails.  The Corps has just as much expertise with NWPs as EPA does with pesticides, the Forest Service with rights-of way, and the Corps with water quality standards.  Deference to agency expertise is not confined to Plaintiffs' idea of "science."  Rather, "[d]eference is appropriate when the agency has expertise in a particular area or the Congress has entrusted the agency to administer a particular statute.'"  *Cal. Pub. Utils. Comm'n v. FERC*, 29 F.4th 454, 465 (9th Cir. 2022).

arguing that the Corps relies on subsequent, project-specific consultations to comply with the ESA.  Pls.' Resp. 38.  NWP 12 authorizes entities to move ahead with dredge and fill activities, but only if, among other conditions, those activities do not affect or are not located in the vicinity of listed species or critical habitat. NWP00104.  In contrast, if a proposed activity "might affect" or is in the "vicinity" of listed species or critical habitat, an entity must first submit a PCN.  *Id.*  Once a PCN is submitted, no further activity is authorized unless and until there is a separate and distinct CWA agency action, typically a verification.  33 C.F.R. § 330.1(e)(2).  It is this second CWA agency action—the verification—and not NWP 12 standing alone, that allows work to proceed.  33 C.F.R. § 330.4(f).  Any effects on listed species or critical habitat associated with the verification are captured in its own independent ESA compliance, and conversely, the verification in no way relies on the Corps' NWP 12 no effect determination for ESA compliance.  Each must comply with ESA Section 7(a)(2) in its own right because they are two distinct agency actions.  The Corps is not deferring its NWP 12 ESA compliance to a subsequent, project-specific consultation; it instead complies with the ESA separately for each distinct CWA action.[12]

     Plaintiffs concede as much.  They recognize that the only way there would

---

[12] This is not a post-hoc rationalization, as Plaintiffs suggest, but rather exactly what the Corps said.  NWP00104; NWP003610, NWP003596.

be an effect to listed species from NWP 12 is if an entity unilaterally proceeds in violation of General Condition 18.  Pls.' Resp. 14 ("NWP 12 does indeed have 'immediate effects' . . . whenever permittees *unilaterally decide that they need not submit a PCN*.") (emphasis added).  That is, Plaintiffs' entire legal theory hinges on noncompliance with NWP 12.  Pls.' Resp. 30 ("a permittees' failure to provide a PCN pursuant to General Condition 18 where NWP 12 activities 'might effect' [sic] listed species *would constitute an unauthorized use of NWP 12* and open the permittee to enforcement action under the CWA or ESA . . . .") (emphasis added).

The potential for CWA noncompliance or unauthorized activity exists independent of any ESA consultation (and will always exist).[13]  But that does not mean the Corps must consult on unauthorized activities.  *Nw. Env't Def. Ctr. v. Corps*, 2013 WL 1294647, at *25 (D. Or. Mar. 27, 2013) (rejecting theory similar to Plaintiffs' here).[14]  Moreover, in situations involving agency regulation of private activity, the Ninth Circuit has been clear that an agency must consult only

---

[13] Notably, Plaintiffs have failed to produce any evidence of unauthorized NWP 12 dredge and fill activities, and the record demonstrates that the Corps is not aware of any instances.  NWP003583.

[14] Plaintiffs argue that "Defendants' position would render that [programmatic consultation] requirement meaningless."  Pls.' Resp. 14.  Not so.  Putting aside the issue of whether NWP 12 is a "program," there are many agency programs that do not expressly prohibit any effect to listed species or critical habitat, as NWP 12 does.  And because those programs do not prohibit an effect to listed species, there are circumstances where agencies are required to programmatically consult.  The nature of NWP 12, and its conditions, makes this case different.

28

on agency action that affirmatively authorizes the private conduct. *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1109 (9th Cir. 2006). NWP 12 does not authorize noncompliance, unauthorized, or illegal discharges.[15] NWP003583. Indeed, Plaintiffs' theory has no meaningful end and would require the Corps to consult with the Services for any conceivable illegal CWA action by a private entity.

Plaintiffs' related concerns, that the Corps impermissibly delegates ESA authority to self-interested permittees, likewise fails. Pls.' Resp. 29. Setting forth conditions in a permit, clearly articulating authorized and unauthorized activities, with an enforcement backstop, is not an impermissible delegation of authority. *Cooling Water Intake Structure Coal. v. U.S. EPA*, 905 F.3d 49, 79 (2d Cir. 2018).

