1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MONTANA
2    GREAT FALLS DIVISION

3    CENTER FOR BIOLOGICAL DIVERSITY,       )
     et al.,                                )
4                                           )    Civil Docket
              Plaintiffs,                   )    No. CV-21-47-GF-BMM
5         v.                                )
                                            )
6    LT. GEN SCOTT A. SPELLMON, et al.,     )
                                            )
7             Defendants,                   )
          and                               )
8                                           )
     AMERICAN GAS ASSOCIATION, et al.,      )
9                                           )
              Defendant-Intervenors,        )
10        and                               )
                                            )
11   STATE OF MONTANA,                      )
                                            )
12            Plaintiff,                    )
     _____)

13

14              Transcript of Motion Hearing

15         Missouri River Federal Courthouse
                125 Central Avenue West
16              Great Falls, MT 59404
                Thursday, June 9, 2022
17              2:37 p.m. to 4:37 p.m.

18

          BEFORE THE HONORABLE BRIAN MORRIS
19

     UNITED STATES CHIEF DISTRICT COURT JUDGE
20

21              Yvette Heinze, RPR, CSR
              United States Court Reporter
22         Missouri River Federal Courthouse
                125 Central Avenue West
23              Great Falls, MT 59404
              yvette_heinze@mtd.uscourts.gov
24                (406) 454-7805

25         Proceedings recorded by machine shorthand
     Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2    PRESENT ON BEHALF OF THE PLAINTIFFS:

3                    Douglas Hayes (in person )
                     SIERRA CLUB
4                    1650 38th Street, Suite 102W
                     Boulder, CO 80301
5
                     Jared Michael Margolis (in person)
6                    CENTER FOR BIOLOGICAL DIVERSITY
                     2852 Willamette St. #171
7                    Eugene, OR 97405

8                    Timothy Bechtold (in person )
                     BECHTOLD LAW FIRM
9                    PO Box 7051
                     Missoula, MT 59807-7051
10

11   PRESENT ON BEHALF OF THE DEFENDANT,
     FEDERAL DEFENDERS:
12

13                   Coby Howell (in person)
                     Melonnie Casner (in person)
14                   OFFICE OF THE U.S. ATTORNEY
                     1000 SW Third Ave, Suite 600
15                   Portland, OR 97204-2024

16

17   PRESENT ON BEHALF OF THE DEFENDANT,
     US ARMY CORPS OF ENGINEERS:
18
                     Kristofor R. Swanson (via video)
19                   Benjamin Grillot (via video)
                     U.S. DEPARTMENT OF JUSTICE
20                   ENVIRONMENTAL & NATURAL RESOURCES DIVISION-NRS
                     P.O. Box 7611
21                   Washington, DC 20044-7611

22

23

24

25

PRESENT ON BEHALF OF THE DEFENDANT,
INTERVENOR-DEFENDANT STATE OF MONTANA:

                    Kathleen L. Smithgall (via video)
                    MONTANA DEPARTMENT OF JUSTICE
                    215 North Sanders
                    PO Box 201401
                    Helena, MT 59620-1401


PRESENT ON BEHALF OF DEFENDANT,
INTERVENOR-DEFENDANTS AMERICAN GAS ASSOCIATION, AMERICAN
PETROLEUM INSTITUTE, AMERICAN PUBLIC GAS ASSOCIATION,
ASSOCIATION OF OIL PIPE LINES, AND INTERSTATE NATURAL GAS
ASSOCIATION OF AMERICA:

                    Brianne C. McClafferty (in person)
                    HOLLAND & HART - BILLINGS
                    401 North 31st Street, Suite 1500
                    Billings, MT 59101-1277

                    Karma B. Brown (via video)
                    HUNTON ANDREWS KURTH LLP
                    2200 Pennsylvania Avenue, NW
                    Washington, DC 20037


PRESENT ON BEHALF OF DEFENDANT,
AMICUS PARTY CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA:

                    Rachel H. Parkin (via video)
                    MILODRAGOVICH DALE STEINBRENNER
                    620 High Park Way
                    PO Box 4947
                    Missoula, MT 59806-4947

                    Brandon M. Tuck (via video)
                    VINSON & ELKINS LLP
                    845 Texas Avenue, Suite 4700
                    Houston, TX 77002

                    Corinne Snow (via video)
                    VINSON & ELKINS LLP
                    2200 Pennsylvania Avenue, NW, Suite 500w
                    Washington, DC 20037

1                         PROCEEDINGS

02:37:32PM   2        (Open court.)

02:37:32PM   3        THE COURT:  Madam Clerk, please call the next case on

02:37:45PM   4   the Court's calendar.

02:37:45PM   5        THE CLERK:  This Court will now conduct a motion

02:37:48PM   6   hearing in Cause Number CV-21-47-GF-BMM, Center for Biological

02:37:55PM   7   Diversity, et al., versus Spellmon, et al.

02:38:01PM   8        THE COURT:  Good afternoon, Mr. Margolis, Mr. Hayes,

02:38:01PM   9   Mr. Bechtold.

02:38:01PM  10        MR. MARGOLIS:  Good afternoon.

02:38:01PM  11        MR. HAYES:  Good afternoon, Your Honor.

02:38:06PM  12        MR. BECHTOLD:  Good afternoon.

02:38:06PM  13        THE COURT:  Good afternoon, Mr. Howell, Ms. Casner,

02:38:09PM  14   Ms. McClafferty.  Nice to see you.

02:38:09PM  15        MS. McCLAFFERTY:  Good afternoon, Your Honor.

02:38:12PM  16        THE COURT:  And I see we're joined by a group of

02:38:14PM  17   people on Zoom.

02:38:16PM  18        Would you please introduce yourselves for the record

02:38:19PM  19   and also identify whom you represent, starting with Ms. Brown.

02:38:28PM  20        MS. BROWN:  Good afternoon, Your Honor.  This is

02:38:30PM  21   Karma Brown from Hunton Andrews Kurth, and I represent the

02:38:31PM  22   Nationwide Permit 12 Coalition, along with Ms. McClafferty.

02:38:35PM  23        THE COURT:  All right.  Thank you.

02:38:36PM  24        Who's next?

02:38:43PM  25        MR. GRILLOT:  Good afternoon, Your Honor.  This is

02:38:45PM 1  Ben Grillot representing the federal defendants for the

02:38:45PM 2  Department of Justice.

02:38:47PM 3          THE COURT:  All right.  How about Ms. Parkin?

02:38:54PM 4          MS. PARKIN:  Thank you, Your Honor.  This is

02:38:54PM 5  Rachel Parkin with Milodragovich Dale Steinbrenner, here on

02:38:59PM 6  behalf of amicus, the Chamber of Commerce of the United States

02:39:02PM 7  of America.

02:39:02PM 8          THE COURT:  Thank you.

02:39:02PM 9          Ms. Snow.

02:39:07PM 10          MS. SNOW:  Good afternoon, Your Honor.  This is

02:39:08PM 11  Corinne Snow.  Joining me here in the room is Brandon Tuck.

02:39:09PM 12  We're both with Vinson & Elkins, representing the United States

02:39:12PM 13  Chamber of Commerce.

02:39:13PM 14          THE COURT:  Ms. Smithgall.

02:39:16PM 15          MS. SMITHGALL:  Good afternoon, Your Honor.  My name

02:39:17PM 16  is Kathleen Smithgall, and I represent the State of Montana.

02:39:20PM 17          THE COURT:  Are you with the Attorney General's

02:39:24PM 18  Office?

02:39:24PM 19          MS. SMITHGALL:  Yes, Your Honor.

02:39:24PM 20          THE COURT:  All right.  Mr. Swanson.

02:39:29PM 21          MR. SWANSON:  Good afternoon, Your Honor,

02:39:31PM 22  Kristofor Swanson, also on behalf of the federal defendants.

02:39:33PM 23          THE COURT:  All right.  Thank you.

02:39:33PM 24          So who's going to argue for plaintiffs?

02:39:37PM 25          MR. BECHTOLD:  Mr. Margolis and Mr. Hayes will argue

02:39:39PM 1   for the plaintiffs, Your Honor.

02:39:40PM 2            THE COURT:  All right.  Thank you.

02:39:40PM 3            And for defendants?

02:39:42PM 4            MR. HOWELL:  Your Honor, Coby Howell.  I'll be

02:39:45PM 5   handling the ESA.

02:39:45PM 6            THE COURT:  Okay.

02:39:47PM 7            MR. HOWELL:  Mr. Grillot will be on the Clean Water

02:39:50PM 8   Act, and Mr. Swanson will be handling the NEPA portion.

02:39:56PM 9            THE COURT:  All right.  Thank you.

02:39:58PM 10           So to focus the argument just a bit, the main issues

02:40:04PM 11  as I see them, for plaintiffs first, are demonstrating how you

02:40:08PM 12  have standing and, if you clear that hurdle, establishing why

02:40:14PM 13  the District of Montana would be the appropriate venue for this

02:40:17PM 14  action.

02:40:18PM 15           For the defendants, I think the question is, well,

02:40:23PM 16  why is this any different than the last time you were here in

02:40:26PM 17  2017?  Did you undertake the consultation that the Court

02:40:30PM 18  directed since that time?  And if you did not, why?  And why

02:40:35PM 19  doesn't that put us in the same position we were at back in

02:40:39PM 20  2017?

02:40:39PM 21           So let's start with Mr. Margolis.

02:40:47PM 22           MR. MARGOLIS:  Good afternoon, Your Honor, and may it

02:40:49PM 23  please the Court.  If you would like, I can get right to the

02:40:52PM 24  standing question.  I did have some opening comments about

02:40:56PM 25  Nationwide Permit 12 and your prior rulings, but if you'd like

02:40:58PM  1   me to jump right into standing, I can.

02:40:59PM  2          THE COURT:  Go ahead.  Make your opening comments and

02:41:02PM  3   then get to the standing.

02:41:02PM  4          MR. MARGOLIS:  Okay.  As you said, this Court

02:41:03PM  5   previously ruled that the Corps violated the Endangered Species

02:41:03PM  6   Act by failing to consult when it reissued Nationwide

02:41:13PM  7   Permit 12.  And the Corps, as you stated, did not -- they

02:41:15PM  8   ignored your declaratory ruling and remand which were not

02:41:19PM  9   disturbed on motions for stay pending appeal, and they reissued

02:41:22PM  10  the permit without doing the consultation that was required

02:41:24PM  11  based on the exact same legal reasoning that this Court had

02:41:27PM  12  rejected.

02:41:29PM  13         I will shorten this by turning your attention real

02:41:31PM  14  quick to the case that we just provided in supplemental notice

02:41:35PM  15  to the Court, which was the *Environmental Defense Center v*

02:41:39PM  16  *Bureau of Ocean Energy* because it really resolves many of the

02:41:41PM  17  central issues in this case.

02:41:43PM  18         In that case, which involved an environmental

02:41:47PM  19  assessment regarding the fracking of offshore oil, the Bureau

02:41:52PM  20  there had argued that Section 7 of the ESA did not apply

02:41:56PM  21  because the EA there was a decision support tool for future

02:42:00PM  22  proposals but did not approve actions absent further

02:42:05PM  23  project-specific review, much like the situation that we're

02:42:07PM  24  dealing with here.

02:42:08PM  25         And the court there, the Ninth Circuit court,

02:42:10PM  1    specifically found that site-specific review cannot cure a

02:42:14PM  2    failure to consult at the programmatic level.  It found where,

02:42:17PM  3    otherwise, a listed species could be gradually destroyed so

02:42:20PM  4    long as each step on the path to destruction is sufficiently

02:42:23PM  5    modest.  And that is in -- that is consistent with your

02:42:28PM  6    decision in the prior case, which found that programmatic

02:42:30PM  7    review of Nationwide Permit 12 is necessary to avoid piecemeal

02:42:36PM  8    destruction of species and habitat.

02:42:37PM  9          So the Ninth Circuit decision in this case leaves no

02:42:40PM 10    doubt that the defendants' position in this case now, is simply

02:42:43PM 11    wrong.

02:42:44PM 12          I do want to turn now to standing because, as you

02:42:47PM 13    said, that's the main issue that we need to deal with here.

02:42:50PM 14          First all, defendants' standing arguments, much like

02:42:54PM 15    their "no effect" determination, are predicated on the exact

02:42:57PM 16    same erroneous legal position that this Court previously

02:43:01PM 17    rejected.  They argue that there's no injury in fact because

02:43:03PM 18    there's no harm to listed species from Nationwide Permit 12 due

02:43:06PM 19    to General Condition 18, which requires project-specific review

02:43:10PM 20    for Nationwide Permit 12 projects.

02:43:14PM 21          Even if this Court had not already made the

02:43:16PM 22    determination that Nationwide Permit 12 does not adversely

02:43:19PM 23    affect listed species, the Court must accept as valid the

02:43:24PM 24    merits of the legal claims.  The Supreme Court actually just

02:43:26PM 25    reiterated that in *Federal Election Commission v Ted Cruz*.

| 02:43:30PM | 1 | So the Court must accept for standing purposes that |
| 02:43:33PM | 2 | the Corps failed to ensure against jeopardy through |
| 02:43:36PM | 3 | consultation on the program as the ESA requires.  And therein |
| 02:43:39PM | 4 | lies the basis for plaintiffs' standing.  Plaintiffs have a |
| 02:43:42PM | 5 | cognizable interest in protecting endangered species from |
| 02:43:46PM | 6 | Nationwide Permit 12 activities.  And the program certainly |
| 02:43:49PM | 7 | meets the low "may affect" threshold for Section 7 |
| 02:43:49PM | 8 | consultation, as Your Honor has previously held. |
| 02:43:52PM | 9 | THE COURT:  Mr. Margolis -- |
| 02:43:52PM | 10 | MR. MARGOLIS:  Yes. |
| 02:43:53PM | 11 | THE COURT:  -- as I recall in the last case you |
| 02:43:57PM | 12 | brought -- or the last case the plaintiffs brought on this |
| 02:43:59PM | 13 | issue, they identified specific species that were at risk with |
| 02:44:06PM | 14 | regard to the proposed pipeline in Montana, and it included, I |
| 02:44:13PM | 15 | believe, the pallet sturgeon and a type of beetle. |
| 02:44:16PM | 16 | Do you have anything similar in this case? |
| 02:44:18PM | 17 | MR. MARGOLIS:  Well, yes.  This case concerns -- |
| 02:44:20PM | 18 | first of all, it's a different case.  That case was about |
| 02:44:21PM | 19 | Keystone XL, initially.  And this case is procedurally a little |
| 02:44:28PM | 20 | bit different.  This case concerns a procedural ESA violation |
| 02:44:29PM | 21 | for a programmatic review that must be done before the program |
| 02:44:31PM | 22 | is implemented through site-specific projects. |
| 02:44:35PM | 23 | And we discussed in our briefing the applicable |
| 02:44:38PM | 24 | Ninth Circuit case law from *Kraayenbrink* and other cases, which |
| 02:44:41PM | 25 | state that for a procedural injury the plaintiff need only |

02:44:44PM  1  establish that the agency violated the procedural rules

02:44:48PM  2  designed to protect their interests and that the challenged

02:44:50PM  3  action will threaten those interests, and we've established

02:44:52PM  4  that through declaration.

02:44:54PM  5          So, for example, the first Hamel declaration talked

02:44:57PM  6  about impacts to protected sturgeon from Nationwide Permit 12

02:45:02PM  7  activities through sedimentation and oil spills and explained

02:45:02PM  8  how those affect his academic and aesthetic interests.

02:45:06PM  9          And the first Hartl declaration, at paragraphs 27 to

02:45:10PM  10 29, discussed impacts to listed species from Nationwide

02:45:13PM  11 Permit 12 through habitat loss and contamination from oil

02:45:16PM  12 spills, which harm his interests.

02:45:17PM  13         And so our position is consistent with the

02:45:21PM  14 Supreme Court's decision in *Summers*.  But I want to be clear

02:45:24PM  15 about one thing.  *Summers* did not contemplate the circumstances

02:45:26PM  16 here, and this goes to what you were just asking me.  Cases

02:45:29PM  17 like *Summers* and *Kraayenbrink*, they dealt with specific --

02:45:32PM  18 regulations that were specific to identified areas, such as

02:45:35PM  19 grazing and BLM lands or salvage on forest service lands, where

02:45:40PM  20 the plaintiffs had the opportunity to identify areas subject to

02:45:43PM  21 those regulations that affected their interests at the outset.