---

[15] Plaintiffs rely on *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015); and *Lane County Audubon Society v. Jamison*, 958 F.2d 290 (9th Cir. 1992). Those cases are readily distinguishable. Whatever impacts *Kraayenbrink* court believed the action at issue might have had on species, 632 F.3d at 495–97, those impacts cannot occur here because NWP 12 does not authorize activities that might affect a listed species. In *Conner*, the FWS failed to prepare a BiOp despite its concession that the relevant lease sale could affect listed species. 848 F.2d at 1452, 1455–56. In *Cottonwood*, there was no dispute that the underlying agency action required consultation, and the issue was merely whether and under what circumstances an agency retained responsibility to reinitiate consultation. 789 F.3d at 1086. Finally, in *Jamison*, the court concluded with little analysis that the BLM strategy under review may affect the spotted owl because it sets forth criteria for harvesting owl habitat, 958 F.2d at 294; as in *Kraayenbrink*, whatever those impacts might have been, those impacts cannot occur here given General Condition 18.

More to the point, Plaintiffs' logic would gut the Ninth Circuit's holding in *National Family*, which relied on EPA's own assessment of its pesticide restrictions, which in turn relied on user compliance. 966 F.3d at 924 ("Nor did EPA's adoption of mitigation measures, including a 30-foot downwind buffer and certain label restrictions, to reach a 'no effect' finding as to plants and animals off the treated field render EPA's conclusions arbitrary, capricious, or contrary to law.").

Plaintiffs alternatively claim that if the Corps does not programmatically consult on unauthorized activities, Plaintiffs' self-coined "aggregate effects" will forever escape analysis. This is inaccurate. <u>First</u>, the math has not changed. *See* Fed. Defs.' Mem. 49. Plaintiffs still fail to articulate how there can be an aggregate effect from an agency action that prohibits any effect. *Id.* There is no "death by a thousand cuts" because there is no "cut" to listed species in the first place. <u>Second</u>, Plaintiffs' sole critique, that a project-specific cumulative effects analysis is limited to the action area, Pls.' Resp. 20, ignores Federal Defendants' explanation as to how broader effects, in addition to cumulative effects, are fully addressed in project-specific consultations. Fed. Defs.' Mem. 49–50. In addition to any environmental baseline analysis, every formal consultation must first "[e]valuate the current status … of the listed species or critical habitat." 50 C.F.R. § 402.14(g)(2). This analysis incorporates all adverse (and beneficial) effects

beyond the proposed action's action area because these effects manifest in the status of the species or critical habitat.   Plaintiffs' contention, that effects outside the action area are ignored, is wrong.

Plaintiffs also once again place undue weight on statements from the Services.   <u>First</u>, this Court is obligated to review the Corps' final word, not that of another agency.   *Nat'l Ass'n of Home Builders,* 551 U.S. at 659.   <u>Second</u>, with respect to the Plaintiffs' assertion that the "Services have made it clear that, in their expert opinion, consultation is required for the NWP 12," Pls. Resp. 26, the Services did not formally request that the Corps initiate consultation on the 2021 NWP 12, as they may do under their regulations.   50 C.F.R. § 402.14(a). Moreover, the Services' statement in the preamble of a different rule, published in 2015, that discussed general principles applicable to hypothetical future programmatic consultations, is not relevant to the Corps' decision whether to consult on the particular Permit at issue in this case.   And the letter from a FWS field office does not represent the agency's considered views.   Improper reliance on such a letter is one of the reasons the Supreme Court reversed the Ninth Circuit in *Homebuilders*, 551 U.S. at 659.

***

Plaintiffs acknowledge that the duty to consult, programmatic or otherwise, is triggered only if the agency action "may affect" listed species.   Pls.' Resp. 15.

31

Thus, Plaintiffs' grievance, and all of their related arguments, boil down to whether reissuance of NWP 12, standing alone, "may affect" listed species and critical habitat. NWP 12's potential to affect wetlands and aquatic resources does not mean listed species will be located in those areas or that "critical habitat" and "waters of the United States" are synonymous. 16 U.S.C. § 1532(5)(A); 33 U.S.C. § 1362(7). In fact, the Corps' biological assessment concluded the opposite. NWP003582. Asked to identify an example where use of NWP 12 "may affect" listed species or critical habitat, Plaintiffs respond that any contrary suggestion "defies credulity." Pls.' Resp. 21. But the lack of any specific example is telling.[16] General Condition 18 prohibits any effect to listed species or critical habitat and thus the Corps' no effect determination is at least reasonable.

## IV. Vacatur Would Need to be Limited to the Project From Which Plaintiffs Have Shown a Concrete Harm

Summary judgment should be granted in favor of Federal Defendants on all Plaintiffs' claims. In the event that the Court should conclude otherwise, however, our opening brief explained why vacatur would not be the appropriate remedy.