02:45:46PM  22         But, here, Nationwide Permit 12 is not limited to any

02:45:49PM  23 specific area.  It can be used in any jurisdictional waterway

02:45:52PM  24 across the United States.  And there's no way of knowing at the

02:45:54PM  25 outset, at this preliminary stage, where it will be used.

02:45:57PM 1     But regardless, consistent with *Summers*, we've

02:46:00PM 2 established a geographic nexus.  And the Ninth Circuit has made

02:46:03PM 3 clear that that nexus can be broad.

02:46:04PM 4     For example, in *National Family Farm*, the declaration

02:46:08PM 5 there that established standing stated that the declarant --

02:46:12PM 6 that the pesticide approved was approved in the state where the

02:46:15PM 7 declarant lived, and the state -- and the declarant had an

02:46:19PM 8 interest in observing listed species in that state.  And so

02:46:22PM 9 that's a general -- a broad geographic nexus that showed where

02:46:26PM 10 the activity applied to.

02:46:28PM 11     The same thing applies here.  We've shown a

02:46:30PM 12 geographic nexus with specific examples, including rivers with

02:46:34PM 13 listed sturgeon that are likely to be affected by Nationwide

02:46:37PM 14 Permit 12 activities.  And we reaffirm that in supplemental

02:46:41PM 15 declarations that showed specific examples of activities that

02:46:45PM 16 are approved by Nationwide Permit 12 that affect our interests.

02:46:52PM 17     And so those supplemental declarations, they show,

02:46:54PM 18 for example, the Hamel declaration, the second declaration.  It

02:46:57PM 19 talked about the Pamplico pipeline, which implicates critical

02:47:15PM 20 habitat for endangered sturgeon in the Great Pee Dee River in

02:47:17PM 21 South Carolina.

02:47:18PM 22     THE COURT:  That's starting to slide over into venue.

02:47:21PM 23 If you've got dangerous species in South Carolina, why isn't

02:47:26PM 24 the suit brought in South Carolina?

02:47:27PM 25     MR. MARGOLIS:  Well, there shouldn't even really be

02:47:28PM 1   an issue about venue in this case, Your Honor.  Defendants have

02:47:30PM 2   waived any argument as to venue.  They never filed a motion to

02:47:32PM 3   dismiss regarding venue.  They didn't argue it in their motion

02:47:35PM 4   for summary judgment.  So it's waived.

02:47:37PM 5         They even cited in their own arguments, *Independent*

02:47:40PM 6   *Towers of Washington v Washington*, the Ninth Circuit case from

02:47:44PM 7   2003, that said the Court will not consider any claims that

02:47:46PM 8   were not actually argued in the appellant's opening brief.

02:47:50PM 9         Moreover, in the answer to our complaint, which is

02:47:54PM 10  ECF Number 28, paragraph 17, they admitted that venue was

02:47:58PM 11  proper in this district.  And so they should be estopped from

02:48:01PM 12  making any argument as to venue.

02:48:03PM 13        But, regardless, it's not clear what they're asking

02:48:06PM 14  for.  Are they asking for claim splitting?  Your Honor has

02:48:08PM 15  already found that the NEPA and Clean Water Act and Endangered

02:48:12PM 16  Species Act claims are intertwined.  So what would be the

02:48:13PM 17  purpose of claim splitting here?

02:48:16PM 18        So we believe that the venue argument has been

02:48:17PM 19  waived, and they should be estopped from arguing venue, and

02:48:20PM 20  there's no purpose in making a venue determination in this case

02:48:24PM 21  at this time.

02:48:26PM 22        Now, I want to go back to the specifics that we've

02:48:30PM 23  provided regarding standing.  Before I get there, let's be

02:48:39PM 24  clear.  Okay.  For this procedural injury, the Ninth Circuit in

02:48:43PM 25  *Environmental Defense Center* specifically found that for claims

02:48:45PM  1    of procedural injury, the need for factual development ceases

02:48:48PM  2    when the alleged procedural injury or procedural violation is

02:48:52PM  3    complete.

02:48:53PM  4            We're talking -- at this stage we don't need to show

02:48:55PM  5    more than what we've already shown, which is that our interests

02:48:59PM  6    are affected by the failure to consult.  And this is consistent

02:49:02PM  7    with the Supreme Court's decision in *Ohio Forestry* and the

02:49:05PM  8    Ninth Circuit's decision in *Kraayenbrink*, which found that

02:49:07PM  9    programmatic challenges are ripe when the programmatic decision

02:49:10PM 10    is made.

02:49:12PM 11            Importantly here, it's very difficult for the

02:49:15PM 12    plaintiffs to determine where Nationwide Permit 12 is being

02:49:17PM 13    used because the Army Corps doesn't make any information public

02:49:19PM 14    as to where it's being used.  So we need to dig around and try

02:49:23PM 15    to find these examples, which we have provided consistent with

02:49:25PM 16    *Summers*.  These examples of --

02:49:26PM 17            THE COURT:  Counsel, let me slow you down for a

02:49:29PM 18    second.

02:49:29PM 19            How do you respond to the defendants' argument, well,

02:49:32PM 20    that's what the PCNs are for?  That gives you sufficient time

02:49:36PM 21    to -- you know, the public construction notices -- give you

02:49:42PM 22    time to identify potential endangered species that might be

02:49:46PM 23    impacted by a project and bring an action then, if necessary.

02:49:51PM 24            MR. MARGOLIS:  I don't believe they've made that

02:49:51PM 25    argument, nor could they, because the preconstruction

02:49:52PM  1   notifications are not made public.  There's no way for those

02:49:55PM  2   to -- for us to access those, absent a FOIA request, which we

02:49:59PM  3   have made.

02:49:59PM  4          And we actually have an argument we presented in a

02:50:03PM  5   footnote in one of our briefs that explain that we made a FOIA

02:50:06PM  6   request to try to obtain preconstruction notifications, and so

02:50:09PM  7   far have not been provided with any of those.

02:50:11PM  8          So they can't make an argument that we have this

02:50:14PM  9   information and that it's public because it is not.

02:50:19PM 10          Importantly here, the harm to listed species is not

02:50:23PM 11   hypothetical, and we're not relying on statistical probability

02:50:26PM 12   that some harm might occur.  The Corps admits that thousands of

02:50:29PM 13   Nationwide Permit 12 authorized activities may affect listed

02:50:33PM 14   species and require a consultation.  So it's inevitable that

02:50:36PM 15   our interests are affected.

02:50:37PM 16          THE COURT:  The Courts required consultation, I

02:50:39PM 17   believe, in 2007 and 2012.  Why is it required every time?  Is

02:50:48PM 18   that the new normal now?  Because up until -- from '77 to 2007,

02:50:54PM 19   there was no consultation.

02:50:55PM 20          MR. MARGOLIS:  They did do voluntary consultation

02:50:57PM 21   previously with the National Marine Fishery Service.

02:51:01PM 22          Importantly, the 2012 consultation, you know,

02:51:03PM 23   resulted in a jeopardy determination that in 2014 was changed

02:51:09PM 24   based on the implementation of protections at that national

02:51:12PM 25   level.

02:51:12PM 1      But, importantly, they never consulted with the Fish

02:51:15PM 2  & Wildlife Service.  That was only with the National Marine

02:51:17PM 3  Fishery Service.  Plus, they haven't consulted since the 2014,

02:51:22PM 4  a programmatic biological opinion.  So it's not clear that the

02:51:26PM 5  mechanisms that were put in place in 2014 are even working to

02:51:29PM 6  protect listed species.

02:51:31PM 7      So at this point, there's no way for us to know if

02:51:34PM 8  listed species are continuing to be jeopardized as the National

02:51:36PM 9  Marine Fishery Service found in 2012.  And more species are

02:51:40PM 10  affected by Nationwide Permit 12 activities that are within

02:51:43PM 11  Fish & Wildlife's jurisdiction than NMFS's jurisdiction --

02:51:43PM 12      (Clarification requested by stenographer.)

02:51:47PM 13      MR. MARGOLIS:  National Marine Fishery Service.  And

02:51:47PM 14  I am fast.  I apologize.  I'm a New Yorker.  It's hard not to

02:51:51PM 15  talk fast.

02:51:51PM 16      As I was saying, the harm to listed species here is

02:51:59PM 17  not hypothetical.  The Corps' own decision document makes it

02:52:03PM 18  clear that there's a substantial risk that harm will occur, and

02:52:05PM 19  that's a standard from the Supreme Court decision in *Clapper v*

02:52:10PM 20  *Amnesty International*.

02:52:11PM 21      The record shows that Nationwide Permit 12 activities

02:52:13PM 22  alter stream morphology, resulting in increases in sediments

02:52:17PM 23  and pollutants in the water.  That can be found in the record

02:52:19PM 24  at NWP 1037 to 1040.  And the Court concluded that Nationwide

02:52:25PM 25  Permit 12 activities result in adverse affects to wildlife,

02:52:29PM  1    including the destruction of aquatic habitat, and that can be

02:52:32PM  2    found at NWP 1062.

02:52:35PM  3              Importantly, defendants' argument that plaintiffs can

02:52:38PM  4    never meet *Summer's* hard floor is predicated on a complete

02:52:41PM  5    mischaracterization of Section 7.  They claim that no amount of

02:52:45PM  6    investigation will produce an example of authorized injury in

02:52:48PM  7    fact because under the permit there cannot be one, but that is

02:52:50PM  8    not how the ESA works.

02:52:53PM  9              Project-specific review still allows for harm to

02:52:56PM 10    listed species through incidental take, which can occur from

02:52:58PM 11    direct harm and habitat modification.  Those are the small cuts

02:53:04PM 12    that add up to death by a thousand small cuts.

02:53:05PM 13              And as Your Honor previously ruled, their position is

02:53:08PM 14    entirely inconsistent with the regulations.  The ESA requires

02:53:12PM 15    consultation on programs, and that the agency consider the

02:53:15PM 16    effects of the action as a whole but does not provide for that

02:53:18PM 17    take authorization to occur at the programmatic level.

02:53:25PM 18              50 CFR 402.14(i)(6) specifically says that take

02:53:27PM 19    authorization must be addressed through subsequent Section 7

02:53:30PM 20    consultation on projects implementing the program.  So the

02:53:33PM 21    regulations contemplate that while programs themselves might

02:53:37PM 22    not have direct effects -- it's the projects that have the

02:53:40PM 23    direct effects -- programmatic consultation is still required.

02:53:43PM 24              And that was confirmed by the Ninth Circuit in the

02:53:45PM 25    recent *Environmental Defense Center* case where the Court

02:53:48PM 1   specifically rejected the argument that the ESA did not apply

02:53:52PM 2   to programmatic documents that themselves did not mandate any

02:53:55PM 3   action citing Pacific Rivers Council.  Again, leaving no doubt

02:53:59PM 4   that the defendants are wrong on that point.

02:54:00PM 5        And defendants' position would render the requirement

02:54:03PM 6   to consult on programs meaningless.  They're asking you to do

02:54:06PM 7   away with consultation on programs because they always require

02:54:10PM 8   consultation on the projects that are implementing the

02:54:13PM 9   programs.  So project-specific review cannot negate the need to

02:54:18PM 10  consult on the program as the ESA requires.

02:54:21PM 11       Programmatic consultation is vital as the services

02:54:24PM 12  have found in the preamble to the regulations on programmatic

02:54:28PM 13  consultation, that it allows for a broad-scale examination

02:54:32PM 14  that's not as readily conducted through subsequent

02:54:33PM 15  project-specific consultations.

02:54:35PM 16       Importantly, plaintiffs' position does not hinge on

02:54:38PM 17  noncompliance with Nationwide Permit 12 as the defendants

02:54:41PM 18  allege.  I want to make this clear because they said this a few

02:54:44PM 19  times.  Nationwide Permit 12, because it will be used thousands

02:54:48PM 20  of times, even when it's used lawfully and that

02:54:50PM 21  project-specific consultation does occur, the program has

02:54:53PM 22  impacts to listed species that must be reviewed at that

02:54:56PM 23  programmatic level.

02:54:57PM 24       And, again, we show through specific Nationwide

02:55:02PM 25  Permit 12 projects in our supplemental declarations, including

the Hamel declaration, discussing that Pamplico pipeline, and
the second Hartl declaration, discussing the Bullitt pipeline
in Kentucky that were adversely affected by specific projects.

The defendants have argued that those supplemental
declarations are not properly before the Court.  So I want to
address that real quick.

They're certainly properly before the Court.  They
were submitted in response to defendants' arguments, not on
reply but in opposition.  It's something that's not uncommon.
I would turn your attention to a DC Circuit case from 2021 that
discusses this.  *National Council for Adoption v Blinken*
discusses -- which is 4 F.4th 106 -- discusses how courts allow
supplemental standing declarations when they do not raise
entirely new theories of standing.  They just shore up the
initial ones by providing more specifics.  That's exactly what
we did here.  And, importantly, they had an opportunity to
reply.  So there's no prejudice to us having provided these
supplemental declarations.

And the cases that they rely on are completely
inapposite.  The case *Lujan v National Wildlife Federation*,
there, the plaintiffs tried to submit declarations after a
standing hearing.  And the Ninth Circuit said that the lower
court had discretion to strike them, to reject them, but didn't
say that they had to be rejected and, in fact, cited Rule 6(c)
for the proposition that if they had been submitted before the

02:56:25PM  1  hearing, it would have been timely.  Well, we don't have that
02:56:27PM  2  same issue here at all.
02:56:28PM  3         And in *Zamani v. Carnes*, that was about arguments
02:56:32PM  4  that were raised for the first time on reply.  Again, we're not
02:56:34PM  5  raising new standing arguments on reply.  We're simply
02:56:37PM  6  submitting information to buttress what we've already provided.
02:56:44PM  7         We believe we had standing when the complaint was
02:56:46PM  8  filed, providing evidence supporting that along the way,
02:56:50PM  9  through allegations submitted in standing declarations, is
02:56:54PM 10  acceptable.  And it's not clear exactly what they want here,
02:56:57PM 11  what the defendants want.  Should we dismiss this case and
02:57:00PM 12  refile it now that we have examples?  That would make no sense.
02:57:03PM 13  It would be inefficient.  We've provided examples consistent
02:57:05PM 14  with *Summers*, and so we believe we've shown standing in this
02:57:10PM 15  case.
02:57:10PM 16         Now, one last thing on procedural standing.  When
02:57:15PM 17  challenging a programmatic action, once the plaintiffs have
02:57:17PM 18  shown that they have standing because that programmatic action,
02:57:20PM 19  like a regulation, affects their interest, that standing has
02:57:23PM 20  not been limited to the specific locations identified in the
02:57:27PM 21  standing declarations, as the defendants have attempted to
02:57:30PM 22  argue.
02:57:30PM 23         So while plaintiffs are unable to identify all the
02:57:32PM 24  locations where program -- where this program will be
02:57:35PM 25  implemented through projects, particularly here, since the

02:57:40PM 1    Corps doesn't make that information public -- we've provided
02:57:42PM 2    sufficient specificity by pointing to specific Nationwide
02:57:46PM 3    Permit 12 projects and to specific harm in waters that are
02:57:49PM 4    affected or likely to be affected by Nationwide Permit 12
02:57:52PM 5    activities to challenge Nationwide Permit 12 as a whole.
02:57:56PM 6             Under the defendants' theory, the plaintiffs would
02:57:58PM 7    never be able to challenge the programmatic action, only
02:58:00PM 8    projects.  But the Ninth Circuit has made clear, post-*Summers*,
02:58:03PM 9    that that is not the case.
02:58:07PM 10            *WildEarth Guardians v United States Department of*
02:58:09PM 11   *Agriculture*, which is 795 F.3d 1148, from 2015, that dealt with
02:58:14PM 12   a programmatic EIS, which was the basis for further
02:58:17PM 13   project-specific actions, much like what we're dealing with
02:58:20PM 14   here.  And in ruling that the plaintiff had standing to sue
02:58:22PM 15   over the programmatic review, the Court held that the challenge
02:58:25PM 16   to the programmatic action did not require the plaintiff to
02:58:27PM 17   show standing for all the specific actions taken under that
02:58:30PM 18   program.  The Court specifically said that the PEIS also
02:58:35PM 19   applies to other geographic regions that the declarant does not
02:58:39PM 20   visit is irrelevant to the standing analysis.
02:58:40PM 21            And the same is true from *National Family Farm*, and
02:58:43PM 22   standing there was based on a declaration stating that
02:58:46PM 23   pesticide was approved in the state where the declarant lived.
02:58:49PM 24   But standing then was not limited to that state.  The
02:58:51PM 25   standing -- the plaintiffs had standing to challenge EPA's

02:58:56PM  1   registration of the pesticide nationwide, and the same should
02:58:56PM  2   apply here.
02:58:57PM  3          We're challenging Nationwide Permit 12 as a whole,
02:59:00PM  4   not specific projects.  We've provided examples of specific
02:59:03PM  5   projects to show that we are directly affected, but our
02:59:05PM  6   challenge here is to Nationwide Permit 12 as a whole.
02:59:09PM  7          If the Court has no further questions about the
02:59:12PM  8   procedural standing, I'd like to turn to *Havens* organizational
02:59:15PM  9   standing.
02:59:16PM  10         THE COURT:  Well, let's focus again on -- one of the
02:59:21PM  11  arguments the defendants make is the creation of the nationwide
02:59:28PM  12  permit instills great discretion upon the Corps; they're
02:59:33PM  13  instructed as the agency in charge to fill in the gaps.  And
02:59:38PM  14  you're kind of preempting that process by trying to make them
02:59:41PM  15  come up with a list of potential harms before they have even
02:59:45PM  16  had a chance to evaluate what might be potential harms because
02:59:48PM  17  we don't know where the construction projects will be.
02:59:51PM  18         How do you respond?
02:59:52PM  19         MR. MARGOLIS:  That's not the purpose of programmatic
02:59:53PM  20  review, and that's why there's this two-step analysis created
02:59:57PM  21  under the Endangered Species Act regulations.  We're not asking
02:59:59PM  22  them to try to figure out exactly where Nationwide Permit 12
03:00:02PM  23  will be used.
03:00:03PM  24         Programmatic review, as the Fish & Wildlife Service
03:00:08PM  25  and National Marine Fishery Services have said, is intended to

03:00:10PM  1    ensure that there are mechanisms in place to track the impacts

03:00:12PM  2    as that program is carried out to ensure that the aggregate

03:00:16PM  3    impacts of the program do not result in jeopardy.