---

[16] The Court need not take the Corps' word. Of the three specific examples Plaintiffs provide in their standing declarations, none involve an entity relying on NWP 12 that results in a "may affect" to listed species or critical habitat without completing consultation. Instead, the first (Byron) does not have any listed species, the second (Bullitt) is suspended, and the last (Pamplico) is not authorized and will need to wait for separate CWA authorization with its own ESA compliance. Joyce Decl. ¶ 13; Reusch Decl. ¶ 29; Hughes Decl. ¶ 22.

32

Fed. Defs.' Mem. 53–54.  In response, Plaintiffs assert that the vacatur question would require further briefing.  Pls.' Resp. 59–60.

Plaintiffs do not dispute, however, that any remedy would need to be limited (at most) to the uses of NWP 12 that Plaintiffs have shown to be causing them harm for standing purposes.  Fed. Defs.' Mem. 54–55.  Plaintiffs identified only one such use of NWP 12 in their opening brief, the Byron Pipeline in Laurel, Montana.  Notably, Plaintiffs have not separately challenged the Corps' NWP 12 verification associated with that project.  And Plaintiffs have now conceded that they do not rely on the Byron Pipeline for purposes of an injury-in-fact supporting their ESA claim.  Pls.' Resp. 3 n.1.  Indeed, Plaintiffs' alleged harm from NWP 12 use at the Byron Pipeline was not even ripe at the time Plaintiffs filed their Complaint, as the Corps did not issue its verification associated with that Pipeline until August 2021.  Joyce Decl. ¶ 12.  And Plaintiffs have not supplemented their Complaint.  The two other pipelines Plaintiffs belatedly identify cannot serve as the basis for Plaintiffs' standing or remedy, whether for the ESA claim or the others.  Neither project presented (nor presents) a live controversy.  The Corps' verification of the Bullitt Pipeline post-dates Plaintiffs' complaint and has since been suspended.  Reusch Decl. ¶¶ 27, 29.  And the Corps has not completed its review of the PCN for the Pamplico Pipeline.  Hughes Decl. ¶ 22.

33

Despite the very discrete nature of their alleged Article III injury, Plaintiffs state that they "are amenable to vacatur being limited to new construction projects." Pls.' Resp. at 61. But that was the very same remedy the Supreme Court stayed in the case challenging the prior NWP 12. *See N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1049 (D. Mont. 2020) (vacating permit "as it relates to the construction of new oil and gas pipelines"); *U.S. Army Corps of Eng'rs v. N. Plains Res. Council*, 141 S. Ct. 190 (2020) (Mem.) (staying remedy for anything other than the Keystone XL pipeline). Like the plaintiffs there, Plaintiffs here allege facts of NWP 12-based harms associated with only a single pipeline. Vacating NWP 12 for potential use by all new construction projects would be unsupported.

## CONCLUSION

The Court should grant Federal Defendants' Cross-Motion for Summary Judgment, deny Plaintiffs' Motion for Summary Judgment, and enter Judgment in favor of Federal Defendants.

May 20, 2022

Respectfully submitted,

MARK STEGER SMITH
Assistant U.S. Attorney
Office of the U.S. Attorney
2601 Second Ave. North
Suite 3200
Billings, MT 59101
Tel: (406) 247-4667
Fax: (406) 657-6058
mark.smith3@usdoj.gov

TODD KIM
Assistant Attorney General
Envt. & Natural Resources Division
U.S. Department of Justice

_s/ Benjamin J. Grillot_____
BENJAMIN J. GRILLOT
(D.C. Bar No. 982114)
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0303
Fax: (202) 305-0506
benjamin.grillot@usdoj.gov

___s/ Kristofer R. Swanson____
KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0248
Fax: (202) 305-0275
kristofor.swanson@usdoj.gov

___s/ Coby Howell____
COBY HOWELL
(WY BAR. NO. 6-3589)
Senior Trial Attorney
Wildlife & Marine Resources Section
1000 SW Third Ave Suite 600
Portland, OR 97204
503-727-1044
coby.howell@usdoj.gov

**CERTIFICATION OF SERVICE AND LENGTH**

I hereby certify that on May 20, 2022, I filed the foregoing pleading on the Court's CM/ECF system, which will send notice to all counsel of record. I further certify that the brief is 8,402 words, exclusive of the caption, tables, signature block, and certification.

*/s/ Benjamin Grillot*
BENJAMIN J. GRILLOT