03:00:18PM  4            THE COURT:  How does that work in this case?

03:00:20PM  5            MR. MARGOLIS:  It will work exactly as they did

03:00:22PM  6    previously in their prior consultations with NMFS where they

03:00:24PM  7    look at how they can track the impacts of the entire program to

03:00:29PM  8    make sure that it's not causing death by a thousand small cuts,

03:00:32PM  9    as we've said, and whether there are mechanisms that need to be

03:00:34PM  10   in place to ensure against jeopardy.

03:00:37PM  11           So, for example, we talked about the -- them relying

03:00:42PM  12   on permit applicants, the delegation to permit applicants to

03:00:46PM  13   provide them with information as to whether projects may affect

03:00:49PM  14   listed species, which we think is a violation of the Endangered

03:00:49PM  15   Species Act.

03:00:54PM  16           As we've said, programmatic consultation might result

03:00:58PM  17   in mechanisms put in place to ensure that that does not occur,

03:01:00PM  18   that project-specific consultation always does occur.  And

03:01:04PM  19   there are other mechanisms that can be put in place.  Again,

03:01:06PM  20   it's about tracking the impacts on listed species.

03:01:09PM  21           Right now, they don't have mechanisms in place.

03:01:10PM  22   National Marine Fishery Service has been very adamant about

03:01:13PM  23   this, in the prior consultations that they did, that they did

03:01:17PM  24   not have mechanisms in place to track the overall impacts of

03:01:19PM  25   the program.  And that's what the programmatic consultation is

03:01:22PM 1    intended to do.

03:01:23PM 2            We're not asking them to come up with a list of

03:01:25PM 3    activities that would occur.  We're asking them to consider how

03:01:28PM 4    to ensure that the program itself does not result in jeopardy

03:01:32PM 5    through mechanisms at that national level.

03:01:34PM 6            Again, the prior consultations with NMFS show exactly

03:01:38PM 7    how that took place, what was implemented, and we provide that

03:01:41PM 8    in our briefing, discussions of exactly what the National

03:01:45PM 9    Marine Fishery Services required.

03:01:51PM 10           Are there any further questions on the procedural

03:01:53PM 11   standing?

03:01:53PM 12           THE COURT:  No, go ahead.

03:01:54PM 13           MR. MARGOLIS:  The plaintiffs have also shown *Havens*

03:01:58PM 14   organizational standing in this case, and this case fits

03:02:01PM 15   perfectly with *Havens* because, here, the Corps set up

03:02:04PM 16   Nationwide Permit 12 in such a way as to require us to take it

03:02:06PM 17   upon ourselves to find out about the program and its impacts,

03:02:10PM 18   to uncover how it is being applied.  They purposely hide the

03:02:14PM 19   information with no public access, no public accountability,

03:02:17PM 20   which puts the onus on the public to ferret out how Nationwide

03:02:20PM 21   Permit 12 is being used.

03:02:21PM 22           And having set up the system in that way, they can't

03:02:25PM 23   then argue that we don't need to use our own resources to

03:02:25PM 24   protect our interests, which is the basis for *Havens*

03:02:28PM 25   organizational standing.

The defendants' attempt to narrow *Havens* to situations where plaintiffs are unable to function as an organization, citing a concurring and dissenting opinion from *Fair Housing Council of San Fernando* Valley v Roommate.com. But that is not what the law says.  The majority opinion there, the Court stated that the plaintiffs had organizational standing where the agency's conduct caused the plaintiff to divert resources independent of litigation costs, which frustrated the central mission of the organization.

And in that case, the plaintiff, as the Court noted, investigated the defendant's alleged violations and, in response, started new education and outreach campaigns. Because that was not part of litigation, that frustrated the central mission, and the plaintiffs had organizational standing.

And the same applies here.  We've shown that the Corps' failure to consult did not allow the plaintiffs to go about their business as usual, as the government claims.  The plaintiffs diverted resources trying to protect their members' interests, which takes away from our other work.  That's the frustration of our mission.

It's not based on having to litigate.  It's based on tracking Nationwide Permit 12 activities, making FOIA requests, reviewing those requests, if we get them, and education campaigns that have resulted in thousands of comments being

03:03:42PM 1  provided on Nationwide Permit 12 from our members.

03:03:47PM 2        Importantly, *Havens* is not about -- we talked about

03:03:50PM 3  information.  It's not an informational injury.  So, in

03:03:53PM 4  response, the government talks about informational injury.

03:03:55PM 5  This is not an informational injury claim.  It's depriving us

03:03:59PM 6  of key information that we rely on to fulfill our mission.

03:04:02PM 7  That's why the lack of information provides *Havens*

03:04:06PM 8  organizational standing.

03:04:11PM 9        Do you have any questions about *Havens* organizational

03:04:13PM 10 standing, Your Honor?

03:04:13PM 11       THE COURT:  No.

03:04:13PM 12       MR. MARGOLIS:  I just want to point out one more

03:04:19PM 13 thing on the merits before I turn this over to my cocounsel to

03:04:22PM 14 talk about NEPA and the Clean Water Act, which is this reliance

03:04:27PM 15 on permittee compliance to implement mitigation measures that

03:04:32PM 16 the government has pointed out from *National Family Farm* as a

03:04:36PM 17 reason why the delegation here was not unlawful.

03:04:40PM 18       I want to make sure this is clear.  Reliance on

03:04:44PM 19 permittees to apply measures included in a permit, that's not

03:04:47PM 20 what we're dealing with here.  Here, we're relying on

03:04:51PM 21 self-interested permittees to make the initial effects

03:04:54PM 22 determination.  Right?  If we're talking about a permit

03:04:58PM 23 compliance measure, the agency completes that permit.

03:05:01PM 24       But, here, at the initial effects determination, if

03:05:04PM 25 they fail to submit a preconstruction notification, the Corps

03:05:09PM  1  would never know.  And that ties back into the need, again, for

03:05:11PM  2  programmatic consultation, but it also shows why the delegation

03:05:13PM  3  here -- it creates -- why the "may affect" standard is

03:05:16PM  4  satisfied.  That level of delegation suggests that species may

03:05:20PM  5  be affected without consultation, as this Court previously

03:05:23PM  6  ruled, and they did not remedy that whatsoever since your prior

03:05:27PM  7  discussion -- prior ruling, rather.

03:05:31PM  8           We'll transition here to NEPA and the Clean Water

03:05:34PM  9  Act, but I just want to point out a fundamental disconnect in

03:05:36PM 10  how the Corps approaches the ESA and NEPA --

03:05:36PM 11           (Clarification requested by stenographer.)

03:05:36PM 12           MR. MARGOLIS:  -- a fundamental disconnect on how

03:05:46PM 13  they approach the ESA and NEPA.  For NEPA purposes, they do an

03:05:48PM 14  analysis at the programmatic level but don't do any

03:05:51PM 15  project-specific NEPA analysis.

03:05:54PM 16           They do the opposite for the Endangered Species Act,

03:05:56PM 17  where they do only project-specific review, ignoring the clear

03:06:00PM 18  requirement in the Endangered Species Act to consult on the

03:06:00PM 19  program itself.

03:06:03PM 20           It's not clear why they do it that way, but clearly

03:06:07PM 21  the NEPA analysis being done at the programmatic level shows

03:06:09PM 22  that they can undertake a programmatic analysis at the

03:06:12PM 23  Endangered Species Act level and choose not to based on this

03:06:16PM 24  erroneous legal argument that this Court has already rejected

03:06:18PM 25  and which is inconsistent with the Ninth Circuit's decision --

03:06:23PM  1    recent decision that we provided in the supplemental notice.

03:06:29PM  2            Regardless, the NEPA analysis was inadequate, and so

03:06:32PM  3    I'll turn it over to my cocounsel to discuss that.

03:06:33PM  4            THE COURT:  All right.  Thank you, Mr. Margolis.

03:06:33PM  5            MR. MARGOLIS:  Thank you, Your Honor.

03:06:36PM  6            THE COURT:  Mr. Hayes.

03:06:40PM  7            MR. HAYES:  Good afternoon, Your Honor.  Again,

03:06:49PM  8    Doug Hayes, on behalf of plaintiffs.  I plan to address

03:06:52PM  9    plaintiffs' claims under the National Environmental Policy Act

03:06:55PM  10   and the Clean Water Act.

03:06:57PM  11           I'd like to start with NEPA.  And at the outset, I

03:07:01PM  12   just want to make a couple general points.  First, Nationwide

03:07:06PM  13   Permit 12 is the final permit authorizing the crossings of

03:07:09PM  14   waterways by pipelines throughout the United States for a

03:07:14PM  15   period of five years.  There's often no further Corps

03:07:20PM  16   involvement at all.  So this is the final permit itself.

03:07:24PM  17           The Army Corps has prepared this environmental

03:07:27PM  18   assessment for what they estimate to be about 47,000 water

03:07:32PM  19   crossings over a five-year period.  And this is the only NEPA

03:07:36PM  20   analysis for those tens of thousands of activities.  There's no

03:07:42PM  21   project-level review by the Corps or other agencies under NEPA.

03:07:48PM  22   So this is it.

03:07:49PM  23           Now, in discussing the NEPA claims, I'd like to sort

03:07:53PM  24   of divide it up into two categories.  One, the three sort of

03:07:57PM  25   construction-related impacts that we discussed; and then I'd

03:08:02PM 1   like to turn to the oil spills and climate change issues after

03:08:06PM 2   that.

03:08:07PM 3          Now, the construction-related impacts involved

03:08:12PM 4   frac-outs, forested wetland clearing, and cumulative effects.

03:08:17PM 5   All three of these occur during construction while these

03:08:23PM 6   pipeline crossings are being constructed.  All of these involve

03:08:27PM 7   adverse impacts to the waterways themselves.  So we're not

03:08:30PM 8   talking about uplands or anything like that.  And all three of

03:08:35PM 9   these plaintiffs submitted extensive information to the

03:08:37PM 10  Army Corps about the impacts to waterways which the Corps

03:08:41PM 11  completely ignored.

03:08:43PM 12         Now, with frac-outs, the first of these three, just

03:08:48PM 13  to recap, the frac-outs are when the pipelines are installed

03:08:52PM 14  under waterways using horizontal directional drilling, and the

03:08:57PM 15  pressurized fracking drilling fluid gets released through

03:09:04PM 16  fissures in the bedrock and releases into the waterways.

03:09:06PM 17         And I'd just like to point to three places in the

03:09:11PM 18  record that emphasizes the gravity of this issue.  First of

03:09:16PM 19  all, Document 38-6, at page 8, it's an Army Corps document from

03:09:22PM 20  2020 where the Corps itself says this has become a critical

03:09:26PM 21  issue, and it says it poses grave risks to environmentally

03:09:30PM 22  sensitive areas.

03:09:33PM 23         Document 38-8, that plaintiffs provided, is a

03:09:39PM 24  discussion of an incident on the Rover pipeline in Ohio, in

03:09:46PM 25  2017, where two million gallons of drilling fluid contaminated

03:09:49PM  1   with diesel fuel was spilled into a pristine wetland and

03:09:51PM  2   covered it in 13 inches of drilling mud.

03:09:53PM  3           THE COURT:  What's the page number?

03:09:58PM  4           MR. HAYES:  That is page 26 of Document 38-8.  It's

03:10:01PM  5   also in the record at NWP32566, I believe.

03:10:09PM  6           And then on page 19 of that same document, there's a

03:10:12PM  7   discussion of another pipeline, the Mariner East pipeline in

03:10:15PM  8   Pennsylvania, where there were at least -- this is a pipeline

03:10:18PM  9   that went across the state of Pennsylvania.  There were at

03:10:21PM 10   least 125 separate frac-out incidents that released hundreds of

03:10:26PM 11   thousands of gallons, 40 percent of those impacted wetlands, 52

03:10:32PM 12   impacted streams.

03:10:33PM 13           So this is all information on the issue of frac-outs.

03:10:38PM 14   The Corps itself acknowledges in these documents that it poses

03:10:42PM 15   grave risk, and the Corps refused to analyze it.  And it's all

03:10:46PM 16   based on their position that the Corps doesn't have to analyze

03:10:53PM 17   impacts that it doesn't directly regulate under NEPA.  And

03:10:56PM 18   that's contrary to NEPA, based on several cases, including the

03:11:02PM 19   *Coalition to Protect Puget Sound* case from the Western District

03:11:07PM 20   of Washington, 2019.

03:11:08PM 21           The second construction-related impact I'd like to

03:11:13PM 22   discuss is forested wetland clearing.  Again, this is when the

03:11:18PM 23   pipelines are constructed through these high-quality forested

03:11:23PM 24   wetlands, and they have to create a 50- to 100-foot wide

03:11:27PM 25   right-of-way and permanently maintain it, prevent anything from

03:11:31PM   1   growing back so that the pipeline can be maintained.

03:11:34PM   2          Again, plaintiffs submitted extensive information on

03:11:39PM   3   forested wetlands and the impacts from pipelines.  And the

03:11:44PM   4   Corps, their position on forested wetlands clearing is a little

03:11:48PM   5   bit different.  The EA actually acknowledges permanent adverse

03:11:53PM   6   effects and permanent loss of wetlands functions.  But those

03:11:57PM   7   are the only two phrases they use.  They refuse to go into any

03:12:01PM   8   further detail.

03:12:03PM   9          And as we know from several cases in the

03:12:08PM   10  Ninth Circuit, simply acknowledging adverse impacts is

03:12:13PM   11  insufficient.  It fails to meet NEPA's hard look requirement --

03:12:16PM   12  or "hard look" mandate.  The most recent case that we filed as

03:12:21PM   13  supplemental authority this week, *Environmental Defense Center*

03:12:25PM   14  *v Bureau of Ocean and Energy Management*, it talks about that as

03:12:29PM   15  well.  It reaffirms that.

03:12:30PM   16         The third category of construction-related impacts is

03:12:35PM   17  the cumulative effects.  So the Corps -- what the Corps did

03:12:41PM   18  with cumulative effects is include an eight-page national scale

03:12:48PM   19  analysis, and it's the same boilerplate analysis that they use

03:12:53PM   20  for every other nationwide permit.  All 58 of them use the

03:12:57PM   21  same, quote/unquote, "national scale analysis."  But it doesn't

03:13:02PM   22  even mention oil and gas pipelines or construction at all.

03:13:07PM   23         And, again, we're not talking about operation here.

03:13:11PM   24  We're talking about building the right-of-way, building the

03:13:17PM   25  pump stations, the access roads, the on-the-ground impacts from

03:13:20PM 1   construction, including stacking them in close proximity to

03:13:26PM 2   each other and so forth.

03:13:27PM 3          And so for all those construction-related impacts,

03:13:35PM 4   these are, you know, again, impact the waterways.  They are

03:13:39PM 5   directly authorized by Nationwide Permit 12 itself, and the

03:13:43PM 6   Corps failed to meet NEPA's "hard look" standard.

03:13:46PM 7          I'd like to turn to the oil and gas spills now.  Now,

03:13:53PM 8   there's a lot of discussion in the briefs about whether

03:13:57PM 9   Nationwide -- whether the Corps permits oil pipelines.  So I

03:14:01PM 10  just want to put it this way:  Nationwide Permit 12 authorizes

03:14:05PM 11  the crossings of US waters by oil and gas pipelines.  There's

03:14:12PM 12  no dispute about that.  The result of that action is that these

03:14:16PM 13  oil and gas pipelines are installed in the waterways in these

03:14:20PM 14  streams, rivers, wetlands.  And the pipelines have a propensity

03:14:25PM 15  to leak, spill, rupture.

03:14:27PM 16         And so under the NEPA case law, it requires the

03:14:34PM 17  Corps -- it's a reasonably foreseeable impact to those

03:14:37PM 18  waterways themselves.  So NEPA requires the Army Corps to

03:14:42PM 19  consider spills into the waterways from the oil and gas

03:14:46PM 20  pipelines.

03:14:47PM 21         Now, the Corps, again, refuses to look at the impacts

03:14:52PM 22  of spills because it says it doesn't have to look at impacts

03:14:58PM 23  that the Corps doesn't itself directly regulate.  And that's

03:15:03PM 24  important here because the government in their brief tried to

03:15:06PM 25  distance themselves from that position.

03:15:08PM  1    So I want to point to the EA where they make that

03:15:11PM  2 determination.  It's at NPW, page 952.  They're talking about

03:15:19PM  3 a -- the EA explains that some commenters asked the Corps to

03:15:24PM  4 evaluate spills.  And in response the Corps says, "Since the

03:15:28PM  5 Corps does not regulate the release of oil and natural gas, it

03:15:32PM  6 is not required to perform a detailed analysis of the effects

03:15:35PM  7 of those possible future leaks or spills."

03:15:39PM  8    So that is their position.  That was their basis for

03:15:42PM  9 refusing to look at oil and gas spills.  It wasn't based on a

03:15:48PM 10 scoping decision or a reasonable interpretation of their own

03:15:52PM 11 scoping regulations, as the briefs argue.  That is their

03:15:58PM 12 position, and it's arbitrary and capricious.  It's contrary to

03:16:03PM 13 NEPA, as the Ninth Circuit's held in *Ocean Advocates v US Army*

03:16:09PM 14 *Corps of Engineers, Sierra Club v Sigler*, Fifth Circuit case,

03:16:13PM 15 and *Standing Rock Sioux Tribe v Army Corps of Engineers.*

03:16:18PM 16    Now, admittedly, those are all individual permit

03:16:22PM 17 cases, and I want to address the distinction that the

03:16:26PM 18 government defendants make there.  It's clear that all these

03:16:31PM 19 cases require the Army Corps to look at the impacts of oil

03:16:36PM 20 spills when issuing 404 permits, at least in the individual

03:16:39PM 21 permit context.

03:16:40PM 22    So the question becomes:  Why are Nationwide

03:16:44PM 23 Permit 12 -- excuse me -- why are nationwide permits any

03:16:45PM 24 different?  The defendants make that argument, but they can't

03:16:49PM 25 provide any legal basis for that position.  And there really is

03:16:54PM 1    none.  Individual permits, nationwide permits, are two

03:16:58PM 2    different provisions of Section 404.  They're two different

03:17:01PM 3    types of permits that allow the Corps to authorize discharge

03:17:06PM 4    and fill of material for various projects.  Under both

03:17:12PM 5    provisions, the Corps is authorizing the same thing, the

03:17:14PM 6    discharge and fill.  Under both provisions, the Corps provides

03:17:19PM 7    the -- or excuse me -- applies the same regulations, the public

03:17:23PM 8    interest factors, at 33 CFR 320.4.

03:17:30PM 9            So, again, the defendants can't provide any legal

03:17:34PM 10   basis for this distinction that would allow the Corps to

03:17:40PM 11   disregard a whole category of impacts that they would be

03:17:44PM 12   required to look at under individual permits.

03:17:46PM 13           THE COURT:  Counsel, what's the purpose of a

03:17:49PM 14   nationwide permit if we're going to subject the issuance of it

03:17:52PM 15   to all of the analysis and consultation you're seeking?  Isn't

03:17:58PM 16   Congress' intent, "Well, there are a number of crossings at

03:18:01PM 17   waterways that likely would have a limited impact.  So we're

03:18:04PM 18   going to group those all into one big permit"?

03:18:07PM 19           MR. HAYES:  That's true.  So, again, the Corps can

03:18:11PM 20   issue project by project 404 permits, or they can permit an

03:18:17PM 21   entire category of activities, which they have attempted to

03:18:21PM 22   do -- or which they have done here.  But before doing so, they

03:18:26PM 23   have to evaluate the impacts of those activities under NEPA.

03:18:29PM 24   There's no question about that.

03:18:31PM 25           So what the government's position --

03:18:33PM 1      THE COURT:  Does it have to be in the EIS, or can it

03:18:35PM 2  be in the EA?

03:18:39PM 3      MR. HAYES:  Well, they -- the environment assessment

03:18:42PM 4  here -- we've argued that an EIS is required because it clearly

03:18:47PM 5  reaches the significance threshold.

03:18:48PM 6      But the EA -- the purpose of the EA is to make a

03:18:51PM 7  convincing case why an EIS isn't required.  And the EA, you

03:18:58PM 8  know, has to meet NEPA's "hard look" mandate, and that means

03:19:00PM 9  looking at all the reasonably foreseeable effects.

03:19:03PM 10      So if the Army Corps -- let me put it this way:  If

03:19:08PM 11  the Army Corps has to evaluate oil spills when issuing a single

03:19:13PM 12  permit, then how could it be that they could issue an entire --

03:19:18PM 13  a permit for an entire category of activities that won't have

03:19:23PM 14  any project-level review whatsoever and they can avoid

03:19:26PM 15  evaluating those same impacts that they have to do at the

03:19:28PM 16  project level?

03:19:29PM 17      You're right that a nationwide permit -- the purpose

03:19:32PM 18  is to perspectively authorize an entire category of activities,

03:19:38PM 19  in this case, 47,000 oil and gas pipeline crossings.  But

03:19:42PM 20  before doing so, they have to analyze the impacts of that under

03:19:44PM 21  NEPA and make a determination that the impacts are in fact

03:19:49PM 22  minimal, and that's what they've failed to do here.

03:19:52PM 23      Now, the government relies on the Supreme Court's

03:19:58PM 24  decision in *Public Citizen*, but that case is clearly

03:20:05PM 25  distinguishable.  In *Public Citizen*, the agency -- no matter

03:20:08PM  1  what the agency did, they had no -- it had no authority to

03:20:14PM  2  affect the outcome.  It couldn't stop these trucks from

03:20:17PM  3  operating in the United States.

03:20:20PM  4        Here, it's quite different.  The Court clearly has

03:20:23PM  5  the authority and the obligation to not issue Nationwide

03:20:30PM  6  Permit 12 if it determines the impacts would be more than

03:20:34PM  7  minimal.

03:20:37PM  8        So it's in the statute.  The public interest factors

03:20:39PM  9  that the Army Corps has to apply, again, are -- they're broad.

03:20:46PM 10  They talk about safety, general environmental concerns, water

03:20:50PM 11  quality, et cetera, and clearly leave room for the Corps to

03:20:53PM 12  look at the oil spill impacts into these waterways.  And,

03:20:57PM 13  again, they have to decline to issue the nationwide permit if

03:21:01PM 14  they find the impacts would be more than minimal.

03:21:07PM 15        With the climate change claim, Your Honor, it's the

03:21:12PM 16  same analysis.  The Corps refused to evaluate the greenhouse

03:21:20PM 17  gas implications of permitting all of these oil and gas

03:21:26PM 18  pipelines nationwide because they don't regulate the downstream

03:21:31PM 19  combustion of fossil fuels.  That's the position -- again, it

03:21:33PM 20  was not a scoping decision.  It wasn't an application of

03:21:37PM 21  their -- of the Army Corps's NEPA scoping regulations.  In

03:21:44PM 22  fact, the government argues that those regulations don't even

03:21:47PM 23  apply here.

03:21:48PM 24        The position was that the Corps does not have to

03:21:52PM 25  evaluate impacts, downstream burning of fossil fuels.  And

03:21:58PM 1   courts have repeatedly ruled otherwise.  The *Columbia*

03:22:02PM 2   *Riverkeeper v United States Army Corps of Engineers*, that case

03:22:07PM 3   involved the Army Corps's permitting of a methanol export

03:22:12PM 4   facility in Washington.  It was a, quote/unquote, "midstream

03:22:17PM 5   facility," much like pipelines.  And the Court there said, "The

03:22:23PM 6   Corps's assertion that the greenhouse gas emissions are outside

03:22:26PM 7   their jurisdiction does not relieve its duty to take a hard

03:22:29PM 8   look."

03:22:31PM 9        The Court there looked at the public interest factors

03:22:34PM 10  that the Army Corps has to apply and said they clearly apply

03:22:39PM 11  there to greenhouse gas emissions and required the Corps to

03:22:45PM 12  evaluate the emissions from upstream fracking and downstream

03:22:52PM 13  burning of -- or, excuse me -- production of these chemicals in

03:22:55PM 14  Asia.

03:22:55PM 15       So here we had a 404 permit for an export facility.

03:23:01PM 16  The permit was limited to the discharges of dredge and fill

03:23:06PM 17  material for the construction of this facility.  And here we

03:23:08PM 18  have a Court saying, "The Army Corps was required under NEPA to

03:23:12PM 19  look at the downstream burning of fossil fuels."

03:23:16PM 20       So clearly the Corps would be able to do that here,

03:23:18PM 21  and it would inform their decision as to whether or not the

03:23:22PM 22  impacts of this massive permit are minimal.

03:23:27PM 23       Now, in the interest of time, I would like to turn to

03:23:33PM 24  the Clean Water Act claim real quick, unless the Court has any

03:23:35PM 25  questions about NEPA.

03:23:35PM   1          THE COURT:  No, go ahead.

03:23:37PM   2          MR. HAYES:  So the Clean Water Act claim boils down

03:23:42PM   3   to this:  The Corps has issued Nationwide Permit 12, which

03:23:46PM   4   allows pipelines to use the permit an unlimited amount of times

03:23:52PM   5   to permit these massive pipelines, sometimes hundreds,

03:23:58PM   6   sometimes thousands of individual water crossings that it

03:24:01PM   7   considers, quote/unquote, "single and complete projects."

03:24:05PM   8          Now, they have two main justifications for ensuring

03:24:09PM   9   minimal effects, despite this unlimited nature, neither of

03:24:13PM  10   which withstand scrutiny.  The first is that the Corps argues,

03:24:20PM  11   at the project-level review, district engineers will be able to

03:24:25PM  12   ensure -- look at projects and ensure the environment impacts

03:24:31PM  13   will be only minimal.

03:24:33PM  14          The problem there is very simple.  The EA itself

03:24:36PM  15   estimates that for over 7,000 projects over a five-year period,

03:24:42PM  16   there will be no project-level review.  So for 7,250 pipeline

03:24:50PM  17   water crossings, the Corps will never know about it.  There

03:24:53PM  18   will never be an opportunity to evaluate the project-level

03:24:56PM  19   impacts.

03:24:58PM  20          The Corps -- excuse me -- the defendants point to

03:25:02PM  21   some of the previous cases about Nationwide Permit 12, but none

03:25:06PM  22   of those cases involve the facts that we have here, which is

03:25:11PM  23   the Corps expressly admitting that some-thousand -- 7,000

03:25:18PM  24   projects will escape that review altogether.  None of the

03:25:21PM  25   previous versions of Nationwide Permit 12 contain that

03:25:25PM   1    admission.   None of the courts discussed it.

03:25:27PM   2          The second justification that the Corps uses to

03:25:33PM   3    ensure minimal effects at the project level is this idea that

03:25:39PM   4    crossings are located at separate and distant locations along

03:25:42PM   5    the pipeline, and they get this language from the Corps's

03:25:49PM   6    implementing regulations at 33 CFR 330.2.

03:25:53PM   7          But it's important to look at that regulation because

03:25:57PM   8    what it does is allow the Corps to treat separate crossings as

03:26:04PM   9    separate projects only if they're located at separate and

03:26:08PM   10   distant locations.   What the Corps has done here is to take

03:26:12PM   11   that regulation and say -- and simply assume that all of the

03:26:17PM   12   water crossings along any linear pipeline are, in fact,

03:26:20PM   13   separate and distant.

03:26:22PM   14         Again, this is based on the record of this permit

03:26:26PM   15   reissuance.   The plaintiffs have provided multiple examples of

03:26:32PM   16   this never occurring -- of pipelines where there are thousands

03:26:36PM   17   of water crossings, sometimes a dozen within a mile.   There was

03:26:40PM   18   never any separate and distant determination.   It's a step that

03:26:47PM   19   the Corps claims happens but, in practice, it surely doesn't.

03:26:52PM   20         The Corps's reason for not defining separate and

03:26:57PM   21   distant is that it may vary by region.   The Corps says they

03:27:01PM   22   can't do a one-size-fits-all definition of separate and

03:27:06PM   23   distant, which is fine, but the Corps fails to take the next

03:27:11PM   24   step, which is they have to -- if they're going to take that

03:27:13PM   25   position, they have to actually require district engineers or

03:27:17PM 1   regions to establish some kind of local guidelines or at least

03:27:23PM 2   make sure that at the project level these crossings are in fact

03:27:28PM 3   separate and distant, and they've failed to do that here.

03:27:34PM 4           Again, plaintiffs have provided multiple examples in

03:27:35PM 5   our comments on the reissuance.  The Corps failed to respond to

03:27:39PM 6   them at all, which is arbitrary and capricious in and of

03:27:43PM 7   itself.  But what they've done here is in the face of

03:27:46PM 8   continuing evidence, every time they reissue this permit, they

03:27:50PM 9   ignore the evidence and continue to bury their head in the

03:27:56PM 10  sand, as the Court said in *Kraayenbrink*, and that's a violation

03:28:00PM 11  of the APA and the Clean Water Act.

03:28:07PM 12          Unless the Court has any questions, I'll leave it at

03:28:10PM 13  that.

03:28:10PM 14          THE COURT:  All right.  Thank you, Mr. Hayes.

03:28:12PM 15          Is that it for the plaintiffs?  Why don't we take a

03:28:18PM 16  five-minute recess and come back.

03:28:20PM 17      (Proceedings in recess from 3:28 p.m. until 3:38 p.m.)

03:38:42PM 18          THE COURT:  Everyone back on Zoom?  We had six

03:38:45PM 19  before.  All right.  There we go.

03:38:53PM 20          Mr. Howell.

03:38:55PM 21          MR. HOWELL:  Thank you, Your Honor.  Good afternoon.

03:39:08PM 22  I'll be handling the Endangered Species Act issues as well as

03:39:14PM 23  standing.

03:39:14PM 24          THE COURT:  All right.  Let's start with standing, if

03:39:15PM 25  you would.

03:39:16PM  1      MR. HOWELL:  Okay.  So I think the best place to

03:39:23PM  2  start with standing is where we left off in this Court's

03:39:27PM  3  decision in *Northern Plains*.  So we have the Supreme Court

03:39:31PM  4  staying injunctive relief.  And I think it's difficult to

03:39:40PM  5  interpret what that stay means.  But what they did is they

03:39:45PM  6  stayed injunctive relief except for the project that the

03:39:49PM  7  plaintiffs identified, which was Keystone XL.

03:39:54PM  8      And so I think a fair interpretation of that stay

03:39:58PM  9  order is that the plaintiffs need to identify a specific

03:40:01PM 10  project in order to receive a remedy.

03:40:07PM 11      THE COURT:  Well, on the other hand, though, that

03:40:09PM 12  order related to emergency relief.  You could argue if you're

03:40:14PM 13  going to obtain emergency relief, you have to identify a

03:40:17PM 14  specific project.

03:40:20PM 15      How do you respond to that?

03:40:22PM 16      MR. HOWELL:  I mean, I think that's also a fair

03:40:24PM 17  interpretation of that order, but the remedy is also tied up

03:40:29PM 18  with standing.  And I think the way we look at it, you know,

03:40:32PM 19  the issues that were briefed depended on what injury and fact

03:40:38PM 20  was actually occurring.  And it was Keystone XL.  That was the

03:40:44PM 21  project that they identified.  The PCN had been issued prior to

03:40:49PM 22  the complaint, and the verifications were done.  And then we

03:40:54PM 23  move into the case.

03:40:56PM 24      Here, in contrast, we have very different

03:41:01PM 25  declarations and different -- very different assertions of

03:41:05PM 1    harm.

03:41:06PM 2         So if we look at the plaintiffs' standing

03:41:07PM 3    declarations, there's two groups -- or two categories, I'll

03:41:12PM 4    call them.  The first is where they identify a specific

03:41:19PM 5    project.  The second are these more generalized assertions of

03:41:26PM 6    harm that don't identify the projects, and let me take those in

03:41:28PM 7    turn.

03:41:29PM 8         So the declarations that identify a project -- you

03:41:34PM 9    have Mr. Krum, you have Mr. Hamel, Mr. Hartl.  They identified

03:41:41PM 10   Byron pipeline, the Bullitt pipeline in Kentucky, and the

03:41:47PM 11   Pamplico pipeline in South Carolina.

03:41:49PM 12        The Byron pipeline, there are no ESA-listed species,

03:41:57PM 13   critical habitat.  Plaintiffs have conceded they're not relying

03:41:59PM 14   on that declaration for their ESA claims.  So that's out.

03:42:03PM 15        The other two, Bullitt and Pamplico, we don't have a

03:42:11PM 16   lot of controversy there.  Bullitt, the verification has been

03:42:14PM 17   suspended.  We don't have authorization to move forward.

03:42:26PM 18        Pamplico, that's pending in South Carolina.  So that

03:42:28PM 19   energy company -- I believe it's Dominion Energy -- does not

03:42:31PM 20   have authorization to move forward and perform any activities

03:42:36PM 21   associated with those wetlands.  So we don't have a live

03:42:41PM 22   controversy for the projects that the plaintiffs have

03:42:44PM 23   identified.

03:42:46PM 24        Venue:  Before I turn to the second category of

03:42:53PM 25   declarations, we also have a venue problem here, at least with

03:42:58PM 1   respect to the ESA claims.  So Byron pipeline, no ESA-listed
03:43:08PM 2   species.
03:43:08PM 3           And I want to address Mr. Margolis' argument about
03:43:15PM 4   waiver and estoppel.  So in their complaint -- and this is at
03:43:19PM 5   paragraph 17 and 28 -- they make the allegation that there will
03:43:25PM 6   be oil and gas pipelines that are constructed in this district
03:43:31PM 7   and because plaintiff MEIC resides in the district.
03:43:35PM 8           Now, we move forward through summary judgment.  And
03:43:40PM 9   if you look at the allegations at paragraph 28, they talk about
03:43:43PM 10  oil and gas development in the Bakken oil fields.  As we move
03:43:50PM 11  forward -- and the evidence that they presented to the Court on
03:43:53PM 12  summary judgment, there is no oil and gas development in their
03:43:58PM 13  standing declarations about the Bakken oil fields.  So the
03:44:02PM 14  allegation doesn't end up being true in their complaint.
03:44:06PM 15          Byron pipeline, the project that they identify in
03:44:12PM 16  this district, they concede on their ESA claims in their
03:44:18PM 17  opposition brief.  So all of that happens after.  So we didn't
03:44:22PM 18  waive our argument.  We're not estopped from arguing it.  It's
03:44:27PM 19  that they didn't present the evidence that they made the
03:44:30PM 20  allegation in their complaint about.  So it's an evidentiary
03:44:34PM 21  problem for this -- for the plaintiffs right now.  So there's
03:44:39PM 22  definitely a venue problem with ESA claims.
03:44:42PM 23          Let me turn back to the second category of --
03:44:48PM 24          THE COURT:  Where do plaintiffs get the idea that you
03:44:51PM 25  conceded venue in your response?

03:44:56PM  1    MR. HOWELL:  Well, we certainly didn't do it in our

03:45:00PM  2    briefing.  We didn't raise it in our opening brief.

03:45:03PM  3          THE COURT:  The answer to the complaint.

03:45:06PM  4          MR. HOWELL:  Well, we were taking their allegations

03:45:11PM  5    as true.  They made a sufficient allegation in their complaint

03:45:16PM  6    that would have established venue, but then they didn't prove

03:45:19PM  7    it up.

03:45:21PM  8          And so, I guess, you know, to boil it down, I mean,

03:45:23PM  9    we have an evidentiary objection to venue right now because the

03:45:27PM 10    evidence doesn't support venue, and it's fair for us to raise

03:45:32PM 11    that now.

03:45:35PM 12          The second category of declarations, they don't

03:45:45PM 13    identify any projects.  There is a hypothesis that these

03:45:50PM 14    declarants are going to be -- that the general permit is going

03:45:56PM 15    to be used in a location near them, and it's going to affect

03:45:59PM 16    the listed species, thereby harming their interest.  But they

03:46:03PM 17    never identify any specific project.

03:46:06PM 18          That's the same fact pattern that we have in *Summers*.

03:46:11PM 19    They're relying on a statistical probability that that

03:46:16PM 20    declarant is going to be in a location --

03:46:19PM 21          THE COURT:  How could they identify a project at this

03:46:21PM 22    stage?

03:46:23PM 23          MR. HOWELL:  How could they identify a project?

03:46:26PM 24    Well, they've been able to do it with Byron pipeline, Bullitt

03:46:31PM 25    pipeline, Pamplico pipeline.  I mean, these are sophisticated

03:46:37PM  1  environmental organizations with probably hundreds of thousands
03:46:38PM  2  of members all over the state.  These oil and gas pipelines
03:46:44PM  3  aren't a secret.  So if -- you know, there are FERC
03:46:51PM  4  proceedings.  There's state proceedings.  They're not being
03:46:53PM  5  done under the cover of darkness.
03:46:56PM  6          And if you have truly a standing declarant that
03:47:00PM  7  has -- well, take Mr. Krum, for example.  He has a daughter.
03:47:05PM  8  His daughter lives where they're going to do horizontal
03:47:10PM  9  drilling under the Yellowstone River.  He's aware of that.  But
03:47:14PM 10  there's no ESA-listed species or critical habitat there so that
03:47:18PM 11  can't support standing.  So it's not like these are secrets.
03:47:22PM 12          THE COURT:  Are the PCNs public?
03:47:25PM 13          MR. HOWELL:  No, they are not.
03:47:32PM 14          THE COURT:  All right.  Well, then you have to do
03:47:34PM 15  some digging to find out about projects.
03:47:38PM 16          MR. HOWELL:  I think that's fair, Your Honor, yeah.
03:47:40PM 17          Well, but if you're a declarant that has an interest
03:47:46PM 18  in species, you know where those species are located.  You know
03:47:50PM 19  about critical habitat.  And if there's a proposed oil and gas
03:47:54PM 20  pipeline in that location, that would probably raise your
03:48:00PM 21  antenna, and you would know about it.
03:48:04PM 22          The point here is their standing declarations, the
03:48:09PM 23  projects that they identify are insufficient.  They're not a
03:48:13PM 24  live controversy right now.  The other set presents a *Summers*
03:48:17PM 25  problem, where they're relying on that statistical probability.

03:48:21PM  1        But it goes a step further that moves us past

03:48:26PM  2   *Summers*, and I think this addressed the plaintiffs' reliance on

03:48:29PM  3   the Ninth Circuit's decision in *National Family* and the recent

03:48:34PM  4   decision that they cite for standing purposes, *Environmental*

03:48:37PM  5   *Defense Center* and *BOEM* on their supplemental authority.

03:48:41PM  6        So in both of those cases -- take *National Family,*

03:48:47PM  7   EPA authorized the use of pesticides.  They knew pesticides

03:48:53PM  8   were going to be applied in the location where their declarant

03:48:58PM  9   was.  It was going to affect milkweed.  That milkweed was a

03:49:03PM 10   source of food for the Monarch butterfly.  And, therefore, the

03:49:08PM 11   connection between the Monarch butterfly and the declarant's

03:49:12PM 12   interest in viewing it and the authorized use of the pesticide,

03:49:15PM 13   that was sufficient for standing purposes.  That makes sense.

03:49:20PM 14        In the *BOEM* case, you have authorized drilling going

03:49:24PM 15   on, and that drilling, everybody acknowledged, was -- certainly

03:49:28PM 16   rose to the level of "may affect" and, in some cases, adversely

03:49:32PM 17   affected the listed species.  So you have an authorized

03:49:35PM 18   drilling going on.

03:49:36PM 19        And, you know, putting aside the cases about whether

03:49:41PM 20   an EA is a final agency action -- and we didn't raise standing

03:49:44PM 21   in that case.  It was a ripeness argument.  But in those

03:49:48PM 22   circumstances, when you have an authorization that has the

03:49:51PM 23   potential to affect listed species, that may support standing.

03:49:58PM 24        But here -- and I think it's worth stepping back.

03:50:04PM 25   Mr. Hayes talked about this general permit authorizing certain

03:50:09PM   1   activities to take place, 50,000 uses.  Well, about 80 percent

03:50:15PM   2   of those uses are going to trigger a PCN, according to the

03:50:20PM   3   Corps.

03:50:21PM   4          So what we're really talking about here are 10,000

03:50:25PM   5   uses that -- he's right.  There's a permit to dredge and fill

03:50:30PM   6   in waters of the United States or do other activities.  But

03:50:35PM   7   here's the catch:  General Condition 18 doesn't allow those

03:50:41PM   8   10,000 activities to move forward in the vicinity of listed

03:50:46PM   9   species or critical habitat.

03:50:50PM  10          So if you are a pipeline company and you are

03:50:53PM  11   designing a pipeline, you have an incentive to move your

03:50:58PM  12   pipeline away from listed species in critical habitat.  Because

03:51:02PM  13   if you do, if you put it in a place where there are no listed

03:51:08PM  14   species in the vicinity, you don't have to do a PCN.  You don't

03:51:12PM  15   have to consult with Fish & Wildlife or NMFS.  You don't have

03:51:18PM  16   to wait for the Corps for a verification.  There's an incentive

03:51:20PM  17   to move the activity away from listed species.  And that's good

03:51:23PM  18   for them, and that's good for listed species.

03:51:26PM  19          My point is, you're not going to have a discharge or

03:51:34PM  20   fill under the general permit with a listed species or critical

03:51:40PM  21   habitat because you have General Condition 18.  It's

03:51:46PM  22   unauthorized conduct at that point, if it in fact happens.  And

03:51:51PM  23   the record demonstrates that the Corps is unaware of any

03:51:55PM  24   incident of that happening.  So that's a finding that they made

03:52:00PM  25   in the administrative record.

03:52:04PM 1        So my point is the hypothesis that they're relying

03:52:09PM 2   on, the *Summers* standing, their procedural injury, it cannot

03:52:12PM 3   come to pass because of the conditions in the permit.

03:52:18PM 4        So you asked at the outset, why is this case

03:52:21PM 5   different than Northern Plains?  I think one of the big reasons

03:52:26PM 6   is we have insufficient standing declarations to support their

03:52:30PM 7   allegations with the ESA complaint.  We have a problem with

03:52:34PM 8   venue too.  We didn't have that in the other case.

03:52:39PM 9        So unless the Court has any other questions on

03:52:44PM 10  standing, I'd like to move to the merits of the ESA claim.

03:52:47PM 11       THE COURT:  All right.  So what consultation did you

03:52:50PM 12  conduct?

03:52:52PM 13       MR. HOWELL:  So under the Endangered Species Act,

03:52:59PM 14  under the consultation regulations, if an action agency like

03:53:03PM 15  the Corps makes a "no effect" determination, that fulfills both

03:53:09PM 16  their procedural obligation to consult under Section 7(a)(2),

03:53:14PM 17  and their substantive obligations under 7(a)(2) as well.  So

03:53:19PM 18  you have a procedural and substantive component.  That "no

03:53:25PM 19  effect" determination fulfilled that requirement.  So --

03:53:29PM 20       THE COURT:  When did you make that determination?

03:53:31PM 21       MR. HOWELL:  When?

03:53:32PM 22       THE COURT:  Yes.

03:53:33PM 23       MR. HOWELL:  It was made in conjunction with issuance

03:53:38PM 24  of the nationwide permit.

03:53:41PM 25       THE COURT:  So after the *Northern Plains* decision?

03:53:43PM  1        MR. HOWELL:  Correct.  Yes.

03:53:49PM  2        So the Corps's "no effect" finding is our response to

03:53:53PM  3   the Court's remand order.

03:53:57PM  4        THE COURT:  How could you make that determination

03:53:59PM  5   without consulting the relevant agencies?

03:54:03PM  6        MR. HOWELL:  Well, so, I think -- Okay.  One of --

03:54:08PM  7   there are two factors -- or two issues, I think, that sets us

03:54:16PM  8   apart from *Northern Plains*.  The first is the issuance of the

03:54:21PM  9   Ninth Circuit's decision in *National Family*.  So that decision

03:54:24PM  10  comes out three months after this Court issues its opinion in

03:54:28PM  11  *Northern Plains*.

03:54:30PM  12       And in that decision, the Ninth Circuit, I think,

03:54:33PM  13  somewhat clarify the obligations under the Endangered Species

03:54:40PM  14  Act.  They build on their *California Lockyer* decision, and what

03:54:41PM  15  they said is if you have specific and binding commitments, an

03:54:47PM  16  action agency, like the Corps, can reach a reasonable "no

03:54:52PM  17  effect" determination, thereby fulfilling its procedural and

03:54:55PM  18  substantive duties under Section 7.  That decision, I think,

03:55:03PM  19  changes the legal landscape from where we were in *Northern*

03:55:07PM  20  *Plains*.

03:55:07PM  21       THE COURT:  What was the agency at issue in the Ninth

03:55:11PM  22  Circuit case?

03:55:14PM  23       MR. HOWELL:  So in *National Family*, the action is EPA

03:55:17PM  24  registering pesticides, Enlist Duo, as well as issuing label

03:55:24PM  25  restrictions.

03:55:25PM 1       And I think this case is very similar to the case we

03:55:29PM 2  have here.  So when EPA puts out a pesticide, they have a label

03:55:35PM 3  that says, Here's how you can use your pesticide.  They say

03:55:40PM 4  there's a 30-foot buffer.  There's nozzle restrictions.

03:55:45PM 5  There's restrictions on water and temperature and time of day

03:55:49PM 6  and all of these kinds of things.  It's a label that you read

03:55:52PM 7  on the pesticide, and they rely on the farmers to follow that

03:55:56PM 8  label.

03:55:57PM 9       And if you follow -- and so what -- and this is

03:56:02PM 10  page 927 of that opinion.  What EPA did is that they assumed

03:56:07PM 11  compliance.  They assumed that these farmers are going to

03:56:10PM 12  comply with the label.  And based on that assumption, they

03:56:16PM 13  analyze what effect is it going to have on listed species, what

03:56:20PM 14  effect, the pesticides.

03:56:23PM 15       And they even went so far to find that there was

03:56:25PM 16  going to be exposure.  Listed species were going to be exposed

03:56:29PM 17  to this harmful pesticide, but it was within the normal range.

03:56:34PM 18  And the Ninth Circuit said that was sufficient -- or it was

03:56:39PM 19  reasonable to make a "no effect" determination which fulfills

03:56:43PM 20  your ESA consultation requirements.

03:56:47PM 21       THE COURT:  So the Corps didn't appeal the *Northern*

03:56:51PM 22  *Plains* decision?

03:56:52PM 23       MR. HOWELL:  The --

03:56:56PM 24       THE COURT:  The Corps appealed the *Northern Plains*

03:56:59PM 25  decision with regard to the vacatur --

03:57:01PM  1        MR. HOWELL:  Correct.

03:57:02PM  2        THE COURT:  -- but not regarding the merits?

03:57:06PM  3        MR. HOWELL:  Your Honor, I don't know that off the

03:57:10PM  4   top of my head.

03:57:10PM  5        THE COURT:  Well, I haven't seen any Ninth Circuit

03:57:14PM  6   decision regarding the merits decisions.  Have you?

03:57:19PM  7        MR. HOWELL:  No.

03:57:19PM  8        And we are moving to vacate the District Court

03:57:24PM  9   opinion, which I believe this Court has set that for argument

03:57:28PM 10   later this month.

03:57:30PM 11        THE COURT:  So at what point did the Corps say, "Oh,

03:57:34PM 12   gosh, we can rely on the National Family's decision and make

03:57:39PM 13   our own determination on the need to consult"?

03:57:42PM 14        MR. HOWELL:  Yep.

03:57:43PM 15        THE COURT:  When was that decision made?

03:57:44PM 16        MR. HOWELL:  So prior to completing our issuance of

03:57:50PM 17   the general permit, the Corps sat down and conducted and --

03:57:55PM 18   well, they compiled a biological assessment, a BA.  And this BA

03:58:03PM 19   looked at a lot of different things.  It looked at the data on

03:58:07PM 20   prior use.  They looked at where species were located.

03:58:14PM 21        And I would point the Court -- there's a great table

03:58:18PM 22   in this biological assessment, and this is NWP003611, all the

03:58:26PM 23   way to 27.  It's Table 5.1.  And they list out all the species

03:58:33PM 24   and all the consultations that have taken place on those

03:58:36PM 25   species, I believe, with respect to the PCNs -- permit

03:58:42PM 1  activities.

03:58:43PM 2          So they sit down, and they find hot spots of listed

03:58:47PM 3  species, and they look at how many times they estimate the

03:58:52PM 4  general permit is going to be used, and they analyze all of

03:58:57PM 5  that.  And that analysis really tracks the -- what EPA did in

03:59:02PM 6  *National Family*.  It's the same analysis.  They sit down, and

03:59:07PM 7  they're trying to figure out whether there is going to be a

03:59:12PM 8  "may affect" that triggers the consultation in the biological

03:59:16PM 9  assessment.  In that biological assessment, they reach the

03:59:20PM 10 conclusion that there will be no effect on listed species.

03:59:25PM 11         So that's where -- so you're asking, where did we do

03:59:29PM 12 the consultation?  That biological assessment and that "no

03:59:34PM 13 effect" finding, that's the culmination of the Corps' response

03:59:38PM 14 to this Court's order, remand order, in *Northern Plains*.

03:59:42PM 15         THE COURT:  That's in the record in this case?

03:59:43PM 16         MR. HOWELL:  Correct.

03:59:53PM 17         The other aspect of this -- so in *National Family* --

04:00:00PM 18 so we have a different factual record here.  We have a

04:00:04PM 19 biological assessment.  We have a "no effect" determination.

04:00:09PM 20         If you look at the *National Family* decision -- and

04:00:15PM 21 this is on page 928 -- there's a discussion about whose burden

04:00:19PM 22 it is to undermine the "no effect" finding.  And the Ninth

04:00:25PM 23 Circuit made clear that it's the plaintiffs' burden to present

04:00:32PM 24 record evidence that's going to undermine the "no effect"

04:00:36PM 25 finding that the Corps made.

04:00:38PM  1          We don't have that here.  We don't have the
04:00:43PM  2    plaintiffs coming forward saying, "Here in the record, this is
04:00:47PM  3    what undermines the 'no effect' finding."
04:00:51PM  4          And we actually have the opposite.  We have the Corps
04:00:54PM  5    making an explicit finding that they are not aware of any
04:01:00PM  6    activity occurring that's going to affect listed species or
04:01:05PM  7    critical habitat that doesn't go through that PCN and a
04:01:10PM  8    separate verification system.  That's a separate agency action.
04:01:16PM  9    And that record cite is NWP003583.  That's in the biological
04:01:35PM  10   assessment.  The Corps is making that finding.
04:01:37PM  11         So, I guess, Your Honor, to summarize, the Corps was
04:01:43PM  12   mindful of this Court's order in *Northern Plains*.  It took it
04:01:47PM  13   seriously.  The *National Family* decision comes out three months
04:01:53PM  14   later.  It's controlling in the circuit.  The Corps sat down,
04:01:59PM  15   compiled a lengthy, lengthy biological assessment.  It looked
04:02:04PM  16   at the data.  It looked at the species.  It makes its
04:02:07PM  17   cumulative effect findings.  And it ultimately reaches the same
04:02:10PM  18   conclusion:  No effect.  It's much more supported than the
04:02:14PM  19   previous one, and you have a biological assessment.  That's
04:02:20PM  20   what concluded the Corps's ESA responsibilities.
04:02:24PM  21         THE COURT:  Just to clarify, you weren't counsel of
04:02:30PM  22   record in the *Northern Plains* case?
04:02:32PM  23         MR. HOWELL:  That's correct.
04:02:33PM  24         THE COURT:  Mr. Swanson and Mr. Grillot were counsel
04:02:37PM  25   of record?

04:02:38PM  1          MR. HOWELL:  Correct.

04:02:39PM  2          THE COURT:  So they would be able to answer the

04:02:41PM  3   question about whether the Corps filed an appeal?

04:02:47PM  4          MR. SWANSON:  Yes, Your Honor.

04:02:47PM  5          MR. HOWELL:  Yes.

04:02:47PM  6          MR. SWANSON:  This is Chris Swanson.  The Corps did

04:02:50PM  7   appeal the merits of the ESA finding, as well as the remedy.

04:02:54PM  8   The Ninth Circuit dismissed that appeal as moot with direction

04:02:59PM  9   for the Court to dismiss the underlying ESA claim in it.

04:03:04PM 10          THE COURT:  When was that?

04:03:06PM 11          MR. SWANSON:  That was in the fall, I believe.  And

04:03:12PM 12   on the Court's docket now is briefing with respect to whether,

04:03:17PM 13   as a result of that Ninth Circuit order, the Court's opinion

04:03:20PM 14   should be vacated.  I believe the hearing on that motion is

04:03:24PM 15   later this month.

04:03:25PM 16          THE COURT:  All right.  Thank you.

04:03:26PM 17          Go ahead, Mr. Howell.

04:03:28PM 18          MR. HOWELL:  Just one final point on this:  The

04:03:35PM 19   argument that the Corps is relying on site-specific

04:03:39PM 20   consultations to fulfill their ESA obligation, that's not our

04:03:44PM 21   position.  What our position is is that the "no effect"

04:03:47PM 22   determination is ESA compliance for issuance of the general

04:03:53PM 23   permit.

04:03:55PM 24          Now, I think everybody in this room, or at least the

04:04:02PM 25   lawyers on this side, agree that in order to trigger the

04:04:06PM  1   obligation to consult, there has to be a "may affect" finding.

04:04:13PM  2   And, here, we just don't have that because of General

04:04:19PM  3   Condition 18.

04:04:21PM  4           And my colleague, Mr. Margolis --

04:04:25PM  5           THE COURT:  The Corps has the obligation to make the

04:04:27PM  6   "no effect" finding?

04:04:28PM  7           MR. HOWELL:  The Corps does.  That's correct.

04:04:32PM  8           And Mr. Margolis was making the point that without

04:04:36PM  9   doing a programmatic consultation, these escape review.  But I

04:04:44PM  10  think one of the comments that the Court made earlier on -- so

04:04:49PM  11  you have the subset of activities that have this minimal impact

04:04:53PM  12  on the ecosystem.  They're not located anywhere near listed

04:04:59PM  13  species.  They cannot take place legally in the vicinity of

04:05:04PM  14  listed species.  And so you have this roughly 10,000

04:05:10PM  15  anticipated crossings of waters of the United States that can't

04:05:14PM  16  take place near ESA-listed species or critical habitat.

04:05:20PM  17          So what would we do a programmatic consultation on?

04:05:25PM  18  There's no effect there.  And if there's no effect, I mean,

04:05:31PM  19  it's just a paper exercise.  I don't know what NMFS or Fish &

04:05:41PM  20  Wildlife Service would analyze in that context because there's

04:05:41PM  21  no effect because of that condition in the permit.

04:05:45PM  22          So this notion that there's going to be death by a

04:05:49PM  23  thousand cuts, there's no cut in the first place to those

04:05:54PM  24  listed species.  So you don't have this aggregated impacts or

04:06:01PM  25  cumulative effects.  You just don't have that in the first

04:06:03PM 1  place.

04:06:03PM 2           So I just want to be clear:  The Corps is not relying

04:06:06PM 3  on future site-specific consultations to comply with the ESA.

04:06:14PM 4  Their "no effect" determination is their compliance.  It's

04:06:18PM 5  supported by the biological assessment, and it's reasonable.

04:06:23PM 6  And it tracks the Ninth Circuit's decision in *National Family*

04:06:27PM 7  to a tee.

04:06:32PM 8           Your Honor, if you don't have any other questions,

04:06:34PM 9  I'll turn it over to my colleagues.

04:06:36PM 10          THE COURT:  All right.  Thank you, Mr. Howell.

04:06:39PM 11          Who is going to argue next for the government?

04:06:44PM 12          MR. GRILLOT:  Yes, Your Honor.  This is attorney

04:06:45PM 13  Ben Grillot.  I'm going to, in the interest of time, speak

04:06:47PM 14  briefly on the Clean Water Act issue.

04:06:50PM 15          At the outset, I want to note and correct a few

04:06:53PM 16  things that opposing counsel said.  At the beginning of his

04:06:56PM 17  argument, Mr. Hayes stated that after the permit is issued

04:07:00PM 18  there's, quote, "often no further Corps involvement."

04:07:03PM 19          But as Mr. Howell just pointed out, approximately 80

04:07:06PM 20  to 85 percent of activities authorized under Nationwide

04:07:10PM 21  Permit 12 require a PCN.  And for those that don't, as

04:07:13PM 22  Mr. Howell noted, those are situations in which there are no

04:07:17PM 23  species that would be affected.  The amount of land at issue is

04:07:20PM 24  less than a tenth of an acre.  And many of the impacts are

04:07:24PM 25  temporary in nature, and applicants are required to restore

04:07:28PM  1    those back to their original condition.

04:07:30PM  2            The second key point that I want to clarify is that

04:07:35PM  3    Counsel Hayes continued to refer to the 47,000 activities that

04:07:37PM  4    were authorized by Nationwide Permit 12 as crossings or

04:07:41PM  5    projects, but, in fact, they're just activities.  And -- a

04:07:44PM  6    specific crossing could have multiple activities associated

04:07:47PM  7    with it, and it's an overstatement and a conflation of the

04:07:51PM  8    facts to call each activity authorized under Permit 12 a

04:07:56PM  9    crossing.

04:07:57PM  10           Instead, as noted, there was roughly 1,500 activities

04:08:00PM  11   a year that occur without a PCN, but the Corps reasonably

04:08:06PM  12   concluded that on the whole, Nationwide Permit 12's

04:08:10PM  13   environmental impacts would be minimal, which is what's

04:08:12PM  14   required under 404(e) of the Clean Water Act.

04:08:14PM  15           And to make two arguments:  One, that

04:08:17PM  16   project-specific review is not sufficient; and, two, a point

04:08:22PM  17   about separate and distant crossings.  I'll touch on each of

04:08:23PM  18   them very briefly.

04:08:25PM  19           The project-specific review, the tiering of review in

04:08:27PM  20   which, again, 80-some percent of activities require a PCN to

04:08:31PM  21   get a closer look.  That structure has been upheld since 2005

04:08:35PM  22   in the *Bulen* case when the Fourth Circuit found that reliance

04:08:38PM  23   on post-issuance procedures is, quote, "a reasonable, if not

04:08:41PM  24   the only possible way, to determine a project has minimal

04:08:44PM  25   environmental impacts."

04:08:46PM 1          So what the Corps did is they looked carefully at

04:08:49PM 2    uses of the permit in the past, including from March 2017 to

04:08:54PM 3    March 2019, compiled them in a detailed spreadsheet that's in

04:08:57PM 4    the record -- it's NWP20219 -- looked at public comments, and

04:09:02PM 5    included conditions, the PCN conditions, that reflected the

04:09:06PM 6    foreseeable effects for those instances in which the

04:09:09PM 7    environmental impact might be more than minimal to give them

04:09:12PM 8    further scrutiny by district engineers.

04:09:15PM 9          This structure, reflecting foreseeable effects, was

04:09:18PM 10   upheld in the context of Nationwide Permit 12 by the

04:09:22PM 11   Tenth Circuit in *Bostick*, and it has been repeatedly upheld in

04:09:23PM 12   other contexts across the country.  The plaintiffs make vague

04:09:30PM 13   assertions that those aren't enough.

04:09:31PM 14         So unless you have further questions about the

04:09:34PM 15   appropriateness of project-specific review for Clean Water Act,

04:09:36PM 16   I'll move on to separate and distant crossings.

04:09:39PM 17         THE COURT:  Go ahead, please.

04:09:42PM 18         MR. GRILLOT:  Okay.  Since 1988, the Corps has

04:09:44PM 19   defined each crossing of a water body, meaning the same water

04:09:49PM 20   body or multiple water bodies, as a single and complete

04:09:50PM 21   project, provided the crossings are at separate and distant

04:09:53PM 22   locations.

04:09:54PM 23         I mean, the important point that the plaintiffs

04:09:57PM 24   conflate here is that they say that there's an assumption that

04:09:59PM 25   all crossings are separate and distant.  They ignore the fact

04:10:03PM  1  that when a district engineer verified the PCN, then they have

04:10:06PM  2  determined that a crossing is sufficiently separate and

04:10:09PM  3  distant.  If it wasn't, they would require modifications to the

04:10:11PM  4  permit under their authority in 33 CFR 330.5, 330.1.  They'd

04:10:19PM  5  require modifications, or in some instances, require an

04:10:21PM  6  individual permit.  So if a district engineer has verified a

04:10:25PM  7  PCN, then they have determined that those crossings are

04:10:27PM  8  sufficiently separate and distant.

04:10:28PM  9          And the plaintiffs are looking for specific spacing

04:10:31PM  10  requirements.  But as noted and as been upheld by every court

04:10:35PM  11  that's looked at this issue, district engineers require

04:10:38PM  12  flexibility to take into account local conditions --

04:10:41PM  13  topography, geology, hydrology -- and make a determination

04:10:44PM  14  whether or not those crossings are separate and distant.

04:10:49PM  15          Plaintiffs point to crossings under Keystone and

04:10:52PM  16  the Gulf Coast.  The specific crossings that they point to

04:10:55PM  17  under the Gulf Coast were upheld and challenged in *Bostick*.

04:10:59PM  18  The Keystone crossings, although verified, those verifications

04:11:02PM  19  were later suspended and then withdrawn.  So it's never been

04:11:05PM  20  litigated.

04:11:08PM  21          They cannot point to an instance in which district

04:11:10PM  22  engineers have verified crossings that caused more than *minimal*

04:11:13PM  23  environmental effects, nor can they.

04:11:16PM  24          And for this reason, the Corps' longstanding approach

04:11:18PM  25  to linear projects, again, since 1988, deserves deference and

04:11:22PM 1  should be upheld, and the Corps's determination that Nationwide

04:11:29PM 2  Permit 12 satisfies 404(e) of the Clean Water Act should be

04:11:34PM 3  granted.

04:11:34PM 4           THE COURT:  All right.  Thank you, Mr. Grillot.

04:11:36PM 5           Mr. Swanson.

04:11:38PM 6           MR. SWANSON:  Yes, thank you, Your Honor.  I'll be

04:11:41PM 7  addressing the NEPA claims.

04:11:41PM 8           Mr. Hayes categorized plaintiffs' arguments into two

04:11:46PM 9  categories, one being these operational or downstream

04:11:50PM 10  combustion effects and another being construction-related

04:11:54PM 11  effects.  And I'll address in those categories as well and, at

04:12:00PM 12  the outset, note that the major problem with plaintiffs'

04:12:03PM 13  arguments is that they continue to ignore the limited nature of

04:12:07PM 14  the Corps action here.

04:12:09PM 15           When one appropriately views that limited action

04:12:14PM 16  through the lens of a couple legal principles, which I'll go

04:12:16PM 17  through, it becomes evident that the Corps did in fact

04:12:19PM 18  reasonably assess effects from its action in the EA.

04:12:24PM 19           Starting with the category of the operational

04:12:27PM 20  impacts -- these are oil spills and downstream climate

04:12:31PM 21  impacts -- there's three key NEPA principles that would govern

04:12:35PM 22  the Court's review here.

04:12:37PM 23           The first is that NEPA applies to major federal

04:12:39PM 24  actions, not private actions, not state actions, not local

04:12:43PM 25  actions.

04:12:44PM 1          The second, which is from the Ninth Circuit's

04:12:47PM 2    *White Tanks* opinion, is that NEPA requires an assessment of

04:12:52PM 3    potential effects that are triggered by the federal action.

04:12:57PM 4          And the third principle is that agencies are entitled

04:13:00PM 5    to deference in the reasonable scoping of their NEPA analyses,

04:13:04PM 6    including the impacts to be considered.  That's the Ninth

04:13:11PM 7    Circuit's *Selkirk* opinion.

04:13:11PM 8          So the question here on this operational impacts

04:13:15PM 9    issue for the Court is whether the Corps looked at what it was

04:13:18PM 10   supposed to, whether it looked at these effects in relation to

04:13:22PM 11   the action that it was authorizing, and reached a rational

04:13:25PM 12   conclusion about whether it needs to analyze those effects.

04:13:28PM 13         And the answer here is, yes, and that is in the

04:13:31PM 14   record at pages 953 -- 953 and 1035.  And the Corps's reasoning

04:13:39PM 15   is that its action here is limited.  Right?  The major federal

04:13:43PM 16   action is the nationwide permit, which is defined by its terms

04:13:47PM 17   and conditions.

04:13:49PM 18         What that nationwide permit -- what the major federal

04:13:52PM 19   action here is not doing is it is not generally regulating or

04:13:57PM 20   authorizing the siting or operation of these pipelines.  And,

04:14:02PM 21   thus, the Corps action here is not comparable to actions, say,

04:14:06PM 22   taken by the Federal Energy Regulatory Commission or the State

04:14:09PM 23   of Montana under the authorities the state cites in its brief,

04:14:14PM 24   and even not comparable to other federal actions that are more

04:14:16PM 25   directly approving fossil fuel extraction, for example, or

04:14:21PM  1   transportation.

04:14:21PM  2          And plaintiffs' error is trying to analogize the

04:14:26PM  3   Corps' limited authority to those broader authorities,

04:14:30PM  4   including in the attempted analogy to the DC Circuit,

04:14:33PM  5   *Sierra Club v FERC* opinion.

04:14:35PM  6          But the Corps' conclusion here is consistent with the

04:14:38PM  7   binding precedent in the Ninth Circuit, which would be

04:14:41PM  8   *Public Citizen* and the Ninth Circuit's *White Tanks* opinion,

04:14:44PM  9   which stand for the principle that where the federal agency's

04:14:47PM  10  role is a limited one, with respect to the action at issue, the

04:14:51PM  11  agency can reasonably focus its impacts on the effects from

04:14:57PM  12  that federal action.

04:15:00PM  13         Turning just quickly to the second category, these

04:15:05PM  14  are the impacts from horizontal directional drilling, forested

04:15:09PM  15  wetlands, and cumulative impacts.  And, here, the question is

04:15:12PM  16  really one about the depth of the analysis.  The Corps analyzed

04:15:17PM  17  these things.  It's just that plaintiffs do not believe they

04:15:19PM  18  were analyzed sufficiently enough.

04:15:22PM  19         Two legal principles again at issue, one of which

04:15:25PM  20  Mr. Grillot mentioned, and that is the idea that with

04:15:29PM  21  nationwide permits, the analyses are necessarily and

04:15:33PM  22  appropriately general and predictive.  And that's a function of

04:15:37PM  23  the congressional authority under which the Corps is acting.

04:15:42PM  24  And that's set forth in the Fourth Circuit's *Bulen* opinion.

04:15:46PM  25         And the second principle is that environmental

04:15:48PM 1  assessments, unlike environmental impact statements, are

04:15:53PM 2  supposed to briefly discuss potential impacts.  And that's in

04:15:56PM 3  the NEPA regulations, 40 CFR, Section 1501.5(c).

04:16:02PM 4        So with those principles in mind here, the Corps did

04:16:07PM 5  assess and reasonably assess each of these three categories of

04:16:10PM 6  action -- impacts, excuse me.  With respect to the directional

04:16:14PM 7  drilling, the Corps disclosed the potential for an inadvertent

04:16:18PM 8  return, which is plaintiffs' concern that money -- excuse me --

04:16:23PM 9  drilling mud would return out of the drilling hole during

04:16:26PM 10 installation of the pipeline.  That's addressed at pages 1033

04:16:30PM 11 and 35 of the EA, which states the general impacts to wetlands

04:16:36PM 12 and water quality, which is then discussed in more detail at

04:16:41PM 13 pages 1036 to 1040.

04:16:42PM 14       Forested wetlands, similarly, disclosed that there

04:16:46PM 15 would be a conversion of those wetlands and that there could be

04:16:49PM 16 impacts on wetlands function.  That's at pages 1035 to -37 and

04:16:54PM 17 961 to -64.

04:16:56PM 18       And, similarly, with cumulative impacts, the Corps

04:17:00PM 19 conducted a national-level review, as courts have required it

04:17:02PM 20 to do for nationwide permits, and compared the current status

04:17:07PM 21 of the national aquatic environment, generally, and the impacts

04:17:12PM 22 that this permit would have on that environment.

04:17:15PM 23       And unless the Court has any other questions, I'll

04:17:17PM 24 stop there in the interest of time.

04:17:19PM 25       THE COURT:  All right.  Thank you, Mr. Swanson.

04:17:21PM  1          All right.  Any other defendants going to speak

04:17:27PM  2    today?

04:17:29PM  3          MR. HOWELL:  Your Honor, not from the government, but

04:17:35PM  4    I believe --

04:17:35PM  5          MS. CASNER:  I believe that Ms. Brown has some

04:17:35PM  6    comments that she would like to make.

04:17:35PM  7          THE COURT:  All right.  Ms. Brown.

04:17:35PM  8          MS. BROWN:  Yes, Your Honor.  Thank you.

04:17:42PM  9          THE COURT:  Would you identify whom you represent?

04:17:42PM  10          MS. BROWN:  Yes.  I represent the Nationwide

04:17:46PM  11   Permit 12 Coalition, we're a defendant in the case.

04:17:46PM  12          THE COURT:  All right.  Go ahead, please.

04:17:48PM  13          MS. BROWN:  I just had a couple quick points I wanted

04:17:51PM  14   to make on the ESA.  I will defer to the arguments that have

04:17:53PM  15   already been presented by the government's counsel on the

04:17:57PM  16   Clean Water Act and NEPA issues.

04:18:00PM  17          But the Corps met its ESA obligations when it

04:18:01PM  18   determined that its action, which here is Headquarters'

04:18:04PM  19   reissuance of Nationwide Permit 12, has no effect on listed

04:18:08PM  20   species or designated critical habitat.  And it's important to

04:18:11PM  21   recognize that that Headquarters' action has clearly defined

04:18:15PM  22   boundaries.  It's bounded in scope, and it's restricted due to

04:18:18PM  23   General Condition 18.

04:18:20PM  24          General Condition 18 prohibits any of the project's

04:18:24PM  25   specific uses that might affect listed species or are in the

04:18:28PM  1   vicinity of the designated critical habitat absent appropriate

04:18:32PM  2   consultation.

04:18:33PM  3          And then, specifically, the district engineer needs

04:18:36PM  4   to tell the project proponent its activity is authorized.  So

04:18:40PM  5   they may not continue until they receive that verification that

04:18:43PM  6   the consultation and the ESA requirements have been met.

04:18:46PM  7          And those project-specific uses of Nationwide

04:18:50PM  8   Permit 12 are new agency actions.  Those project-specific uses

04:18:55PM  9   are distinct from the Headquarters' action, and the Corps

04:18:58PM 10   complies with the ESA independently for each discrete agency

04:19:03PM 11   action.

04:19:03PM 12          THE COURT:  Ms. Brown.

04:19:03PM 13          MS. BROWN:  Yes.

04:19:04PM 14          THE COURT:  The Headquarters' action you're

04:19:07PM 15   discussing, do the Headquarters make any other determinations

04:19:10PM 16   in issuing the permit?

04:19:12PM 17          MS. BROWN:  Headquarters reissued Nationwide

04:19:15PM 18   Permit 12 and determined that it has no effect on listed

04:19:17PM 19   species.

04:19:17PM 20          THE COURT:  Right.  But other than "no effects"

04:19:19PM 21   determination, did the Headquarters make any other decisions

04:19:23PM 22   about the adequacy of the analysis?

04:19:26PM 23          MS. BROWN:  That's found in the biological

04:19:27PM 24   assessment, which Mr. Howell discussed where they analyzed --

04:19:32PM 25          THE COURT:  No, I understand that.  So they made a

04:19:34PM  1   "no effects" determination.

04:19:35PM  2         My question was whether Headquarters made any other

04:19:38PM  3   determinations about the effect, either on endangered species

04:19:44PM  4   or anything else related to the permit.  Is this unique for the

04:19:49PM  5   Headquarters to make this kind of a determination, or do they

04:19:52PM  6   do it with regard to other issues as well?

04:19:54PM  7         MS. BROWN:  Headquarters has made the same "no

04:19:58PM  8   effect" determination, I believe, for all of the nationwide

04:20:00PM  9   permits because of General Condition 18, which has the same

04:20:04PM 10   restriction for all nationwide permits.

04:20:05PM 11         THE COURT:  All that have been issued throughout the

04:20:07PM 12   beginning of the act?

04:20:10PM 13         MS. BROWN:  I don't -- I -- well --

04:20:15PM 14         THE COURT:  We had a consultation in 2007 and 2012.

04:20:20PM 15         MS. BROWN:  They had a voluntary consultation process

04:20:23PM 16   with NMFS.

04:20:27PM 17         THE COURT:  Right.  So did the Headquarters make a

04:20:28PM 18   "no effect" determination in addition to the voluntary

04:20:32PM 19   consultation?

04:20:33PM 20         MS. BROWN:  I believe they did, but I would defer to

04:20:40PM 21   counsel for the government if there's something else on that

04:20:43PM 22   point.

04:20:43PM 23         THE COURT:  All right.  Go ahead, please.

04:20:46PM 24         MS. BROWN:  Okay.  So plaintiffs' claim boils down to

04:20:49PM 25   whether Headquarters' reissuance of Nationwide Permit 12 may

04:20:53PM  1  affect listed species or habitat, and it does not.  The facts

04:20:56PM  2  here are distinguishable from the case cited by plaintiffs,

04:20:58PM  3  *Western Watersheds v Kraayenbrink*, which is a Ninth Circuit

04:21:03PM  4  decision from 2011.

04:21:03PM  5          Unlike Headquarters' reissuance of Nationwide

04:21:09PM  6  Permit 12, in *Western Watersheds*, there was resounding evidence

04:21:09PM  7  from the agency experts -- and those were the BLM scientists

04:21:13PM  8  and Fish & Wildlife Service -- that the amendments to grazing

04:21:15PM  9  regulations may affect listed species and habitat.

04:21:19PM 10          But there's nothing here that suggests that NWP 12

04:21:19PM 11  may affect listed species and habitat.  The statements that

04:21:27PM 12  Mr. Margolis cites are from the Corps' public interest, NEPA,

04:21:29PM 13  and 404(b)(1) guidelines analyses, and they regard effects to

04:21:33PM 14  the environment or aquatic resources.

04:21:35PM 15          And then plaintiffs conflate those effects with

04:21:40PM 16  effects on listed species or designated critical habitat, but

04:21:42PM 17  they are not the same.  None of the requisite statements that

04:21:45PM 18  are cited by plaintiffs discuss General Condition 18 or effects

04:21:49PM 19  to ESA-listed species or habit.

04:21:52PM 20          So the Corps developed its biological assessment,

04:21:54PM 21  which Mr. Howell discussed, that looked at these activities

04:21:58PM 22  that were authorized by the Headquarters' reissuance, and the

04:22:01PM 23  Corps properly determined that, as restricted and conditioned,

04:22:04PM 24  reissuance of Nationwide Permit 12 has no effect on listed

04:22:08PM 25  species or habitat.

04:22:10PM  1          Finally, as Your Honor mentioned, in this instance,
04:22:12PM  2  in the 2021 reissuance, the services, even though they have
04:22:15PM  3  authority to request consultation, they did not here, and they
04:22:19PM  4  indicated no disagreement with the Corps' "no effect" finding.
04:22:23PM  5          So once a "no effect" determination is made by the
04:22:26PM  6  action agency, that is the fulfillment of its obligations under
04:22:30PM  7  the ESA.  Programmatic consultation is not required in this
04:22:34PM  8  instance.  And the services regulations, which are not binding
04:22:37PM  9  on the Corps in any event, do not indicate to the contrary, but
04:22:40PM  10  they clarify that when there is a "no effect" finding, that's
04:22:45PM  11  the end of it.  You don't have to engage in consultation on a
04:22:48PM  12  program or a rule or an action.  No effect is the end of it.
04:22:53PM  13          I just wanted to address two cases that I think are
04:22:57PM  14  analogous to this situation, which the Court may like to look
04:23:00PM  15  at.  There's *Center for Biological Diversity v Department of*
04:23:04PM  16  *Interior*, and that's at 563 F.3d 466, from the DC Circuit, in
04:23:11PM  17  2009.  And that was a challenge to DOI's decision to expand
04:23:14PM  18  leasing on the Outer Continental Shelf for offshore oil and gas
04:23:18PM  19  development.
04:23:19PM  20          The plaintiffs in that case, CBD, argued that DOI
04:23:23PM  21  failed to consult.  But the DC Circuit dismissed plaintiff's
04:23:27PM  22  ESA challenge due to the multistage nature of the leasing
04:23:29PM  23  program, explaining that the first stage of the leasing program
04:23:32PM  24  does not cause any harm because it does not require any action
04:23:36PM  25  or infringe on the welfare of animals, which is, by design,

04:23:41PM  1  only implicated at later stages in the program, each of which

04:23:44PM  2  requires ESA consultation.  And that's at page 43.

04:23:47PM  3        The same is true here.  The Headquarters' action is

04:23:50PM  4  limited to only those Nationwide Permit 12 activities that have

04:23:53PM  5  no effect on species or habitat.  And, later, project-specific

04:23:58PM  6  activities that might effect species or habitat are only

04:24:03PM  7  authorized if and when the project-specific consultation is

04:24:07PM  8  undertaken and the Corps notifies the project proponent that

04:24:11PM  9  it's complete.

04:24:13PM 10        The second case is *NRDC v Department of the Navy*, and

04:24:17PM 11  this is found at 2002 Westlaw 32095131, and it's from the

04:24:23PM 12  Central District of California.

04:24:25PM 13        And, there, the Court confirmed that the Navy did not

04:24:29PM 14  improperly divide its action to avoid consultation.  The action

04:24:34PM 15  at issue is the Navy's Littoral Warfare Advanced Development

04:24:37PM 16  Program, which serves as a framework to oversee and coordinate

04:24:40PM 17  future actions -- in this case, they were sea tests -- that

04:24:44PM 18  would be subject to appropriate ESA analysis on a --

04:24:44PM 19  (video disruption.)

04:24:44PM 20     (Clarification requested by stenographer.)

04:24:47PM 21        MS. BROWN:  -- sea-test-by-sea-test basis.

04:25:16PM 22        The plaintiffs in that case had argued that the

04:25:18PM 23  program frameworks and future sea tests were a single program

04:25:22PM 24  and that the Navy was thus required to consult on that program

04:25:27PM 25  framework and the future tests as a whole, rather than only on

04:25:32PM 1    the individual sea tests.  But the Court disagreed noting that
04:25:36PM 2    an agency has substantial discretion to determine whether a
04:25:39PM 3    program or its component elements are the more appropriate
04:25:43PM 4    object of ESA consultation.
04:25:47PM 5            The Navy had structured its program, like the Corps
04:25:49PM 6    has done with the nationwide permits, to provide for
04:25:51PM 7    consultation with NMFS on the individual sea tests when there
04:25:55PM 8    would be more concrete information available about the location
04:25:57PM 9    of the sea tests and the technology tested.
04:26:01PM 10           The Court found this to be proper, and it stated that
04:26:04PM 11   programmatic consultation was not necessary or worthwhile in
04:26:08PM 12   light of the Navy's pursuit of consultation in connection with
04:26:11PM 13   individual sea tests.  That's precisely what we have here.
04:26:15PM 14           And, finally, if I might just take one minute, I
04:26:18PM 15   wanted to address the necessity of Nationwide Permit 12 for the
04:26:21PM 16   reliable, safe, and affordable delivery of energy.  The
04:26:25PM 17   Coalitions' members are the companies primarily responsible for
04:26:29PM 18   pipeline construction, maintenance, repair, and servicing
04:26:31PM 19   activities that are authorized by Nationwide Permit 12, and
04:26:34PM 20   they have public service obligations to provide service to
04:26:38PM 21   customers which could not be met without this streamline
04:26:41PM 22   authorization.
04:26:42PM 23           As Your Honor pointed out, if we do not have
04:26:44PM 24   Nationwide Permit 12 and we're required to go through the
04:26:47PM 25   individual permit process for each of these activities that

04:26:50PM 1    have only minor impacts, it would really disrupt the entire

04:26:55PM 2    program, as well as be contrary to congressional intent in

04:26:59PM 3    establishing the nationwide permits.

04:27:01PM 4            The vast majority of projects that are authorized by

04:27:03PM 5    Nationwide Permit 12 are minor discharges of dredge or fill

04:27:07PM 6    material associated with small maintenance, repair, and removal

04:27:13PM 7    projects.  They include projects that promote safety, energy,

04:27:16PM 8    resilience and reliability, and those that would help reduce

04:27:18PM 9    greenhouse gas emissions and support the transition to

04:27:18PM 10   renewables.

04:27:21PM 11           So they're critical to the goals of supporting

04:27:25PM 12   pipeline integrity assessment and management activities and

04:27:31PM 13   also pipeline right-of-way upkeep.  These are crucial and

04:27:32PM 14   time-sensitive activities, and the work is often conducted on

04:27:37PM 15   tight schedules mandated by other federal agencies.  We would

04:27:39PM 16   not be able to meet those deadlines without Nationwide Permit

04:27:42PM 17   12.  There would be significant expense and delay, which would

04:27:46PM 18   harm the public, the environment, and our nation's economy,

04:27:50PM 19   energy security, and diversity.  Thank you.

04:27:51PM 20           THE COURT:  Thank you, Ms. Brown.

04:27:54PM 21           Mr. Margolis and Mr. Hayes, I'll give you a brief

04:27:58PM 22   rebuttal.

04:28:04PM 23           MR. MARGOLIS:  Sorry, Your Honor?

04:28:07PM 24           MS. SMITHGALL:  Your Honor --

04:28:07PM 25           THE COURT:  I said I would give you a brief rebuttal.

04:28:07PM  1          MR. MARGOLIS:  Yes, Your Honor.  Thank you.

04:28:07PM  2          THE COURT:  I'm sorry.  Did someone --

04:28:10PM  3          MS. SMITHGALL:  Your Honor, this is

04:28:12PM  4  Kathleen Smithgall --

04:28:12PM  5          THE COURT:  I'm sorry.

04:28:13PM  6          MS. SMITHGALL:  -- for the State of Montana, and I

04:28:13PM  7  was hoping I could just take a moment of your time.

04:28:17PM  8          THE COURT:  I'm sorry, Ms. Smithgall.

04:28:19PM  9          Go ahead, please.  I'll give you a minute.

04:28:20PM 10          MS. SMITHGALL:  Your Honor, I appreciate it.

04:28:22PM 11          Good afternoon.  And, again, my name is Katherine

04:28:23PM 12  Smithgall.  I represent the State of Montana.  I'll be very

04:28:26PM 13  brief.  I just want to note the role of states in this process.

04:28:30PM 14          As the federal defendants have noted, the Corps has a

04:28:32PM 15  limited role.  And the other parts of this process are left to

04:28:36PM 16  the states for them to establish standards and criteria

04:28:39PM 17  specific to their own sovereign interest and needs.

04:28:43PM 18          And as highlighted in the state's briefing and as

04:28:44PM 19  noted by Mr. Swanson, the state retains siting authority over

04:28:48PM 20  the construction of oil pipelines and, more directly, regulates

04:28:52PM 21  oil and natural gas pipeline.

04:28:54PM 22          And Montana, specifically, is in a unique position

04:28:57PM 23  because in undertaking these processes, it must comply with the

04:29:00PM 24  Montana Constitution's right to a clean and healthful

04:29:04PM 25  environment, as well as other statutory mandates.

04:29:06PM  1          Now, really quickly, the Byron pipeline, which

04:29:10PM  2    plaintiffs point to as a purported source of harm, is a good

04:29:13PM  3    example of the state's role with respect to the Corps's Clean

04:29:17PM  4    Water Act obligation.  In that case, DEQ issued a 401

04:29:21PM  5    certification after conducting an independent water quality

04:29:25PM  6    inquiry consistent with Montana's own water quality standards.

04:29:29PM  7    DEQ determined that this project, which will help meet the

04:29:33PM  8    growing demand for power in Montana and the surrounding region,

04:29:36PM  9    would have no impact on the water quality in the Yellowstone

04:29:39PM 10    River.

04:29:40PM 11          So this independent but related regulatory process

04:29:43PM 12    allows the State of Montana to have input into federally

04:29:46PM 13    approved projects that may affect its waters and allows the

04:29:49PM 14    state to apply its own standards.

04:29:52PM 15          Imposing additional requirements on the Corps is

04:29:54PM 16    duplicative of these efforts and threatens the state's role in

04:29:56PM 17    this process by feeding to the federal government power that is

04:30:01PM 18    typically reserved for the states.

04:30:03PM 19          And we ask that this Court grant summary judgment in

04:30:05PM 20    favor of the federal defendants.  Thank you.

04:30:10PM 21          THE COURT:  Thank you, Ms. Smithgall.

04:30:10PM 22          All right.  Now, Mr. Margolis, brief rebuttal.

04:30:15PM 23          And my first question for you, I think you and Mr.

04:30:19PM 24    Hayes both cited the *Environmental Defense Center v Bureau of*

04:30:25PM 25    *Ocean Energy Management* case, the recent Ninth Circuit decision

04:30:27PM 1   regarding the standing analysis.  That decision seems to
04:30:31PM 2   address more in-depth manner the ripeness than standing.
04:30:37PM 3           MR. MARGOLIS:  It does address ripeness, but the
04:30:40PM 4   decision has pertinence to standing because it talks about what
04:30:44PM 5   needs to be established at the time a programmatic -- a
04:30:48PM 6   procedural injury occurs, at the time the actual procedure is
04:30:52PM 7   violated.
04:30:52PM 8           THE COURT:  What are those standards?  What needs to
04:30:54PM 9   be --
04:30:54PM 10          MR. MARGOLIS:  As the Court there said -- let me find
04:30:58PM 11  this in my notes because I want to make sure.  It says that
04:31:01PM 12  "For claims of procedural injury, the need for factual
04:31:03PM 13  development ceases when the alleged procedural violation is
04:31:06PM 14  complete."
04:31:08PM 15          And that's important here because when you are
04:31:10PM 16  talking about a procedural violation for a programmatic action
04:31:14PM 17  that's suppose to occur before project-specific actions occur
04:31:17PM 18  under that program, it's impossible at that stage to identify
04:31:21PM 19  specific program -- projects that are implementing the program.
04:31:24PM 20          But, of course, we then went on to identify some in
04:31:27PM 21  our supplemental standing declarations, meeting the
04:31:31PM 22  requirements of *Summers*.  And, in fact, the defendants were
04:31:36PM 23  talking about how the plaintiffs need to identify a specific
04:31:38PM 24  project.  Well, we did.  That's exactly what we did, even
04:31:41PM 25  though at this stage it's not always possible or even

04:31:47PM  1   necessary, given the -- where we're at, which is that this is a
04:31:51PM  2   need for a programmatic review that's supposed to take place
04:31:56PM  3   before projects are implemented.
04:31:57PM  4            I wanted to address the venue issue real quick.  I'll
04:32:00PM  5   try to be quick here without speaking too fast but --
04:32:04PM  6            Venue was clearly waived.  They were not taking our
04:32:08PM  7   allegations as true in the complaint.  That's an odd way to
04:32:11PM  8   frame it because an answer is supposed to either admit, deny,
04:32:15PM  9   or state that there's not enough information on which to make a
04:32:19PM  10  statement.  They didn't say there's not enough information.
04:32:21PM  11  They specifically admitted that venue is proper.  They didn't
04:32:25PM  12  even set forth venue in their defenses -- potential defenses in
04:32:29PM  13  their answer.  And they didn't preserve their argument.
04:32:32PM  14           At the time their motion for summary judgment was
04:32:35PM  15  filed, the information -- they say that we didn't prove up at
04:32:39PM  16  that time, but we had already filed our summary judgment brief.
04:32:41PM  17  They saw our standing declarations.  So the time for raising
04:32:45PM  18  this was in the answer.
04:32:46PM  19           There was a potential time to raise it in their
04:32:48PM  20  motion for summary judgment, which they failed to do.  So they
04:32:50PM  21  clearly waived the argument.  There's a time to bring a venue
04:32:54PM  22  claim.  That time has passed, and the issue has been waived.
04:32:58PM  23           A couple more points:  One thing, the government
04:33:04PM  24  agreed that here we have -- the plaintiffs have to do some
04:33:07PM  25  digging to find projects because they don't make

04:33:09PM  1   preconstruction notifications public.  And counsel for the
04:33:15PM  2   government specifically talked about how we would need to go
04:33:18PM  3   out there and find these projects out.
04:33:19PM  4        Well, that supports *Havens* standing.  That's exactly
04:33:21PM  5   what *Havens* standing is all about.  If we have to go out there
04:33:23PM  6   and find these things on our own, that takes away from our
04:33:26PM  7   mission to protect listed species and that provides *Havens*
04:33:30PM  8   organizational standing.
04:33:32PM  9        Another statement was made that there's no evidence
04:33:34PM 10   here of "may affect."  The Corps admits that thousands of
04:33:39PM 11   consultations need to take place under Nationwide Permit 12,
04:33:42PM 12   specifically because Nationwide Permit 12 may affect listed
04:33:44PM 13   species.  Just because project-specific consultation will occur
04:33:49PM 14   doesn't mean that the program doesn't affect listed species.
04:33:54PM 15   In fact, it proves that the program affects listed species.
04:33:56PM 16        The statement regarding the 2009 *Center* case and the
04:34:00PM 17   *Department of Navy* cases that are somewhat outliers, that talk
04:34:04PM 18   about how project-specific review might be able to replace the
04:34:08PM 19   need for programmatic consultation, well, that has been, if not
04:34:12PM 20   directly overruled, it's completely inconsistent with this
04:34:16PM 21   Circuit's decision in *Conner v Burford*, but, more recently, in
04:34:21PM 22   the *Environmental Defense Center* case where the Court
04:34:25PM 23   specifically said site-specific review cannot cure a failure to
04:34:28PM 24   consult at the programmatic level, citing *Conner v Burford*, the
04:34:32PM 25   exact same case that Your Honor relied on in the previous

04:34:35PM  1   Nationwide Permit 12 case to find that program-level

04:34:38PM  2   consultation does not replace the need -- or the

04:34:41PM  3   project-specific consultation does not replace the need for

04:34:43PM  4   programmatic review.

04:34:45PM  5          A couple other short points:  There was a comment

04:34:52PM  6   made that the Pamplico pipeline is not a live controversy.

04:34:58PM  7   That is inconsistent with the statements made in the

04:34:59PM  8   government's reply brief, which specifically says that "The

04:35:02PM  9   Corps is in the process of complying with the ESA for this

04:35:06PM 10   proposal," suggesting that, as we stated, that project does

04:35:09PM 11   have effects on listed species.

04:35:11PM 12          And, again, it doesn't matter that they're complying

04:35:12PM 13   with ESA for that specific project because it is the aggregate

04:35:18PM 14   impacts, the cumulative impacts of all the projects under

04:35:21PM 15   Nationwide Permit 12 that create an effect on listed species

04:35:24PM 16   that needs to be addressed at that programmatic level.

04:35:27PM 17          And then, lastly, this reliance on *National Family*,

04:35:34PM 18   the buffers and other restrictions that were used to make a "no

04:35:37PM 19   effect" determination, that's based on a scientific analysis

04:35:41PM 20   that the actual impacts to species wouldn't occur because of

04:35:48PM 21   the exposure -- the amount of exposure to those species.

04:35:50PM 22          That is not what's going on here.  What's going on

04:35:52PM 23   here and what they've tried to say is that they did this

04:35:54PM 24   biological assessment that complied with the procedures of the

04:35:58PM 25   ESA and that they're not relying on future project-specific

04:36:01PM 1   consultations.  That is absolutely not what the biological

04:36:05PM 2   assessment said.

04:36:07PM 3        At NWP3596, this is the conclusion of the biological

04:36:12PM 4   assessment, "The issuance or reissuance of NWPs does not

04:36:15PM 5   require ESA Section 7 consultation because no activities

04:36:20PM 6   authorized by any NWPs may affect listed species or designated

04:36:24PM 7   critical habitat without first completing activity-specific ESA

04:36:28PM 8   Section 7 consultation.

04:36:30PM 9        So while they say the Corps was mindful of this

04:36:31PM 10  Court's order, this shows that it was not.  They just

04:36:36PM 11  reiterated the same exact argument that you rejected in the

04:36:39PM 12  prior case as the conclusion of their biological assessment.

04:36:43PM 13  It didn't provide any actual analysis.  It just reiterated the

04:36:45PM 14  same argument that's already been denied, and that's

04:36:48PM 15  inconsistent with the recent Ninth Circuit decision that we

04:36:50PM 16  presented in *Environmental Defense Center*.

04:36:52PM 17        THE COURT:  How do you respond to Mr. Howell's

04:36:56PM 18  argument about the Ninth Circuit case that came down after the

04:37:01PM 19  *Northern Plains* case?

04:37:03PM 20        MR. MARGOLIS:  First of all, this is the first we're

04:37:05PM 21  hearing about that.  They didn't provide that argument in their

04:37:07PM 22  briefing.

04:37:08PM 23        But, regardless, again, it's inconsistent with this

04:37:10PM 24  Court's decision in *Environmental Defense Center*, which

04:37:12PM 25  specifically says that "project-specific review cannot replace

04:37:16PM  1    programmatic consultation."  That's now been resolved by the

04:37:18PM  2    Ninth Circuit.

04:37:19PM  3             If they said something -- they didn't say anything,

04:37:21PM  4    that I know of, in the *Nation Family* case that is contrary to

04:37:26PM  5    that.  And now the Court has made clear -- the Ninth Circuit

04:37:27PM  6    has made clear that that's simply not how the ESA works.

04:37:31PM  7             THE COURT:  Thank you, Mr. Margolis.

04:37:34PM  8             MR. MARGOLIS:  Thank you, Your Honor.

04:37:35PM  9             THE COURT:  All right.  So that concludes our

04:37:40PM  10   arguments.  This case is submitted.  I'll have an order out

04:37:46PM  11   forthwith.

04:37:47PM  12            Thank you for your time, counsel.  We'll be in

04:37:51PM  13   recess.

04:37:52PM  14        (The proceedings concluded at 4:37 p.m.)

         15

         16                        --o0o--

         17

         18

         19

         20

         21

         22

         23

         24

         25

## REPORTER'S CERTIFICATE

1

2     I, Yvette Heinze, a Registered Professional

3  Reporter and Certified Shorthand Reporter, certify that the

4  foregoing transcript is a true and correct record of the

5  proceedings given at the time and place hereinbefore mentioned;

6  that the proceedings were reported by me in machine shorthand

7  and thereafter reduced to typewriting using computer-assisted

8  transcription; that after being reduced to typewriting, a

9  certified copy of this transcript will be filed electronically

10  with the Court.

11     I further certify that I am not attorney for, nor employed

12  by, nor related to any of the parties or attorneys to this

13  action, nor financially interested in this action.

14     IN WITNESS WHEREOF, I have set my hand at Great Falls,

15  Montana, this 16th day of October, 2022.

16

17                              /s/ Yvette Heinze

18                              _____
                                 Yvette Heinze
19                              United States Court Reporter

20

21

22

23

24

25